IN THE UNITED STATES COURT OF FEDERAL CLAIMS
Bid Protest

| | | |
|---|---|---|
| _____ | ) | |
| ANALYTICAL GRAPHICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 16-1453C |
| | ) | |
| v. | ) | Judge Marian Blank Horn |
| | ) | |
| THE UNITED STATES, | ) | **TO BE FILED UNDER SEAL** |
| | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| APPLIED DEFENSE SOLUTIONS, INC., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| _____ | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' CROSS-MOTIONS FOR JUDGMENT
ON THE ADMINISTRATIVE RECORD, RESPONSE TO DEFENDANTS' MOTIONS
TO DISMISS, AND REPLY TO DEFENDANTS' RESPONSES TO PLAINTIFF'S
<u>MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD</u>**

DLA PIPER LLP (US)

Seamus Curley
DLA Piper LLP (US)
500 Eighth Street, NW
Washington, D.C. 20004
202-799-4403 (direct dial)
202-799-5403 (facsimile)
seamus.curley@dlapiper.com

*Counsel of Record for Analytical Graphics, Inc.*

Dated: February 13, 2017

<u>On the Brief:</u>
Seamus Curley, Partner
Daniel J. Cook, Associate

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

# TABLE OF CONTENTS

I. PLAINTIFF HAS STANDING TO ASSERT ITS
   COMMERCIAL ITEM CLAIMS AND HAS STATED
   CLAIMS UPON WHICH RELIEF CAN BE GRANTED..................................................1

   A. The Statutorily Mandated Preference for Commercial Items
   And The Rule Of Two Are Interpreted Harmoniously By AGI,
   But The Defendants' Interpretations Extinguish
   The Commercial Item Preference. ...............................................................2

   B. The Government's Other Arguments Fail ....................................................8

   C. ADS's Arguments Are Equally Unavailing..................................................8

II. PLAINTIFF'S MOTION FOR JUDGMENT ON
    THE ADMINISTARTIVE RECORD SHOULD BE
    GRANTED AND DEFENDANTS' MOTIONS SHOULD BE DENIED.........................9

   A. Defendants' Arguments in Response to AGI's MJAR and
   in Support of their Cross-MJARs are Inconsistent
   with Applicable Procurement Law and the Administrative Record ...........................9

      1. Count I—The Air Force's Disregard for the
      Statutory Mandated Preference for Commercial Items ...................................9

         i. *FASA and its Implementing Regulations* ...................................10

         ii. *AGI's Solution*...........................................................13

         iii. *The Commerciality of the Air Force's Requirements* ...............................14

      2. Count II—The Air Force's Failure to Modify its Requirements
      to Accommodate Commercial Items ................................................22

      3. Count III—The Air Force's Irrational Decision to Procure a
      Non-Commercial SSA Solution Based on
      the Desire for Broad Intellectual Property Rights............................................24

      4. Count IV—The Air Force's Failure to Negotiate The
      Terms Of AGI's License...................................................27

      5. Count V—The Air Force's Irrational Set-Aside Decision .............................28

      6. Count VI—The Air Force's Failure to Analyze Price as
      Part of the "Rule of Two" Determination ......................................................33

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

      7.      Count VII—The Irrational Award of a Contract to ADS ...............................38

  B.  Defendant and Defendant-Intervenor's Arguments In Response To
      Plaintiff's Request for Permanent Injunctive Relief.....................................................38

III. CONCLUSION AND RELIEF REQUESTED ..................................................................42

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

# TABLE OF AUTHORITIES

CASES

*Adams and Associates, Inc. v. United States*
   741 F.3d 102 (Fed. Cir. 2014) ............................................................. 32

*CEMS, Inc. v. United States*
   65 Fed. Cl. 473 (2005) ....................................................................... 18

*Centech Grp., Inc. v. United States*
   554 F.3d 1029 (Fed. Cir. 2009) .......................................................... 38

*Heritage of America, LLC v. United States*
   77 Fed. Cl. 66 (2007) ......................................................................... 38

*Impresa Construzioni Geom. Domenico Garufi v. United States*
   52 Fed. Cl. 421 (2002) ....................................................................... 18

*John A. Johnson Contracting Corp. v. United States*
   132 Ct. Cl. 645, 132 F. Supp. 698 (1955) .......................................... 19

*Klinge Corp. v. United States*
   82 Fed. Cl. 127 ................................................................................... 32

*OTI Am., Inc. v. United States*
   68 Fed. Cl. 646 (2005) ................................................................. 19, 18

*Pacific Architects & Eng'rs, Inc. v. United States*
   203 Ct. Cl. 499, 491 F.2d 734 (1974) ................................................. 18

*Palantir USG, Inc. v. United States*
   129 Fed. Cl. 218 (2016) ................................................................... 9, 12

*Planet Depos LLC*
   B-411142, May 26, 2015, 2015 CPD ¶ 165 .................................. 34, 35

*Schlesinger v. United States*
   182 Ct. Cl. 571, 390 F.2d 702 (1968) ........................................ 19, 20, 21

STATUTES

10 U.S.C. 2305(a)(1) ............................................................................. 11

10 U.S.C. 2377 ................................................................................. 11, 26

10 U.S.C. 2320 ................................................................................. 27, 24

41 U.S.C. 3306(a) .................................................................................. 11

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

41 U.S.C. 3307 ................................................................................................................11

41 U.S.C. 110 ...............................................................................................10, 11, 12

*Assessing The Implementation Of Public Law 103-55, The Federal Acquisition
Streamlining Act Of 1994* .......................................................................................40

## OTHER AUTHORITIES

13 C.F.R. § 125.6(a)(2) .........................................................................................32, 33

48 C.F.R. § 19.502-2(b) ...............................................................................................33

48 C.F.R. § 252.227-7013, and 48 .........................................................................24, 27

81 Fed. Reg. 34243 ......................................................................................................32

*House Of Representatives*, 104th Cong. 44-45 (1995) (statement of Jere W. Glover, Chief
Counsel for Advocacy, U.S. Small Business Administration) ................................40

FAR Part 10 ..................................................................................................................11

FAR Part 12 ...........................................................................................12, 13, 16, 18

FAR Part 13 ..................................................................................................................18

FAR Part 14 ..................................................................................................................18

FAR Part 15 ..................................................................................................................18

DFARS § 252.227-7014 ..........................................................................................24, 27

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

# I.   PLAINTIFF HAS STANDING TO ASSERT ITS COMMERCIAL ITEM CLAIMS AND HAS STATED CLAIMS UPON WHICH RELIEF CAN BE GRANTED.

Rather than take on the hard facts in the Administrative Record ("AR") or AGI's specific arguments on commerciality, the Government and ADS devote large portions of their legal memorandum to arguing that AGI does not have standing to challenge the Air Force's commerciality determination or that AGI has failed to state a claim upon which relief can be granted.[1]   The Government argues that, as between the Rule of Two analysis and a commerciality determination, "reading the statutes and regulations together harmoniously, we conclude that Congress intended the small business set-aside to be considered first . . .." Government Memorandum at 43-44.   Thus, according to the Government, "when a procurement is set aside, only a small business has standing to challenge the application of the commercial item and non-developmental preference."   *Id*. at 44.   Because AGI is not a small business, "once the small business-set aside is rules proper, both of AGI's remaining claims should be dismissed for lack of standing . . .."   *Id*.[2]   Additionally, the Government argues that AGI has failed to state a claim because, even if it is determined that the Government's requirements can be satisfied by a

---

[1] *See* Government Memorandum at 43, Section III ("The Court Should Dismiss AGI's Competitive [sic] Item Claims"), Subsections A (alleging no standing) and B (assuming standing, alleging failure to state claim).   The Government's memorandum is styled "DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND MOTION TO DISMISS COMMERCIAL ITEM CLAIMS[,]" which makes on reference to responding to AGI's MJAR.   This is fitting, as the Government advances very little by way of substantive argument on commerciality.   Further, as explained in Section II, *infra*, many of AGI's facts and arguments are not addressed at all.

[2] Regarding the Government's reference to "both" of AGI's arguments, the Government states that "AGI makes two claims based upon the statutory preference . . . set forth at 10 U.S.C. § 2377 . . ., and implementing regulations." Government Memorandum at 43.   The Government states that AGI's first claim is that a determination on commerciality must precede a Rule of Two analysis and the second is that the "contracting officer abused her discretion in connection with the market research prior to recommending the small business set-aside."   *Id*.   Thus, it is unclear what the Government means when it says that, if it prevails on the first issue, "both" of AGI's remaining arguments must be dismissed.   For clarity, AGI addresses the Government's arguments within the context of its Complaint and the arguments made in its MJAR.

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

commercial item, there is no legal requirement that this determination factor into the Rule of Two analysis.

ADS arrives at similar conclusions in its legal memorandum, but it does so through a self-invented acquisition framework that relies upon strained statutory and regulatory interpretations as well as inapplicable authorities.

All of the Defendants' arguments lack merit. FASA's mandated preference for commercial items must be implemented prior to a Rule of Two Analysis. Although this appears to be an issue of first impression for the Court, ample authority supports AGI's position.

A.   **The Statutorily Mandated Preference for Commercial Items And The Rule Of Two Are Interpreted Harmoniously By AGI, But The Defendants' Interpretation Extinguishes The Commercial Item Preference.**

FASA's mandate and the requirements for its implementation, which, for defense procurements, are codified at 10 U.S.C. § 2377(a)-(b):

> (a) Preference.—The head of an agency shall ensure that, to the maximum extent practicable—
>> (1) requirements of the agency with respect to a procurement of supplies or services are stated in terms of—
>>> (A) functions to be performed;
>>> (B) performance required; or
>>> (C) essential physical characteristics;
>> (2) such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements; and
>> (3) offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements.
>
> (b) Implementation.—The head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable—
>> (1) acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency;
>> (2) require prime contractors and subcontractors at all levels under the agency contracts to incorporate commercial items or nondevelopmental items

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

other than commercial items as components of items supplied to the agency;

(3) modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items;

(4) state specifications in terms that enable and encourage bidders and offerors to supply commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items in response to the agency solicitations;

(5) revise the agency's procurement policies, practices, and procedures not required by law to reduce any impediments in those policies, practices, and procedures to the acquisition of commercial items; and

(6) require training of appropriate personnel in the acquisition of commercial items.

Section (c) of the statute requires that market research be conducted "to determine whether there are commercial items, or the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items are available that—. . . (A) meet the agency's requirements; . . . (B) could be modified to meet the agency's requirements; or (C) could meet the agency's requirements if those requirements were modified to a reasonable extent."   Section (d) requires and establishes minimum standards for training for those tasked with conducting the referenced market research.  10 U.S.C 10 U.S.C. § 2377.[3]

Pursuant to the preference, if commercial items are available, an agency <u>must</u> purchase them.  *See* FAR 12.101 ("Policy"), which requires that:

Agencies <u>shall</u>—

(a) Conduct market research to determine whether commercial items or nondevelopmental items are available that could meet the agency's requirements;

---

[3] *See* 41 U.S.C. § 3307 for the parallel statutory provision governing civilian procurements.

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

(b) Acquire commercial items or nondevelopmental items when they are available to meet the needs of the agency; and

(c) Require prime contractors and subcontractors at all tiers to incorporate, to the maximum extent practical commercial items or nondevelopmental items as components of items supplied to the agency.

(emphasis added).

FAR 12.102 ("Applicability"), at subsection (a), provides that FAR Part 12 "shall be used for the acquisition of supplies and services that meet the definition of commercial item." Subsection (b) requires that "Contracting officers shall use the policies in this part in conjunction with the policies and procedures for solicitation, evaluation and award prescribed in Part 13, Simplified Acquisition Procedures, Part 14, Sealed Bidding, or Part 15, Contracting by Negotiation, as appropriate for the particular acquisition. Subsection (c) states that:

Contract for the acquisition of commercial items are subject to the policies in other parts of the FAR. When a policy in another part of the FAR is inconsistent with a policy in this part, this part 12 shall take precedence for the acquisition of commercial items.

(emphasis added). In *CGI Federal Inc. v. U.S.*, 779 F.3d 1346 (Fed. Cir. 2015), the U.S. Court of Appeals for the Federal Circuit interpreted FAR 12.102(a) and 12.102(c) as making FAR Part 12's prescription against contract terms inconsistent with customary commercial practices applicable to a FAR Part 8.4 (General Services Administration Federal Supply Schedule) procurement because such procurements, by definition, involve the acquisition of commercial items. *Id.* at 1353-54.

FAR 12.202(a) states that "[m]arket research (see 10.001) is an essential element of building an effective strategy for the acquisition of commercial items and establishes the foundation for the agency description of needs (see Part 11), the solicitation, and resulting contract." FAR 12.202(c) directs contracting officers to "[f]ollow the procedures in Subpart 11.2

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

regarding the identification and availability of specifications, standards and commercial item descriptions." FAR Part 10 ("Market Research") implements FASA and two additional statutes.[4] FAR 10.001 ("Policy"), at Subsection (a)(3), requires that "[a]gencies must— . . . (3) [u]se the result of market research to—(i) [d]etermine if sources capable of satisfying the agency's requirements exist; . . . [d]etermine if commercial items or, to the extent items suitable to meet the agenyc's needs are not available, nondevelopmental items are available that—(A) [m]eet the agency's requirements; . . . (B) [c]ould be modified to meet the agency's requirements; or . . . (C) [c]ould meet the agency's requirements if those modified to a reasonable extent . . .."[5]

FAR 10.002 ("Procedures"), at Subsection (a), states that "[a]cquisitions begin with a description of the Government's needs stated in terms sufficient to allow conduct of market research." Subsection (b) states that "[m]arket research is then conducted to determine if commercial items or nondevelopmental items are available to meet the Government's needs or could be modified to meet the Government's needs." Subsection (b)(1) explains that the extent of market research can vary but that it should include "(i) [w]hether the Government's needs can be met by— . . . (A) [i]tems of a type customarily available in the commercial marketplace; . . . (B) [i]tems of a type customarily available in the commercial marketplace with modifications; or . . . (C) [i]tems used exlucsively for governmental purposes . . .."

---

[4] *See* FAR 10.000 ("Scope of Part"): "This part prescribes the policies and procedures for conducting market research to arrive at the most suitable approach to acquiring, distributing, and supporting supplies and services. This party implements requirements of 41 U.S.C. 3306(a)(1), 41 U.S.C. 3307, 10 U.S.C. 2377, and 6 U.S.C. 796." Two of the four statutory citations are FASA's implementation of the commercial item preference. The other two (41 U.S.C. 3306(a) and 6 U.S.C. § 796) are unrelated to the Rule of Two.

[5] At the time the procurement decisions at issue here were made, FAR 10.001's only reference to small business issues were two citations to "bundling" at Subsection (a)(2)(iv) and Subsection (a)(3)(vi). The FAR was subsequently amended but such amendments were not applicable to this procurement and, in any event, are not controlling on this issue.

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

The second and third listed considerations for market research also relate to the commercial item preference.   *See* FAR 10.002(b)(1)(ii) ("Customary practices regarding customizing, modifying or tailoring of items to meet the needs and associated costs . . .") and FAR 10.002(b)(1)(iii) ("Customary practices, including warranty, buyer financing, discounts, contract type considering the nature and risk associated with the requirement, etc., under which commercial sales of the produces or services are made . . ."). Items (iv), (v), and (vi) contain additional considerations for market research and, finally, item (vii) includes a general reference to the "[s]ize status of potential sources (see Part 19)." Clearly, during market research, consideration of FASA's mandate precedes and takes priority over consideration of size status.

Subsection (b)(2) identifies potential techniques for market research. Subsection (c) states that if, commercial or nondevelopmental items might not be available to satisfy the agency's needs, the agency should "reevaluate the need . . . and determine whether the need can be restated to permit commercial or nondevelopmental items to satisfy the agency's needs." Subsection (d)(1) requires the use of FAR Part 12 if it is determined that an agency's need can be met by "a type of item or service customarily available in the commercial marketplace . . .." Subsection (d)(2) provides for the converse. Finally, Subsection (e) requires that the agency document its determinations.

FAR Part 11 ("Describing Agency Needs"), similar to FAR Part 10, is intended to implement FASA. *See* FAR 11.002 ("Policy") at Subsection (a). It also specifically references implementing the statutorily-mandated preference for commercial items (*see* FAR 11.002(a)(2)(ii)-(iv), but is silent with respect to the Rule of Two. Finally, FAR Part 7 ("Acquisition Planning") lists as the first policy for agencies is to "perform acquisition planning and conduct market research (*see* part 10) for all acquisition in order to promote and provide

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

for— . . . (1) [a]cquisition of commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items, to the maximum extent practicable (10 U.S.C. 2377 and 41 U.S.C. 3307).

By contrast to FASA's express statutorily-mandated preference for commercial items and its elaborate implementation in the FAR, the Rule of Two (FAR 19.502-2(b)) does not exist in statute.  Rather, as explained by the GAO in *Delex Systems, Inc.*, B-400403 (October 8, 2008) and the Court in *Dynamic Educational Inc. v. U.S.*, 109 Fed. Cl. 306 (2013), the Rule of Two implement's 15 U.S.C. § 644(a)'s general language that small businesses receive a "fair proportion of the total purchases and contracts for property and services for the Government."  *See also* 49 Fed. Reg. 40135 (Oct 3. 1984)(explaining same).

The supremacy the Defendants attribute to the Rule of Two is unsupported by statute, regulation, or case law.  Further, their interpretation of the Rule of Two extinguishes FASA's mandated preference for commercial items on these facts.  By contrast, AGI's position gives effect to both.  That is, if a procuring agency's requirement can be satisfied by commercial items, the procuring agency must proceed under FAR Part 12.  The Rule of Two analysis still must be applied, however, to determine whether the contemplated commercial item acquisition should be set aside.  Thus, contrary to the Defendant's arguments, AGI does not look to eliminate the Rule of Two.  Rather, AGI's position is that, pursuant to the authorities above, commerciality must be determined first.  Further, on these facts, the Defendants' interpretation would violates FAR 12.102(c), because it would render application of FAR Part 19 inconsistent with FAR Part 12.102(a)'s requirement that FAR Part 12 be used in the event that the item being purchased satisfies the definition of a commercial item under FAR 2.101.

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

B.      **The Government's Other Arguments Fail**.

The priority established by the above authorities is clear.   The commerciality determination must come first.  However, the Government also argues that policy considerations favor its reading because, if the Government errs by conducting a set aside, then FAR 19.502-2(a) contemplates a new competition on a full and open basis.   However, the prejudicial procurement decisions challenged by Counts I and II here would not be addressed by this result. Rather, the finding of non-commerciality is the central error being challenged.  It would be a prejudicial error even if it were made not within the context of a set aside.  Further, here, this arbitrary decision is the central determination resulting in the Air Force's set-aside decision. Clearly, the Government's argument fails and AGI has standing to challenge the Air Force's commerciality determination.

Finally, the Government argues that there is no legal requirement that a commercial item decision must be "imported into the Government requirement before any small business set-aside may be considered."   Gov't MJAR at 52.    However, as the authorities discussed above demonstrate, the commerciality determination must be made first, which in turn informs the Rule of Two Analysis.   For these reasons, AGI clearly has standing to challenge the Government's commerciality determination.

C.      **ADS's Arguments Are Equally Unavailing**.

ADS   argues that FASA and FAR Part 12 are subject to other statutes, including the Small Business Act.  ADS's MJAR at 19-30.  However, ADS ignores the plain language of FAR 12.102(c).  Further, ADS relies upon multiple authorities that have nothing to do with the Rule of Two, including 15 U.S.C. § 644(e)(1) and 644(g)(1)(B).   Similarly, 10 U.S.C. § 2323's five percent small business goal is irrelevant and, incidentally, can be in part satisfied by small

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

business subcontracting spend.  ADS continues by overstating the relevance of *Adam & Assocs. v. U.S.*, 741 F.3d 102 (Fed. Cir. 2014) to this issue and by erroneously suggesting that the market research and acquisition planning provisions of the FAR are intended to implement the Rule of Two.  As set forth above, they clearly are not.  However, they clearly do implement FASA.

For all the reasons stated, the priority and sequence is clear from the statutes and implementing regulations.  Commerciality must come first.  As such, AGI has standing to maintain its commercial item arguments.

**II.**     **PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTARTIVE RECORD SHOULD BE GRANTED AND DEFENDANTS' MOTIONS SHOULD BE DENIED.**

**A.**     **Defendants' Arguments In Response To AGI's MJAR And In Support Of Their Cross-MJARs Are Inconsistent With Applicable Procurement Law And The Administrative Record.**

AGI established success on the merits in its MJAR.  The Government and ADS have failed to rebut many of AGI's arguments or take on the difficult facts in any meaningful way. Instead, they advance arguments in their Responses and in support of their cross-MJARs that are inconsistent with governing law or contradicted by the record.  Accordingly, AGI's motion should be granted and the Defendants' should be denied.

**1.**     **Count I—The Air Force's Disregard for the Statutory Mandated Preference for Commercial Items.**

AGI argued in its MJAR that the Air Force violated the law by conducting this procurement on a non-commercial item basis because: (1) FASA and its implementing regulations, as interpreted by this Court in *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218 (2016), require agencies to procure commercial items "to the maximum extent practicable"; (2) the Air Force's SSA requirements were commercial item in nature; and (3) AGI provides a

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

commercial SSA solution that satisfies all of the Air Force's requirements. *See* AGI MJAR at 20-27.  The Government's and ADS's contrary arguments are unavailing.

### i.    *FASA And Its Implementing Regulations.*

Both the Government and ADS take the position that the Air Force did, in fact, satisfy FASA's requirements because the Air Force "enabled and encouraged offerors to supply commercial <u>and non-developmental items</u>," (emphasis added) and because ADS and ExoAnalytic, allegedly offered non-developmental items.  *See* Gov't MJAR at 53; ADS MJAR at 35-36.  This argument is legally flawed because FASA includes a *preference within the preference* for commercial items over non-developmental items.  This argument is factually flawed because neither ExoAnalytic's nor ADS's proposed solutions constituted non-developmental items.

Regarding the legal issue, "non-developmental items" are defined in 41 U.S.C. § 110 as:

> (1) a commercial item;
>
> (2) a previously developed item of supply that is in use by a department or agency of the Federal Government, a State or local government, or a foreign government with which the United States has a mutual defense cooperation agreement;
>
> (3) an item of supply described in paragraph (1) or (2) that requires only minor modification or modification of the type customarily available in the commercial marketplace to meet the requirements of the procuring department or agency; or
>
> (4) an item of supply currently being produced that does not meet the requirements of paragraph (1), (2), or (3) solely because the item is not yet in use.

FAR 2.101 provides an independent definition for commercial item.  As such, it conforms the definition of "non-developmental item" to mean "[a]ny previously developed item of supply used <u>exclusively</u> for governmental purposes by a Federal agency, a State or local government, or

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

a foreign government with which the United States has a mutual defense cooperation agreement." (emphasis added).  Thus, by definition, all commercial items are non-developmental items, but not all non-developmental items are necessarily commercial items.

FASA and its implementing regulations make clear that there is a hierarchy between (a) commercial items and (b) non-commercial item non-developmental items (*i.e.*, the items at 41 U.S.C. § 110(2), (3), and (4)).  *See* 10 U.S.C. § 2377(b)(3) ("The head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable—modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items.") (emphasis added).

Consistent with this, FAR 7.102(a)(1) provides that "[a]gencies shall perform acquisition planning and conduct market research (see part 10) for all acquisitions in order to promote and provide for— . . . [a]cquisition of commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items, to the maximum extent practicable (10 U.S.C. 2377 and 41 U.S.C. 3307) . . ..".  Additionally, FAR 7.103(b) provides that "[t]he agency head or a designee shall prescribe procedures for— . . . [e]ncouraging offerors Encouraging offerors to supply commercial items, or to the extent that commercial items suitable to meet the agency needs are not available, nondevelopmental items in response to agency solicitations (10 U.S.C. 2377 and 41 U.S.C. 3307) . . ..".

Similarly, FAR 10.001(a)(3)(ii) provides that "[a]gencies shall— . . . [u]se the results of market research to— . . . [d]etermine if commercial items or, to the extent commercial items suitable to meet the agency's needs are not available, nondevelopmental items are available that— . . . [m]eet the agency's requirements . . . [c]ould be modified to meet the agency's

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

requirements; or . . . [c]ould meet the agency's requirements if those requirements were modified to a reasonable extent . . .."   Additionally, FAR 11.002(a)(2)(v)   states that, "[i]n fulfilling requirements of 10 U.S.C. 2305(a)(1), 10 U.S.C. 2377, 41 U.S.C. 3306(a), and 41 U.S.C. 3307, agencies shall— . . . [t]o the maximum extent practicable, ensure that acquisition officials— . . . [m]odify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, <u>to the extent that commercial items suitable to meet the agency's needs are not available</u>, nondevelopmental items.") (emphasis added).

Thus, assuming solely for the purposes of argument that ExoAnalytic and ADS were proposing to supply non-developmental items (a proposition belied by the record), a determination to purchase non-developmental items violates FASA if the requirement could be satisfied by a commercial item.  This Court made clear in *Palantir* that agencies do not satisfy FASA simply by "enabling and encouraging offerors" to supply commercial items.  Rather, this Court explained that FASA's use of the language "to the maximum extent practicable," requires agencies to "make serious and genuine efforts to review the availability of commercial products to meet their needs." 129 Fed. Cl at 269.  Consistent with this, pursuant to FAR 12.102(a), if commercial items are available to satisfy an agency's requirement, the agency must conduct a FAR Part 12 procurement—regardless of whether non-commercial—but non-developmental—items exist that would satisfy the requirement.

Regarding the factual issue, based on the definition of a "non-developmental item" in 41 U.S.C. § 110 and FAR 2.101, ExoAnalytic's proposed solution was not a non-developmental item.  Indeed, although the Air Force equivocated on this point, ExoAnalytic indicates that is proposed SSA solution constitutes a commercial item and that it was offered for sale to the private sector and had been so sold in the past. Tab 25 AR353.  Regarding ADS, nothing in its

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

RFI responses, Industry Day presentation, or proposal in response to the JICSpOC Solicitation characterizes its SSA solution as a non-developmental item.  *See*, Tab 24 AR300 (ADS RFI responses addressing question regarding the commerciality of ADS's solution and explaining that "[t]he definition of the product in the Salient Characteristics is not available to the general public and as such would not meet these criteria); Tab 28 AR417 (ADS Industry Day Slides explaining that ADS has a civil space and commercial space portfolio); *see also* Tab 69a (no references ADS proposal in response to final solicitation describing proposed solution as a non-developmental item).

In sum, because the Air Force's requirements could be satisfied by a commercial item, they had to be procured under FAR Part 12.  AGI's and ExoAnalytic's proposed solutions did not constitute non-developmental items.  Even assuming they did solely for the sake of argument, however, there is a preference within the preference and the Air Force was required to purchase on a commercial item basis if possible.

### ii.   *AGI's Commercial SSA Solution.*

The commerciality of AGI's SSA Solution is not in dispute.  The CO testified that AGI's ComSpOC Subscription Service, including technical support, the SSA Software Suite, and the BMC2 Software are all commercial items.  *See* Tab 108 AR2782-83 and 2787-88.  In its memorandum, the Government has not disavowed these admissions.  Moreover, the Government now admits that <u>that AGI could, in fact, satisfy this requirement</u>.  *See* Gov't MJAR at 57 ("No one has ever disputed that AGI has the capability to meet the Government requirement; the market research report identified AGI as one of the eight capable vendors.").[6]  Rather, as

---

[6] Although the Government admits AGI could satisfy of the Air Force's requirements, the Government also asserts that "AGI reported that AGI was capable of performing the services listed in the draft PWS attached to the May 2016 RFI, but AGI did not cite its commercial item subscription service, COMSpOC, or its GSA schedule contract

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

addressed below, the Government continues to drive a fictional wedge between AGI's commercial SSA Solution and the Air Force's requirements.

By contrast, ADS alleges that AGI's solution is not a commercial item because there is absence of a competitive market commercial market for SSA services.  ADS MJAR at 30-31.  However, AGI has established—and the Air Force has admitted—that AGI's commercial SSA Solution meets the definition of a commercial item.  Further, AGI provided information on commercial sales (*see, e.g.*, Complaint ¶ 88 and Tab 26 AR364-65), as did other offerors during the market research phase.  Given this, ADS's argument lack merit.[7]

### iii.  *The Commerciality Of The Air Force's Requirements.*

In response to AGI's assertions that the Air Force's requirements are commercial item in nature, the Government argues that commercial SSA products could not satisfy the Government's needs because "[n]o product includes CDRLs, and compliance with detailed military guidance documents, and unlimited data rights, and services related to the analysis of military threats."  Gov't MJAR at 54.  The Government similarly asserts that "[n]o one provides CDRLs and tailors services to a classified environment in the commercial marketplace, and no one performs military threat analysis in the commercial marketplace.  Items of this type are not built for commercial use.  Similarly, no one offers unlimited data rights for its SSA software in the commercial marketplace: that is not the type of product offered commercially."  *Id.* at 55.

---

for engineering services, as the vehicle for satisfying the services requirements."  Gov't MJAR at 21-22.  ADS similarly argues that "AGI did not cite its GSA schedule contract to the Air Force."  ADS MJAR at 34 n. 6.  These statements are inaccurate.  AGI's RFI response plainly referenced both the ComSpOC Subscription Service and AGI's GSA Engineering services.  *See* Tab 35 AR537-38.

[7] Interestingly, in arguing that AGI's commercial SSA Solution is not a commercial item, ADS asserts that its proposed solution <u>does</u> qualify as a commercial item.  ADS MJAR at 23 n. 4 ("AGI's solution does not meet the commercial item requirement, and non-developmental items proposed by ADS and Exo are commercial items.").  The basis for this unsupported assertion is unclear, especially given that ADS affirmatively stated in its RFI response that its solution is not a commercial item.  Tab 24 AR300 (ADS explaining its solution is not a commercial item).  Additionally, in these proceedings, ADS has already stipulated that its proposed solution does not constitute a commercial item.  Stipulated Fact 91.

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

In the contemporaneous procurement record, the CO alleged eight factors rendered the Air Force's requirement non-commercial:  (1) limited commercial data solutions are available; (2) the required services are not found in the commercial marketplace; (3) unique hardware requirements; (4) the Government's desire for broader data rights; (5) commercial solutions focus on "safety of flight"; (6) most vendors could not provide commercial price lists or commercial customers for software; (7) DoD and Air Force regulations governing the requirement; (8) the need for integration into national security operations. AGI MJAR at 16 (*citing* Tab 108 AR2838-2839, 2851-2852).  During her deposition, the CO identified factor (9), "contract-type," as additional support for her non-commerciality determination.  *See* Tab 108 at 2880-2881.  Now, for the first time, the Government has identified a new factor (factor (10))— Contract Data Requirement Lists ("CDRLs")—to support its non-commerciality determination.

In its MJAR, AGI addressed in detail that none of these proffered justifications withstand scrutiny.   AGI MJAR at 27-32.   In its cross-MJAR, the Government fails to provide any response to AGI's arguments regarding factors (1), (3); (5); and factor (6).   Additionally, regarding factor (4) (the Government's desire for broader data rights), as detailed in Section A.3, *infra*, although the Government indirectly references this issue in its cross-MJAR, it provides no substantive response to AGI's allegations.  For the remaining factors, including the new one, the Government's arguments are thoroughly unpersuasive.

With regard to factor (7) (DoD and Air Force regulations governing the requirement), the Government simply states in conclusory terms that no commercial product requires compliance with detailed military guidance documents. Gov't MJAR at 54.  However, as was established by AGI's MJAR, none of the government-specific compliance documents render the underlying requirement non-commercial or are otherwise incompatible with a commercial item contract.

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

AGI MJAR at 30-31, 31 n. 7.   Indeed, AGI identified several commercial item solicitations available publicly on FedBizOpps.gov that incorporate some of the guidance documents at issue. Neither the Government nor ADS address these arguments.

With regard to factor (8) (the need for integration into national security operations), AGI explained in its MJAR that commercial contracts under FAR Part 12 regularly require system integration related to national security and, in fact, integration into national security operations was and is necessary on other AGI commercial item contracts, including the prior AGI Contract with the Air Force.   The national security overlay neither extinguishes the statutorily mandated preference for commercial items nor changes the analysis as to whether the type of items being purchased constitute commercial items  Again, neither the Government nor ADS address this issue.

As noted, the Government and ADS claim for the first time that the CDRLs listed in the PWS make the SSA requirement non-commercial.   These CDRLs are: (1) a Performance and Manpower Status Report (DI-FNCL-80912); (2) a Conference Report (DI-ADMN-81308A); (3) a Quality Program Plan (DI-QCIC-81379); and (4) a Contingency Operations Plan (DI-MGMT-80004A).   *See* Tab 32b AR506.34.   The description of these CDRLs, taken from a public database of Military, DoD, NASA, DOE, and Government specifications, standards, handbooks, and publications, are below:

- Performance and Manpower Status Report (DI-FNCL-80912):   "The Performance and Cost Report provides current status and projected requirements of funds, man-hours, and work completion. The report is used for evaluation of contractor progress."   *See* http://everyspec.com/DATA-ITEM-DESC-DIDs/DI-FNCL/DI-FNCL-80912_4892.

- Conference Report (DI-ADMN-81308A): "To document for the Government, significant understanding, directions request, recommendations or suggestions that are discussed during a conference with the contractor and the authorized Government representative(s)."   *See* http://everyspec.com/DATA-ITEM-DESC-DIDs/DI-ADMN/DI-ADMN-81308A_5986.

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

- Quality Program Plan (DI-QCIC-81379): "This plan is used to document the details of a contractor's quality system." *See* http://everyspec.com/DATA-ITEM-DESC-DIDs/DI-QCIC/DI-QCIC-81379_50605.

- Contingency Operations Plan (DI-MGMT-80004A: "The management plan describes the contractors organization, assignment of functions, duties, and responsibilities, management procedures and policies, and reporting requirements for the conduct of contractually-imposed tasks, projects, or programs. This Data Item Description (DID) contains format and content preparation instructions for the data product generated by the specific and discrete task requirement as delineated in the contract. This DID may be applied in any contract or program phase where the contract management is under the direction and control of the contractor." *See* http://everyspec.com/DATA-ITEM-DESC-DIDs/DI-MGMT/DI-MGMT-80004A_4408.

Other than stating in conclusory terms that these requirements render the Air Force's SSA needs non-commercial, neither the Government nor ADS provide any explanation as to *why* these documents allegedly do so. Plainly, the descriptions of these requirements demonstrate that they are <u>not</u> unique to non-commercial item procurements. Further, Air Force's incorporation of CDRLs into the Solicitation did not render the underlying requirement non-commercial. Rather, the requirement either is or is not commercial—regardless of administrative inclusions by the CO.

Finally, regarding factor (2) (allegedly non-commercial services), in its MJAR, AGI thoroughly debunked each of the services alleged by the CO during her deposition to constitute non-commercial services. AGI MJAR at 24-25. In its cross-MJAR, the Government attempts to distance itself from the CO, who ultimately made the commerciality determination, by explaining that "the contracting officer lacked the technical expertise to conduct the Industry Day discussions, and relied upon the technical expertise of the program manager at the time, Lt. Col. Calabrese," Gov't MJAR at 19, and "the contracting officer did not have the technical expertise to understand the details of services sought by the Government, or how those services differed from the capabilities of the data/software products," *id.* at 55. *See also* Gov't MJAR at

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

23 ("[T]he contracting officer discussed the need for specific non-commercial services in addition to data/software products with Lt Col Calabrese in May 2016, but the contracting officer relied upon Lt Col Calabrese's advice without achieving a detailed understanding of the technical distinctions.").   The Government argues that the CO "relied upon advice from her technical experts that such services were not available in the commercial marketplace."

In making these admissions, the Government undermines its argument that the CO properly exercised discretion and establishes arbitrary and capricious conduct.  It is a contracting officer's responsibility to make a commerciality determination, and that responsibility cannot be delegated to other agency personnel.  FAR 12.102(b) ("*Contracting officers* shall use the policies in this part in conjunction with the policies and procedures for solicitation, evaluation and award prescribed in Part 13, Simplified Acquisition Procedures; Part 14, Sealed Bidding; or Part 15, Contracting by Negotiation, as appropriate for the particular acquisition.") (emphasis added); DFARS 212.102 (2013) ("(a)(i) When using FAR part 12 procedures for acquisitions exceeding $1 million in value ... the *contracting officer* shall—(A) Determine in writing that the acquisition meets the commercial item definition in FAR 2.101 or meets the criteria at FAR 12.102(g)(1); (B) Include the written determination in the contract file . . ..") (emphasis added).

Although a CO may obtain the advice of others, the CO still must "put his own mind to the problems and render his own decisions." *CEMS, Inc. v. United States*, 65 Fed. Cl. 473, 479 (2005); *Pacific Architects & Eng'rs, Inc. v. United States*, 203 Ct. Cl. 499, 518, 491 F.2d 734, 744 (1974); *see also Garufi*, 52 Fed. Cl. at 427 (CO acted unreasonably by relying on the technical evaluation board's recommendation without independently investigating or verifying the information provided to him); *OTI Am.*, 68 Fed. Cl. at 658 (finding decision by CO to be abuse of discretion because "she did not exercise her discretion, but rather she applied the

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

determinations and conclusions reached by her technical evaluation team"); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 52 Fed. Cl. 421, 427 (2002) (holding that, where CO ha authority to make discretionary decision, such discretion should be exercised independently and in an informed manner); *see also OTI Am., Inc. v. United States*, 68 Fed. Cl. 646, 657-58 (2005) (stating that the decision of the CO "shall represent [his] independent judgment").

If a CO fails to exercise his or her own independent judgment, it represents an abdication rather than an exercise of discretion. *See Schlesinger v. United States*, 182 Ct. Cl. 571, 583-84, 390 F.2d 702, 709 (1968); *John A. Johnson Contracting Corp. v. United States*, 132 Ct. Cl. 645, 658-60, 132 F. Supp. 698, 704-05 (1955).   This is especially true where the contract [or regulation] "single[s] out the contracting officer as the official to decide that particular question." *Schlesinger*, 182 Ct. Cl. at 583.

In considering commerciality, it was permissible—indeed, responsible—of the CO to communicate with technical experts.   However, such communication should have been to gain an understanding of the technical requirements in a sufficient manner to permit the CO to interpret the market research and to determine whether existing commercial solutions could satisfy the Air Force's requirement.   It was arbitrary and capricious for the CO to instead simply accept the determination of Lt. Col. Calabrese that the services required for the procurement are not available in the commercial marketplace.   Lt. Col. Calabrese is not equipped to make such a determination.   Further, he never—and thus the CO never—considered whether the services constituted "of a type" services under the commercial item definition (which, at a  minimum, they clearly do).   In short, the CO effectively delegated her commerciality determination to Lt. Col. Calabrese in violation of applicable law.

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

Regarding the commercial services versus non-commercial services issue, the Government's primary support for its position is a December 5, 2016 Declaration from Lt. Col. Calabrese, who states he authored the Performance Work Statement ("PWS") on the contested RFP.   Specifically, Lt. Col. Calabrese states that he was the "requirement author for a requirements document at issue" in this protest.   *See* Calabrese Dec. ¶ 1.   Additionally, he states that, "[o]ver the course of five months between January and June 2016, I authored the government's requirements in the form of the Performance Work Statement." *Id.* at ¶ 6.

Notably, during the predecessor GAO protest, the Air Force submitted an Affidavit from the Program Manager, Timothy K. Roberts, who stated "I am the program manager for the NG SSA acquisition and am also the source selection board (SSEB) chairman.   As the program manager, I am responsible for stating the requirements for the NG SSA acquisition in the form of the Performance Work Statement ('PWS')." *See* Tab 46 AR698.   The specific role these two individuals played with respect to the PWS is not clarified by the Government.   Further, Lt. Col. Calabrese's Declaration was prepared in the heat of litigation and includes *post hoc* arguments not addressed in the contemporaneous record.   As such, the Declaration should be afforded very little weight.[8]

In paragraphs 7 – 16 of his Declaration, Lt. Col. Calabrese identifies specific services in the ADS Contract PWS that allegedly cannot be satisfied by commercial SSA solutions. However, Lt. Col. Calabrese' Declaration offers an incomplete analysis that is, any event, belied by the Administrative Record.   To illustrate, in the predecessor GAO protest, AGI included as an

---

[8] The Government's reliance on this document is ironic, given that, in setting forth the legal standard for judgment on the administrative record, the Government states that "[p]ursuant to RCFC 52.1, this Court reviews an agency's procurement decisions to determine whether they are supported by the already-existing administrative record . . . Pursuant to this narrow, deferential standard, the focal point for judicial review should be the administrative record already in existence, not some record made initially by the reviewing court."  Gov't MJAR at 34 (internal citations omitted).

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

exhibit to a Declaration by the company's President, Joseph Sheehan, a matrix which explained how AGI had satisfied each requirement in the PWS on commercial contracts or government commercial item contracts, including the AGI contract.  Tab 60 AR769-78.  The Declaration attached to the matrix drew correlations between the matrix and AGI's RFI responses.  *Id.* at 764-67.  The Government never addressed the substance of the matrix in its pleadings before the GAO, nor has the Government addressed the matrix in its cross-MJAR.  Further, Lt. Col. Calabrese' Declaration, in identifying allegedly non-commercial services, offers no position or analysis on why AGI's assertions, which are backed by historical performance, are inaccurate.

Instead, Lt. Colonel Calabrese makes conclusory statements regarding the services at issue without any specific references to market research.  Along these lines, Lt. Col. Calabrese does not appear on any of the relevant contemporaneous procurement documents.  *See, e.g.*, Tab 36 AR579 (Memorandum for Record on Government Purpose Rights and Noncommerciality, signed by CO but not signed by Lt. Col. Calabrese); Tab 38 AR592 (National Security J&A signed by CO and others but not signed by Lt. Col. Calabrese); Tab 39 AR604 (Market Research Report signed by CO and Program Analyst but not Lt. Col. Calabrese); Tab 44 AR688 (Acquisition Plan signed by CO and six other agency personnel but not Lt. Col. Calabrese).

In light of the foregoing, again, Lt. Col. Calabrese's Declaration should be afforded very little, if any, weight.  To the extent the Court wishes to consider the Declaration, however, AGI has submitted as Appendix 1 a February 13, 2017 Declaration by Mr. Sheehan, which addresses the statements made by Lt. Col. Calabrese.[9]  Mr. Sheehan's Declaration explains some of the terms used Lt. Col. Calabrese's Declaration and provides context for Lt. Col. Calabrese's Declaration.  More importantly, Mr. Sheehan's Declaration confirms what the Administrative

---

[9] Concurrently with this filing, AGI has filed a motion seeking leave to file the Declaration of Mr. Sheehan.

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

Record already establishes—that services at issue are either commercially available or "of a type" services that qualify as commercial items.  In sum, the Air Force's requirements could be satisfied with a commercial SSA solution.  As such, AGI is entitled to judgment on the Administrative Record with respect to Count I and the Defendants' cross-MJAR should be denied.

### 2. Count II—The Air Force's Failure to Modify its Requirements to Accommodate Commercial Items.

In its MJAR, AGI demonstrated that the Administrative Record shows that the Air Force violated the law by failing to modify, or consider modifying, its requirements in a manner that would allow the Air Force to take advantage of available commercial SSA solutions.  AGI MJAR at 32-38.  The Government does not dispute that under FASA, agencies are required to modify their requirements to accommodate commercial items.  Rather, the entirety of the Government's substantive response to this allegation is that the CO testified that the requirement could not be split because "the provider had to understand the software given the urgency of the requiring."  Gov't MJAR at 57 (citing AGI MJAR at 36).[10]

As an initial matter, the Government's response ignores the fact that splitting the commercial commodity components of the requirement from the allegedly non-commercial services is just one of the ways the CO could have modified the Government's requirements.  As AGI asserted in its MJAR, the CO could have also considered modifying the services themselves in a way that would allow for the procurement of the full SSA solution—or a substantial portion of it—on a commercial item basis.  The Government does not address this issue, nor does the AR

---

[10] ADS contends that the Air Force was not required to modify its requirements to accommodate commercial items because FASA's statutory mandate can be satisfied by procuring non-developmental items.  ADS MJAR at 35-36.  ADS contends that its solution and ExoAnalytic's solution are both non-developmental in nature, so the Air Force satisfied this requirement.  This erroneous proposition is addressed in Section I.A.1.i, *supra*.

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

contain any evidence that the CO considered modifying the allegedly non-commercial as required under FASA.

Notably, in addressing AGI's arguments under Count II, the Government completely ignores the facts that (1) 71 percent of the total requirement on this procurement was, according to the Air Force, for commodity items, which the CO testified could be satisfied by commercial items, Tab 44 AR682 (Acquisition Plan); Tab 43 AR672 (DD 2579); Tab 108 AR2882 (CO testifying that the hardware, software, and data lines were all commodities); Tab 108 AR 2884 (CO testifying that software and subscription service were commodities); and (2) the CO testified that AGI's ComSpOC Subscription Service, SSA Software Suite, and BMC2 Software Suite are commercial items that could satisfy the Air Force's commodity requirements, Tab 108 AR2783 ("I still consider ComSpOC a commercial item."); Tab 108 AR2811-12 ("I believe the SSA suite as it pertains to the ComSpOC subscription service, it's a commercial item . . . BMC2 software was part of the ComSpOC subscription service, so yes, I did believe it was a commercial item.").

With regard to the remaining 29 percent of the requirement—the allegedly non-commercial services—the Government now admits that AGI could, in fact, satisfy this requirement. *See* Gov't MJAR at 57 ("No one has ever disputed that AGI has the capability to meet the Government requirement; the market research report identified AGI as one of the eight capable vendors.").

To summarize, the CO determined that 71 percent of its requirements could be satisfied by available commercial items and that AGI, a commercial item contractor, could perform the remaining 29 percent of the non-commercial item services requirement. The CO testified that that having a single contractor perform all aspects of the contract was important because she

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

wanted "the contractor to be able to hit the ground running at the time and . . .to know the software and to be able to operate the software . . .." Tab 108 AR2891.  However, the CO opted to conduct the procurement on a non-commercial item basis rather than on a commercial item basis.  Simply stated, this course of action is unjustified under the law.

Further, the AR establishes that the CO gave no meaningful consideration to how the allegedly non-commercial service requirements could be modified to accommodate commercial services (even though the Government now admits AGI could meet these requirements).  This too is a clear violation of the law.

### 3. Count III—The Air Force's Irrational Decision To Procure A Non-Commercial SSA Solution Based On The Desire For Broad Intellectual Property Rights.

In Count III of its Complaint, AGI asserted that the Air Force's decision to procure a non-commercial SSA solution in order to obtain broader intellectual property rights violates 10 U.C.S. § 2320, 48 C.F.R. Subpart 227.71, 48 C.F.R. Subpart 227.72, 48 C.F.R. § 252.227-7013, and 48 C.F.R. § 252.227-7014.  In response to the Count, the Government simply parrots the CO's statements that broader data requirements necessitated a non-commercial item solution. Gov't MJAR at 57.  Importantly, the Government does not even attempt to address AGI's legal argument—namely, that under FASA, the FAR, and the DFARS, an agency's desire for broader data rights is incidental to the underlying determination of whether the agency's requirement is commercial item in nature.  Indeed, the Government does not even address—let alone cite to— the key statutory and regulatory provisions cited by AGI in its Complaint and MJAR: 48 C.F.R. Subpart 227.71, 48 C.F.R. Subpart 227.72, 48 C.F.R. § 252.227-7013, and 48 C.F.R. § 252.227-7014.

Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order

By contrast, although factually and legal deficient, ADS provides a direct response to the arguments raised by AGI in Count III.  ADS attacks the underlying factual premise of AGI's Count III—namely, that the CO's decision to conduct this procurement on a non-commercial item basis was motivated in "significant" part, by a desire for broader data rights.  *See* ADS Brief at 37 n. 7 ("AGI repeats this 'significant' canard in its brief on p. 44 and then doubles down on p. 46, contending that the Contracting Officer 'chose to conduct the procurement on a non-commercial item basis *because* AGI did not offer the type of' license required by the Air Force to meet its needs. These statements are not supported in the record in any way. They are hyperbole at best, and a false spin at worst.").

ADS's argument is puzzling given that ADS stipulated to the fact that "[u]ltimately, four factors were <u>most important to the contracting officer's opinion</u> that the full requirement could not be met by a commercial item.  The four factors were . . .(3) the types of data rights sought were not available in the commercial marketplace . . .."  Stipulated Facts (Defendant and Intervenor  assertion) 109 (internal citations omitted) (emphasis added).  In any event, the contemporaneous procurement record and the CO's deposition testimony leave no doubt that the desire for data rights was one of the primary factors motiving the CO's decision to conduct this procurement on a noncommercial item basis.  *See*, *e.g.*, Tab 44 AR684 (Acquisition Plan explaining  Air  Force's  desire  for  broader  data  rights  supported  non-commerciality determination).

As to AGI's legal arguments in support of Count III, ADS argues that these are "straw man arguments."  ADS Brief at 37.  Relying on the same DFARS provisions cited by AGI, the crux of ADS's argument appears to be that, if the Government cannot immediately identify a commercial  contractor  whose  license  provides  the  types  of  data  and  software  rights  the

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

Government desires, then the Government's requirements are *per se* noncommercial.  However, this is circular logic, as it erroneously presupposes that the Government's desire for broad data rights should inform the underlying determination regarding the commerciality of its requirements.  As AGI argued in its Complaint and its MJAR, the Air Force was required to define its requirements in terms of "(A) functions to be performed; (B) performance required; or (C) essential physical characteristics."  10 U.S.C. § 2377(a)(1).  As the FAR and DFARS make clear, once the Air Force determined that its requirements were commercial, it was obligated under law to purchase the necessary data and software under the licenses customarily provided to the public.  *See* FAR 12.212(a), DFARS 227.7202-1(a), DFARS 227.7102(a), DFARS 227.7202-1(c)(1)-(2).

Finally, ADS argues that:

> AGI's entire argument conflates the data to be produced by this contract, such as space object tracking deviation, with the software a contractor needs to generate the contract.  The contract does not require the awardee to deliver software to the Air Force.  Rather, it calls for the collection and automatic processing of Space Situational Awareness data.  This data, or recorded information of a scientific or technical nature, is technical data to be produced for this contract in which the Air Force must have unlimited rights in [*sic*] pursuant to 252.227-7013(b)(1)(ii).

ADS Brief at 38-39.[11]

This argument echoes a claim made by the Air Force during the GAO proceeding, which AGI thoroughly rebutted on two grounds.  *See, e.g.*, Tab 62 AR795 (Air Force supplemental comments before the GAO) Tab 65 AR813 (AGI's response to same).  First, ADS's claim that "[t]he contract does not require the awardee to deliver software to the Air Force," ADS Brief at

---

[11] Both the Government and ADS repeatedly posit that the Air Force needed "unlimited rights" in software and data. *See, e.g.*, Gov't MJAR at 54, 55, 56; ADS MJAR at 39.  The contemporaneous procurement record and the CO's deposition make clear that the Air Force sought to obtain "government purpose rights," *see* Tab 36, which are different than "unlimited rights."  In any event, AGI's counter-argument holds under either scenario.

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

38, is clearly at odds with the Administrative Record.  *See* Tab 17 AR207 (CLIN0005 of the RFP

stating that "[t]he contractor shall provide . . . annual software in accordance with Section J,

Attachment 1, Performance Work Statement, paragraph 1.3 through 1.3.5 (except paragraph

1.3.1.1)."); Tab 92a AR2457 (final executed ADS contract stating same); Tab 42 AR645 (PWS

explaining that "[t]his is a supply and non-personal services contract to provide nongovernmental

space situational awareness (SSA) software and services."); *see also* Tab 42 AR648, 649, 650,

651, 652, 653 (additional PWS references to the delivery and use of software by the contractor).

Second, as it did before the GAO, here, AGI has addressed the obligation of the Government to

negotiate for greater rights, if they are deemed necessary, with respect to both commercial

computer software and technical data associated with a commercial item.  *See* Complaint ¶ 101

(addressing DFARS 227.7202-1(a) requirement that "[c]ommercial computer software or

commercial computer software documentation shall be acquired under the licenses customarily

provided to the public unless such licenses are inconsistent with Federal procurement law or do

not otherwise satisfy the user needs."); Complaint ¶ 102 (addressing DFARS Subpart 227.71

regarding procurement of technical data).

In sum, it was improper for the Air Force's desire for greater rights to drive its

commerciality determination, which the AR firmly establishes occurred here.  For these reasons,

AGI's MJAR should be granted and the Defendants' cross-MJARs should be denied.

### 4.      Count IV—The Air Force's Failure To Negotiate The Terms Of AGI's License.

In Count IV of its Complaint, AGI asserted that the Air Force's failure to negotiate the

terms of AGI's software license violated 10 U.S.C. § 2320, 48 C.F.R. Subpart 227.71, 48 C.F.R.

Subpart 227.72, 48 C.F.R. § 252.227-7013, and 48 C.F.R. § 252.227-7014.  Similar to Count III,

the Government provides no argument in response to Count IV.  Instead, the Government now

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

admits that "[n]o one has ever disputed that AGI has the capability to meet the Government requirement; the market research report identified AGI as one of the eight capable vendors.  The point is simply that what was required (unlimited data rights) was not a feature available in the commercial marketplace."  Gov't Brief at 57.  The Government makes no effort to address the specific arguments raised by AGI in support of Count IV including: (1) the threshold legal issues regarding the CO allowing the desire for broader data rights to inform her commerciality determination; (2) the CO's disregard for the legal requirement to negotiate broader data rights if such data rights were, in fact, a requirement; (3) the CO disregarding AGI's express statements in its RFI response and during the Industry Day that it was willing to negotiate broader rights; (4) the CO's experience negotiating broader rights with AGI on the prior AGI contract; and (5) the CO's statements that she was unable to locate a commercial license agreement for BMC2 or ComSpOC when the CO, herself, had these agreements in per possession from the AGI Contract. *See* AGI MJAR at 42-45.

ADS similarly provides no direct response to AGI's arguments under Count IV.  Instead, as noted above, ADS merely asserts that AGI's intellectual property rights contentions are "straw man" arguments.  *See* ADS Brief at 37-39.  AGI has already addressed why this position is erroneous in Section A.3., *supra*.

In light of the foregoing, AGI's MJAR should be granted on Count IV and the Defendants' cross-MJAR should be denied.

**5.    Count V—The Air Force's Irrational Set-Aside Decision.**

In support of Count V of its Complaint, AGI argued in its MJAR that the AR establishes that: (1) the Air Force's set-aside decision relied on an arbitrary commerciality determination; (2) the Air Force irrationally concluded that ExoAnalytic could meet the Agency's minimum

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

requirements; and (3) the Air Force irrationally concluded that ADS could meet the Agency's minimum requirements without violating the limitation on subcontracting provision. Regarding the first point—the interplay between the set-aside decision and the arbitrary commerciality determination—AGI has addressed the fallacy of the Government's and ADS's position in Section I. In short, the arbitrary and capricious commerciality determination rendered the Rule of Two determination improper. Further, the commerciality determination was required to occur first. Had such analysis been performed first and properly, the Rule of Two Determination would not have resulted in a set-aside, as the Air Force admits there are not two are more small business that can fulfill its SSA requirement with commercial item solutions. As detailed below, the Government's and ADS's additional arguments against AGI's Count V claims are similarly misplaced.

As a threshold issue, the Government's brief repeatedly references that ExoAnalytic and ADS—but not AGI—had direct access to networks of observatories to provide sensor data.[12] Importantly, however, direct control/ownership of satellite networks was not a Salient Characteristic during the RFI stage, *see* Tab 20 AR268, nor was it a requirement of the prime contract, *see* Tab 42 (final PWS). Indeed, the fact that AGI satisfied all 10 Salient Characteristic, *see* Tab 39 AR605, and, using the Government's own words, "[n]o one has ever disputed that AGI has the capability to meet the Government requirement; the market research report

---

[12] *See, e.g.*, Gov't MJAR at 4-5 ("the only three vendors who had described networks of observatories to provide sensor data were ADS, Exo, and Las Cumbres Observatory Global Telescope Network (LCOGTN)"); *id.* at 5 ("the only two vendors responding to the March 2016 RFI who controlled networks of observatories to provide sensor data were ADS and Exo."); *id.* at 10 ("*only three vendors*, ADS, Exo and LCOGTN, identified a capability to offer extensive observatory networks to provide sensor data") (emphasis in original); *id.* at 16 ("of the three vendors who had responded to the November 2015 RFI with descriptions of available networks of observatories to provide sensor data, *only two of those vendors remained:* ADS and Exo) (emphasis in original); *id.* at 17 ("*only Exo and ADS* controlled networks of observatories to provide sensor data") (emphasis in original); *id.* at 35-36 ("ADS and Exo were the only two vendors who responded to the March 2016 RFI who controlled extensive networks of observatories; sensor data from such observatories was central to the Government requirement.").

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

identified AGI as one of eight capable vendors," Gov't MJAR at 57, underscores the point that direct access to/control of satellite networks was not viewed by the Air Force as a material requirement. Consistent with this, nothing in the contemporaneous procurement record indicates the CO relied on direct access to/control of satellite networks to support her Rule of Two determination. Moreover, the Air Force's purported rationale for limiting the competition to ADS and ExoAnalytic was based on national security considerations, <u>not</u> because ADS and ExoAnalytic were uniquely situated by virtue of their direct access to/control of satellite networks. *See* Tab 38 AR582 (National Security J&A). Simply stated, from the initial November 2015 RFI to the final solicitation, the Air Force only required the prime contractor to provide commercial SSA data. *See*, *e.g.*, Tab 20, Tab 21, Tab 23, Tab 32, Tab 17. How the data was obtained—*i.e.*, through the contractor's proprietary telescope networks or through agreements with telescope operators—was never viewed by the Air Force as a relevant distinction. As such, the Government repeated attempts to distinguish ADS and ExoAnalytic based on their direct access to/control of satellite networks is a red herring and does not support the CO's Rule of Two determination.

Regarding the proprietary of the Rule of Two determination generally, the Government's and ADS's efforts to justify the reasonableness of the CO's belief that ExoAnalytic and ADS were responsible small business offerors are unavailing. As AGI made clear in its MJAR, the procurement record categorically demonstrates that, by failing to satisfy all 10 Salient Characteristics during the RFI stage, the Air Force had effectively determined that ExoAnalytic could not satisfy the Agency's minimum requirements. AGI MJAR at 52-54. Moreover, ADS's contention that ExoAnalytic was capable of meeting the Air Force's requirements because AGI intended to rely on ExoAnalytic as its primary source of satellite data, *see* ADS MJAR at 12 n. 2,

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

is irrelevant because the provision of data is only a portion of the overall SSA requirement. Thus, pursuant to FAR 9.104-1(c), which requires that a prospective contractor "[h]ave [among other things] the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them . . ." in order to be determined responsible, at the time the set-aside determination was made, the CO did not have a reasonable expectation that ExoAnalytic would be a responsible small business offeror.

As to the CO's belief that ADS would be a responsible small business offeror, the relevant inquiry is <u>not</u> whether ADS, together with its teammates, could satisfy the Air Force's requirements. Rather, the question is whether ADS would run afoul of the limitation on subcontracting restriction under FAR 52.219-14 by over-relying on teammates and subcontractors to satisfy significant portions of the Air Force's requirements. In this regard, FAR 9.104-3(d)(2) makes clear that "[a] small business that is unable to comply with the limitations on subcontracting at 52.219-14 may be considered nonresponsible."

In its cross-MJAR, the Government contends that AGI's allegation is actually a price reasonableness challenge. *See* Gov't MJAR at 42 n. 6. However, AGI's argument makes no reference to price reasonableness or the magnitude of ADS's proposed price. Rather, AGI's argument has been, and continues to be, focused on the breakdown of work among the ADS teammates and the question of whether ADS's reliance on teammates and subcontractors would render the company nonresponsible. The Government does not address this issue directly and does not cite to any analysis in the contemporaneous procurement record (there is none) indicating the CO considered these issues.

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

ADS similarly fails to provide a response to AGI's allegation explaining why the breakdown of work among the ADS team does not run afoul of FAR 52.219-14.[13]   Rather, like the Government, ADS simply contends that the CO was not required to perform a responsibility determination at the RFI stage.  AGI does not dispute this.  The argument is <u>not</u> that the CO was required to make a responsibility determination.  Instead, AGI has alleged that the CO could not have *reasonably expected* that ADS would "survive a future responsibility determination." *Adams and Associates, Inc. v. United States*, 741 F.3d 102, 111 (Fed. Cir. 2014).  These are two different inquiries.  Here, the procurement record is devoid of any analysis of this issue and it appears the CO simply relied on ADS's RFI response to a question about compliance with FAR 52.219-14 without ever following up on the issue independently and despite clear counter-indications in the RFI response.

As the court has held previously, contracting officers cannot simply rely on an offeror's affirmative representations when their exists indicia to the contrary.  *See Klinge Corp. v. United States*, 82 Fed. Cl. 127, 135 ("if an offeror's submission contains information that calls into question its TAA compliance, the agency has a duty to make reasonable inquiry and satisfy itself that the product offered meets the terms of the act.  Failure to do so in the face of clear indications of non-compliance would be arbitrary and capricious and not in accordance with

---

[13] ADS claims that "AGI conflates the concept of a 'commodity' representing 71 percent of the anticipated contract costs, to the SSA software comprising 71% of the contract costs."  ADS MJAR at 16.  AGI made no such statements.  Rather, the section of AGI's MJAR cited to by ADS states that "[a]s detailed in the Acquisition Plan, the Air Force chose NAICS code 511210, Software Publishers, because it determined that the software, data subscription service, and other commodity requirements represented 71% of the contract."  AGI MJAR at 55 (citing Tab 44 AR682).  The importance of this point is that software comprised a significant portion of the requirement and ADS's RFI responses indicate that the company does not possess proprietary SSA software and likely will have to rely heavily on third parties.

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

law."). At the time the set-aside determination was made, the CO did not have a reasonable expectation that ADS could comply with the limitation on subcontracting rule.[14]

In sum, the Government's and ADS's arguments in support of the propriety of the CO's Rule of Two determination are legally and factually deficient. Therefore, AGI should prevail on its Count V.

### 6.   Count VI—The Air Force's Failure to Analyze Price as Part of the "Rule of Two" Determination.

AGI also asserted in its MJAR that the AR demonstrates the Air Force's Rule of Two determination failed to analyze price pursuant to 48 C.F.R. § 19.502-2(b). AGI MJAR at 56-59. In support of this claim, AGI argued that (1) the contemporaneous market research documentation did not include any analysis of small business offerors' potential pricing;[15] (2) ADS did not provide any meaningful pricing information in its RFI response; and (3) although

---

[14] ADS also argues that AGI misstated the law regarding the limitations on subcontracting. *See* ADS MJAR at 15-16. AGI acknowledges that on May 31, 2016, SBA issued its final rule implementing the National Defense Authorization Act (NDAA) of 2013 which changed, among other things, the basis for limitations on subcontracting for supplies from the cost of the items to the amount paid to the prime contractor and to subcontractors that are similarly situated. *See* 81 Fed. Reg. 34243; 13 C.F.R. § 125.6(a)(2). However, at the time the set-aside decision was purportedly made, the SBA final rule had not been issued. Moreover, the current version of FAR 52.219-14 as well as the version of FAR 52.219-14 incorporated into the RFP and the final ADS contract have not been updated to reflect the changes in the SBA final rule. In any event, as detailed above, neither the Government nor ADS has made any effort to address how ADS would specifically comply with the limitation of subcontracting restriction under the old standards in FAR 52.219-14 or the new standards under 13 C.F.R. § 125.6(a)(2). Additionally, neither party addresses how ADS's conclusory statement of compliance squares with the counter-indicia in the record.

[15] The Government includes a parenthetical on page 26 of its brief describing the J&A as containing a "detailed finding that the anticipated cost to the Government will be fair and reasonable." Gov't MJAR at 26. However, the cited section of the J&A contains only two sentences which provide only that "[t]he Contracting Officer (CO) anticipates the cost to the Government may be determined to be fair and reasonable on the basis of price and/or cost analysis and by using certified cost or pricing data to analyze elements of cost. Given the government will solicit for the award of one or more contracts for the work, the CO further anticipations that proposed costs to the government will be driven by competitive forces." Tab 38 AR585-86. This clearly falls far short of constituting a "detailed finding" regarding the anticipated costs to the Government.

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

ExoAnalytic submitted some pricing information,[16] the pricing information appears not to cover the full range of requirements necessary to meet the Air Force's SSA needs.  *Id.*

Consistent with this, AGI argued that the mere fact that the Air Force expected to receive proposals from two small business offerors was not, by itself, sufficient to ensure such offerors would submit proposals with "fair market prices" because such a finding would render meaningless the requirement that the CO make such a determination in the first instance.  In other words, if the expectation of two or more proposals was sufficient to demonstrate fair market pricing, there would be no need for the separate regulatory reference to fair market pricing in the FAR provisions outlining the requirements for a Rule of Two determination.

In its brief, the Government fails to address this legal argument regarding the requirement in the Rule of Two for fair market pricing.  ADS, however, doubles down on the proposition that the expectation of competition is, alone, sufficient to support a reasonable finding that fair market prices can be expected.  ADS Brief at 16-18.  In support of its position, ADS relies on GAO case law which is readily distinguishable from the case at hand—*Planet Depos LLC*, B-411142, May 26, 2015, 2015 CPD ¶ 165 and *Walden Sec.*, B-407022, B-407022.2, Oct. 10, 2012, 2012 CPD ¶ 291.  These same cases were at issue in the prior GAO protest and in that proceeding, AGI thoroughly demonstrated why the holdings of *Planet Depos* and *Walden Sec.* are inapposite.  *See* Tab 65 AR821-24.  Specifically, although *Planet Depos* and *Walden Sec.*

---

[16] In its MJAR and in earlier pleadings, AGI mistakenly stated that ExoAnalytic only provided pricing information for observation and telescope data.  AGI MJAR at 58.  Upon further review, it appears ExoAnalytic also provided pricing information for software products and enterprise solutions.  Tab 25 AR357-58.  There is no indication, however, that the price information submitted by ExoAnalytic addressed the full range of the Air Force's SSA requirements and, indeed, because ExoAnalytic did not satisfy all of the salient characteristics, *see* Tab 39 AR605, the pricing information at a minimum did not cover the costs associated with processing and correlating feature-type data and radar cross section changes.  *Id.*  In any event, even if ExoAnalytic provided pricing that addressed all of the Air Force's requirements, the record is clear that ADS did not.  Thus, at best the Air Force had full pricing information from a single small business offeror, which falls short of what is required to determine a likelihood of fair and reasonable pricing.

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

stand for the proposition that, under some circumstances, an agency can rely upon a reasonable expectation of adequate price competition (which requires a determination that fair market prices will be received) to support its set-aside decision, both cases involve unique facts not present here.

In *Planet Depos*, the GAO denied a protest involving a challenge by a large business to an agency's set-aside decision—specifically, a Department of the Treasury decision to set aside court reporting and stenotype services for HUBZone small businesses. *Id.* In the case, the agency's market research identified five potential small businesses capable of satisfying the requirements. *Id.* at 3. Moreover, the agency was able to rely on information from the prior procurement, which was also a set-aside for HUBZone small businesses for the same highly commoditized services, to support its expectation of receiving fair market prices. No such facts and circumstances exist here. Neither ADS nor ExoAnalytic appear to have been able to provide complete pricing information. Further, there is no precedent for a comprehensive SSA requirement being set aside for small businesses, and there is no track record of small businesses fulfilling the full requirement.

Similarly, in *Walden Security*, a case cited in *Planet Depos*, the GAO denied a protest challenging a set aside decision in a procurement for security guard services because the agency concluded that four of 19 firms responding to the presolicitation notice were small businesses capable of meeting the solicitation's requirements. GAO concluded that, "[u]nder the circumstances, we conclude that it was reasonable for the [the agency] to anticipate adequate price competition, and that, as a result of that price competition, award would be made at a fair market price under the set-aside procurement." *Id.* at 5. However, as with *Planet Depos*, the services being procured in *Walden Security* were highly commoditized. By contrast, in the

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

instant case, the requirement at issue is not highly commoditized and there is no robust small business market or track record of small business fulfilling the complete requirement.

As to the remainder of AGI's claims under Count VI, neither the Government nor ADS provide a convincing response in defense of the CO's Rule of Two determination. For example, the Government first claims that "ADS and Exo had been successful in the SSA marketplace for years, indicating an ability to compete on price. Accordingly, it was reasonable for the Air Force to expect that the competition between ADS and Exo, two well-established businesses, would result in a fair market price." Gov't MJAR at 40. However, there is nothing in the contemporaneous procurement record indicating the Air Force considered ADS's and ExoAnalytic's previous "successes" in the SSA marketplace as evidence of the firms' ability to compete on price. Plainly, this is a *post hoc* argument meant to backfill the record. In any event, the degree to which ExoAnalytic and ADS have—or have not—been successful in the SSA marketplace is irrelevant to two firms' prices on the instant acquisition. In this regard, the Air Force has continually stressed that the requirements of this procurement are unique. If true, this would caution against relying on ADS's and ExoAnalytic's past "successes" as evidence of their present ability to submit fair market prices.

Second, the Government posits that:

> because Exo was proposed as a team member for so many vendors responding to the RFIs—including AGI . . . the Exo prices were likely to be reflected in the prices of many market players. Indeed, preliminary price analysis showed that the IGE (based in part on Exo's prices) was roughly half the price charged by a large business competitor (AGI). Assuming that commercial prices offered by AGI for its subscription service are somewhere near the fair market price of a product to meet a portion of the Government requirement, then information that the Exo commercial prices were dramatically lower than AGI prices for similar products supports the contracting officer's reasonable expectation that Exo would make an offer at or below the fair market price in response to the

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

> solicitation, and that ADS would be required to meet or reduce the
> Exo price in order to win award.

Gov't MJAR at 40-41 (internal citations omitted).  However, this argument relies on several assumptions that the Government has not attempted to justify, and which are not addressed anywhere in the AR.  Thus, this too is a *post hoc* attempt by the Government to backfill the record.

Finally, the Government erroneously asserts that AGI's raised a price reasonableness argument before the GAO, and that AGI's current position underlying Count VI is a repudiation of this earlier argument.  *See* Gov't MJAR at 41-42.  This assertion mischaracterizes AGI's allegation, which asserts the CO failed to analyze price.  AGI has not taken any position—either before the GAO or before this Court—regarding the reasonableness of any of the offerors' prices and the Government's efforts to conflate AGI's challenge to the Rule of Two determination with a price reasonableness challenge exposes the Government's deep misunderstanding of the issue. In any event, the technical requirements protest ground AGI raised before the GAO upon which the Government rests this argument is not before this court.  In sum, AGI has alleged that the Air Force (1) did not receive sufficient pricing information from small businesses to support a finding that offers would be received at fair market pricing; and (2) did not otherwise analyze the limited pricing information obtained during the RFI stage in a manner that would support the determination that fair market prices could be expected.  It simply is not enough that the Air Force was to receive two proposals.  In attempting to refute these claims, the Government talks past AGI's arguments but does not cite to anything in the record in support of its position. Accordingly, AGI should prevail on Count VI.

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

### 7.   Count VII—The Irrational Award of a Contract to ADS

As detailed in AGI's MJAR, the Administrative Record establishes that, by conducting the procurement as an acquisition for a non-commercial SSA solution, and by setting aside the procurement for small businesses, the Air Force acted in violation of applicable procurement law.  In their opposition briefs, the Government and ADS fail to refute AGI's claims.  Indeed, for a significant number of allegations raised by AGI, the Government and ADS fail to provide any response.  Accordingly, consistent with AGI's Complaint and its MJAR, because the underlying procurement involved arbitrary and capricious conduct and was conducted in violation of numerous statutes and regulations, the award to ADS was contrary to law.

### B.   Defendant and Defendant-Intervenor's Arguments In Response To Plaintiff's Request for Permanent Injunctive Relief.

As detailed above, the Government and ADS' challenges to AGI's arguments on the merits of this case are unavailing.  With regard to the other three prongs of the injunctive relief test—irreparable harm to AGI; the balance of harms; and the public interest, *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004))—the Defendant's positions are similarly baseless and the Defendant-Intervenor fails to address AGI's arguments in support of a permanent injunction entirely.[17]

With regard to irreparable harm, the entirety of the Government's response is that "AGI was treated fairly in this procurement and has no other rights.  Indeed, a large part of any wound was self-inflicted.  AGI had the option to team with Exo, and refused the opportunity."  *See* Gov't MJAR at 58-59.  However, this argument disregards the fact that by conducting this

---

[17] ADS's brief includes a brief section outlining the legal standard for injunctive relief.  *See* ADS MJAR at 9-10.  However, Defendant-Intervenor's brief does not include a substantive discussion challenging AGI's assertions that it has suffered irreparable harm and that the balance of harms and the public interest weighs in AGI's favor.

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

procurement on a non-commercial item basis in violation of the law, the Government <u>did not</u> <u>treat AGI fairly</u>.  *See Heritage of America, LLC v. United States*, 77 Fed. Cl. 66, 78 (2007) (explaining that the failure of an offeror to have its proposal "fairly and lawfully considered constitutes irreparable injury.") (internal citations omitted).   Moreover, as detailed in AGI's MJAR and the attached Declaration of AGI's president, Joseph Sheehan, the Government's arbitrary conduct has had a significant negative impact on AGI's overall government and commercial business.  *See* AGI MJAR at 61-62.

As to the Government's statement that AGI's injuries are "self-inflicted," this position is baseless.  In effect, the Government is asserting that an aggrieved offeror cannot demonstrate harm if there is a possibility that the offeror could remain involved in the procurement by pursuing subcontracting or teaming opportunities.  However, the Government cites no law in support of this proposition and, indeed, no such law exists.  Moreover, such a proposition is at odds with the court's standard regarding standing in a bid protest action which requires that a prospective bidder establish "a non-trivial competitive injury which can be redressed by judicial relief."  28 § 1491(b)(1).  When AGI learned that the Government intended to conduct this procurement on a non-commercial item basis as a small business set-aside, the company immediately took steps to challenge the terms of the solicitation by filing a bid protest at the GAO.  *See* Tab 1 AR1.  The Government's position—that AGI should have waived its right to protest the Government's actions in lieu of pursuing the contract through a teaming agreement with ExoAnalytic—has no basis in law.  Moreover, the Government's position would require the court's analysis of irreparable harm to include an exhaustive analysis of whether a protestor have pursued subcontracting or teaming opportunities.  Again, there is no legal support for such a

**Protected Information to Be Disclosed Only in Accordance With**
**the U.S. Court of Federal Claims Protective Order**

proposition.  Additionally, the Government's position ignores AGI's contention that there was no way to reasonably team without violating the limitation on subcontracting rules.

Regarding the remaining two injunctive relief factors—the balance of harm and the public interest—the Government conflates these items arguing that "[n]either the public interest factor nor the balance of harms factor supports AGI's motion . . . [because] . . . Congress has decided that the public interest lies in increasing opportunities for small businesses." Gov't Brief at 59.  However, this argument rests on the assumption that Congress believes the public has a greater interest in increasing opportunities for small businesses than it does in ensuring that agencies comply with the statutorily-mandated preference for commercial items.  Notably, the Government provides no support for this position, which is unsurprising given that the FAR expressly provides that the commercial item rules take precedence over other parts of the FAR. *See* FAR 12.102(c).  In any event, the Government position presumes a false dichotomy wherein the requirement that agencies adhere to FASA necessarily means small businesses will suffer.  In point of fact, the commercial item requirements under FASA have long been considered a benefit to small businesses.  *See Assessing The Implementation Of Public Law 103-55, The Federal Acquisition Streamlining Act Of 1994: Hearing Before The Committee On Small Business House Of Representatives*, 104th Cong. 44-45 (1995) (statement of Jere W. Glover, Chief Counsel for Advocacy, U.S. Small Business Administration) (explaining the commercial item regulations implementing FASA "will largely benefit small businesses").

Finally, both the Government and ADS repeatedly suggest that AGI attempted to steer the Air Force towards awarding AGI a sole-source contract, which would be at "inflated pricing."  Gov't MJAR at 21, 59; ADS MJAR at 1, 2, 23, 31, 35, 36.  Although neither the Government nor ADS directly connect these allegations to AGI's request for injunctive relief,

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

implicit in these statements is that the equities weigh against AGI because the company's alleged goal was to avoid a competition.  This, however, is inaccurate.  In response to an Air Force question, AGI suggested several approaches to the procurement which would involve competition and only raised the prospect of a sole source contract as an alternative in the event the Air Force's findings justified such a result.  Tab 26 AR369.  Moreover, it should be noted that the Air Force limited its competition to two competitors.

In any event, to the extent the Government and ADS contend that the practical result of AGI prevailing on the merits of this case will be the award of source award to AGI, such arguments are speculative.  Should the Court find for AGI and require the Air Force to conduct a new procurement, a sole-source award to AGI is only one possible outcome.  It is also possible that after (1) reviewing and reconsidering the commerciality of its requirements; (2) modifying its requirements to accommodate commercial solutions; and (3) after conducting new market research, the Air Force competes its commercial item requirement.

For these reasons and those set forth in its MJAR, AGI has satisfied all of the injunction factors, and the granting of a permanent injunction in this case is appropriate.

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

III.      **CONCLUSION AND RELIEF REQUESTED**

For all of the foregoing reasons, AGI respectfully renews its request that the Court grant its MJAR and provide declaratory and permanent injunctive relief.  Consistent with this, the Court should deny the Government's and ADS's Cross-MJARs and Defendant's Motion to Dismiss AGI's Commercial Item Claims.

Respectfully Submitted,

_____
Seamus Curley
DLA Piper LLP
500 Eighth Street, NW
Washington, DC 20004
(202) 799-4403
(202) 799-5403 (Fax)
Seamus.curley@dlapiper.com

Dated:  February 13, 2017          *Counsel of Record for Analytical Graphics, Inc.*

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 13th day of February, the foregoing document was filed electronically with the Clerk of the Court.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

_____
Seamus Curley
Daniel J. Cook