IN THE UNITED STATES COURT OF FEDERAL CLAIMS
Bid Protest

| | | |
|---|---|---|
| ANALYTICAL GRAPHICS, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 16-1453C |
| v. | ) ) | Judge Marian Blank Horn |
| THE UNITED STATES, | ) ) ) | **TO BE FILED UNDER SEAL** |
| Defendant, | ) ) | |
| v. | ) ) ) | |
| APPLIED DEFENSE SOLUTIONS, INC., | ) ) | |
| Defendant-Intervenor. | ) ) ) | |

## DECLARATION OF JOSEPH SHEEHAN

1. My name is Joseph Sheehan. I am over the age of eighteen (18) years, *sui juris*, and make this Declaration based on my personal experience and knowledge. I am the President of Analytical Graphics, Inc. ("AGI").

2. I provide this Declaration in support of our pending bid protest action before the United States Court of Federal Claims concerning Solicitation No. FA2550-16-R-8008, which was issued by the United States Air Force on behalf of the Joint Interagency Combined Space Operations Center ("JICSpOC"), and which resulted in the award of Contract No. FA2550-17-C-8002 to Applied Defense Solutions, Inc. ("ADS"). Specifically, this Declaration addresses the December 5, 2016 Declaration of Lieutenant Colonel Anthony P. Calabrese of the U.S. Air Force, which was furnished to AGI as part of these proceedings.

--1--
Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order

3. AGI is (and I am) very familiar with Lt. Col. Calabrese.  In the past, Lt. Col. Calabrese has been involved in developing requirements for the Joint Space Operations Center ("JSpOC") Mission System ("JMS") program.  Although AGI has sold portions of its commercial SSA Solution to the JMS program, the vast majority of the procurement activity associated with the JMS program, as well as the relevant programs that preceded it, has been noncommercial item activity and has costed the Government literally billions of dollars over decades.

4. On the challenged procurement, AGI personnel interacted directly with Lt. Col. Calabrese during the April 15, 2016 Industry Day.  Paragraph 2 of Lt. Col. Calabrese's Declaration states that:

> [a]t the Industry Day, I briefed the nature of the requirements and highlighted the additional capabilities required as the JICSpOC moved towards an operational capability on or about June 1, 2016.  At this Industry Day, it was communicated that both commercial data, software, and operations and analysis services were required for the operational contract.

To the extent the use of the word "additional" in the quoted language and the SSA solution components listed in the sentence that follows create the impression that the "operational-phase contract" (*i.e.*, the contested ADS contract) was to include items not included during AGI's predecessor experimental contract (the "AGI contract"), this impression is inaccurate. AGI's commercial SSA solution includes commercial data, commercial software, as well as engineering, operations, and analysis services, all of which were provided under the AGI contract.  Additionally, the Requests For Information ("RFIs") preceding the Industry Day, which acknowledged the commerciality of the SSA solution being sought for the contested contract, included "Salient Characteristics" that necessarily required such services.  As such, the services discussed during the Industry Day were not new or additional.  In any event,

**Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order**

irrespective of the quoted language, it was confirmed to me by the AGI personnel who participated during the Industry Day that Lt. Col. Calabrese verbally acknowledged that AGI's commercial SSA solution satisfied the Air Force's requirements.

5. Paragraph 3 states that the "experiment phase" was intended to bring "together subject matter experts and different software tools to determine the requirements for the tools, people, and systems necessary to characterize on-orbit activities in response to space threats." The experiment phase, as evidenced by the AGI contract, also involved AGI furnishing commercial data, commercial software, and commercial hardware as well as providing operations, engineering, analysis, and other related commercial services.

6. For context, the experiment phase, including the AGI contract, involved a comparative assessment of AGI's capabilities (and those of other private companies for more narrow portions of the overall SSA requirement) against Government solutions, including some that were being developed at the JICSpOC. Based on feedback from the Air Force, it is AGI's understanding that 10 months of performance under the AGI contract confirmed that AGI's commercial SSA solution met or exceeded all of the JICSpOC's SSA and Battlespace Awareness requirements and out-performed the Government solutions.

7. At the end of Paragraph 3, Lt. Col. Calabrese states that, during the experiment phase, "[i]mprovements to existing visualization tools were identified (summarized AR 648, 1.4.1), as well as the services required to operate the software, generate threat timelines, provide decision-makers actionable data based on threat analysis, support future experimentation, and integrate data across all classified systems." The phrase "visualization tools" simply refers to the software tools that produce a visual depiction of data processed by the SSA software

Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order

(*e.g.*, so that an end-user can see a graphic depicting the orbit of a specific space object). Any adjustments needed for a specific visualization tool can be made during the normal course of performance by engineers. We have, in the past, made such configuration changes for non-government (and government) customers. The referenced services in the above quote from Paragraph 3 of Lt. Col. Calabrese's Declaration are covered by our commercial SSA solution, which we provided to the Air Force under the AGI contract and have provided under other government contracts also procured under Federal Acquisition Regulation ("FAR") Part 12.

8. The reference in Paragraphs 3 and 4 to "visualization software" also should be clarified, because the term, which is the Government's, captures one important aspect of SSA software (*i.e.*, visualization), but it does not capture other critical elements of SSA software, including the facilitation of data processing. That is, SSA software, such as AGI's, is not merely a visualization tool. Rather, the software processes data and facilitates more targeted data processing by personnel engaging in specifically delineated tasks including, among other items, tracking specific objects, identifying issues and anomalies, making threat assessments, and reacting to potential threats.

9. Paragraphs 4 and 5 state, respectively, that the experiment phase was to "fill gaps in US sensor coverage" and to "deploy software," but a more accurate description of the experiment phase and, in particular, the AGI contract, was to acquire commercial data, commercial software, commercial hardware, and commercial services to augment, fuse, and process commercial and Government data. This can be verified through the work scope of the AGI contract. These same requirements are also found in the operational ADS contract.

Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order

10. Paragraph 5 indicates that the Air Force "identified capability gaps . . ." during the experiment phase. It is unclear to what this refers (*i.e.*, alleged capability gaps on the Government or contractor side), but AGI's understanding is that it satisfied all of the Air Force's requirements under the AGI contract during the experiment phase and was, and is still, ready to fulfill the requirements under the contested contract.

11. Separately, AGI believes Paragraph 5's reference to the Air Force using "new tools . . . in conjunction with other GOTS and mission partners tools to form a near-real time picture of the space environment . . ." illustrates the institutional bias in favor of a non-commercial solution.

12. Paragraphs 7-16 of Lt. Col. Calabrese's Declaration address multiple aspects of the Performance Work Statement on the contested procurement. The remainder of this Declaration addresses each one.

13. Paragraph 7 references a need for "new tools and analysis services . . . to visualize the required datasets and identify change in an object's radar cross-section." AGI's commercial SSA solution has this capability, which was demonstrated to the Air Force during the AGI contract and in its RFI submissions on the contested procurement.

14. Paragraph 8 states that "[e]xternal commercial sensor weights and biases are required to calibrate external sensor capabilities with government sensors. It is unknown if AGI's commercial product could request and deliver the requisite calibration data to support commercial data integration with government systems." AGI has, can, and did perform these functions, including on the experiment contract. This was addressed in my August 24, 2016 Declaration and its Exhibit A, which were submitted during AGI's predecessor Government

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

Accountability Office ("GAO") protest and with the initial pleadings in this action. Further, delivery of calibration data is not a burdensome task and AGI was and is willing and able to furnish such data. Had a specific question on AGI's capability or willingness to provide such data existed during market research, the Air Force should simply have asked the question.

15. The services and functionalities cited to in Paragraph 9 of Lt. Col. Calabrese's Declaration are services/functionalities AGI performed/provided on the AGI contract and other contracts, including private sector and Government commercial item contracts. AGI's RFI response and the terms of the AGI contract, itself, confirm this. Further, AGI does not understand why Paragraph 9 states that "no signals collection capabilities exist across the commercial enterprise." There are multiple commercial providers that sell this capability, including Zodiac, PaCoRa, and Kratos—with which AGI has worked with in the past. AGI intends to continue to do so in the future.

16. Paragraph 10 of Lt. Col. Calabrese's Declaration discusses sensor tasking. To explain, a sensor (e.g., a telescope or a radar) is used to observe space objects by taking an "image" of the object. In order to accomplish this for a particular object (or multiple objects), the sensor needs to be told what object to "image" and where to look. This is "tasking" the sensor. Importantly, the rate at which sensors are tasked is dynamic and tailorable to mission requirements. In other words, the frequency of tasking (i.e., how often the sensors are given instructions to look for a specific object) will depend on the end-user's needs. In some cases, tasking is done in near real-time. In other cases, tasking is only done once a day or less frequently. In the contested procurement, the Air Force is seeking a contractor who can task sensors frequently and/or in response to a specific occurrence. For example, if an aggressive

--6--
Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order

space object is detected, frequent or real-time sensor tasking might become necessary to track that object. Substantively, the sensor tasking contemplated by the contested solicitation is no different than the sensor tasking that occurs in the non-government SSA world.

17. Paragraph 10 of Lt. Col. Calabrese's Declaration states that "no currently dynamically taskable agreements are in place in the commercial arena . .." This is simply inaccurate. AGI has such agreements in place with its data providers. Further, the dynamic tasking of sensors was built into the salient characteristics of the initial RFIs (specifically Salient Characteristic (ii)). As noted, it is AGI's understanding that it was determined to have satisfied all of the Salient Characteristics.

18. Paragraph 11 refers to the need for "human in the loop to make real-time recommendations to leadership." AGI provided human-in-the-loop services as part of the AGI contract by stationing personnel, including several full-time onsite engineers, at the JICSpOC. On a purely private sector SSA contract, human-in-the-loop services would be provided, but typically the dedicated personnel would work out of our commercial space operations center facility in Exton, Pennsylvania, known as the ComSpOC®. The substantive work (primarily analytical or engineering work) that such personnel would perform, however, would be the same type regardless of location.

19. Paragraph 11 states that "AGI's commercial product alone cannot perform threat analysis required as indicated in the Government's requirements." To be clear, AGI's commercial SSA software does include threat analysis. However, to maximize the software's potential, AGI offers to the commercial marketplace (and has sold to the Government on a commercial item basis) personnel services to facilitate further analysis. As such, the suggestion that

Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order

providing a human-in-the-loop is somehow inconsistent with AGI's commercial offering is inaccurate. This is part of the technical services offering comprising AGI's ComSpOC Subscription Service, which can be augmented by AGI's engineering/analysis service offerings (which, for Government purchases, are available on AGI's General Services Administration Federal Supply Schedule Contract). Such services were provided by AGI personnel to the Air Force under the AGI contract. Notably, Lt. Col. Calabrese toured AGI's Exton facilities on November 15, 2016, approximately three weeks before his Declaration, and observed AGI personnel performing threat analysis analytical services in conjunction with AGI's commercial SSA software.

20. Paragraph 12 states that:

> [d]ebris modeling and integrated sensor support planning to track both an anti-satellite missile and its target in pre- and post-engagement are the sets of software tools required over and above the commercial software used in the experiment phase. These new software tools also require services for interpretation and iteration. During the government's planning process, multiple "what-if" scenarios will be requested to identify and assess what may be the adversary's preferred course of action.

Regarding the referenced "debris modeling and integrated sensor support planning," this refers to modeling the debris that would result from an anti-satellite weapon intercepting and destroying a satellite and sensor tasking to collect "images" of the satellite and debris before and after intercept by the anti-satellite weapon. AGI provided this as part of the AGI contract and has sold such services on a commercial item basis. The Air Force is well aware that AGI's commercial SSA solution already includes commercial software with such capabilities. To further illustrate, on January 11, 2007, AGI used its commercial software at the Joint Space Operations Center at Vandenberg Air Force Base to support the Government

--8--

Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order

in monitoring a Chinese test of a direct-ascent anti-satellite weapon that was used to intercept and destroy a defunct satellite. Simply stated, "new software tools" are not required to satisfy the current Air Force requirement.

21. Regarding the "what-if" scenarios referenced in Paragraph 12, these were a major part of the AGI contract, which was procured under FAR Part 12 basis, and involve the same type of services offered by AGI to the private sector SSA marketplace.

22. Paragraphs 13 and 14 of Lt. Col. Calabrese's Declaration refer to the need for more contractor personnel and services than that which was provided under the AGI contract. Notably, this comment merely goes to the volume of services. The substantive services required to meet the requirement on the contested contract are the same as those that were furnished under the AGI contract. To again illustrate, "planning integration" to "synchronize commercial support to military operations" was a major part of the AGI contract. Further, such services are the type of services AGI would provide for any customer to integrate and synchronize with their systems, data, and operations.

23. Paragraph 15 of Lt. Col. Calabrese's Declaration discusses "information assurance" requirements for the Air Force's requirement under the contested solicitation/contract, including accreditation to bring hardware into the Air Force's secured facility. All of AGI's classified contracts, including those issued under FAR Part 12, include information assurance and hardware accreditation components. In fact, the AGI contract had similar-type requirements. We are ready and willing to again satisfy any such requirements and to provide the services necessary to do so to furnish our commercial SSA solution.

--9--

Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order

24. Finally, Paragraph 16 refers to the need for "government data rights for raw data . . .." AGI's repeatedly-expressed willingness to negotiate with the Air Force to provide data rights needed beyond those typically associated with AGI's commercial SSA solution is well-documented in our GAO protest and in our initial pleadings in this matter.


I HEREBY DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Joseph Sheehan

February 13, 2017

Protected Information to Be Disclosed Only in Accordance With
the U.S. Court of Federal Claims Protective Order