# In the United States Court of Federal Claims

No. 16-1453C
Filed: November 17, 2017
Reissued: December 12, 2017[1]

| | |
|---|---|
| * * * * * * * * * * * * * * * | |
| **ANALYTICAL GRAPHICS, INC.,** | |
| *Protestor,* | **Bid Protest; Cross-Motions for Judgment on the Administrative Record; Small Business Set-Aside; Commercial Availability; 10 U.S.C. § 2377.** |
| v. | |
| **UNITED STATES,** | |
| *Defendant,* | |
| v. | |
| **APPLIED DEFENSE SOLUTIONS, INC.,** | |
| *Defendant-Intervenor.* | |
| * * * * * * * * * * * * * * * | |

**Seamus Curley**, Stroock & Stroock & Lavan LLP, Washington, D.C., for protestor. With him was **Daniel J. Cook**, DLA Piper LLP, Washington, D.C.

**James W. Poirier**, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Chad A, Readler**, Acting Assistant Attorney General, Civil Division, Department of Justice. Of counsel were **Christopher Cole,** and **Jason Templin**, United States Air Force.

**Edward J. Tolchin**, Offit Kurman, P.A., Bethesda, Md., for defendant-intervenor.

---

[1] This opinion was issued under seal on November 17, 2017. The parties were given the opportunity to propose redactions to the court. No redactions were proposed. The opinion, therefore, is unsealed and issued for publication.

**O P I N I O N**

**HORN, J.**

Analytical Graphics, Inc. (Analytical Graphics) filed a post-award bid protest in this court challenging Solicitation No. FA2550-16-R-8008 (the solicitation), issued by the United States Air Force (Air Force) on behalf of the Joint Interagency Combined Space Operations Center (JICSpOC) for its Space Situational Awareness (SSA) data requirements, as well as the contract subsequently awarded to defendant-intervenor Applied Defense Solutions, Inc. (Applied Defense). Analytical Graphics filed suit in the United States Court of Federal Claims after the United States Government Accountability Office (GAO) denied protestor's GAO protest. See generally Analytical Graphics, Inc., B-413385, 2016 WL 6212299 (Comp. Gen. Oct. 17, 2016). In this court, Analytical Graphics asserts that the Air Force acted arbitrarily and capriciously when it issued the solicitation as a non-commercial item solution, because Analytical Graphics alleges that a majority of the services that the Air Force sought were available commercially, and further argues that Air Force acted arbitrarily and capriciously when it issued the solicitation as a set-aside for small businesses.

**FINDINGS OF FACT**

By way of background to understand the protest currently before the court, JICSpOC was established by the Department of Defense in October 2015. Even before JICSpOC was formally established, the Air Force had begun market research "for a new, firm-fixed price subscription service for commercial space observation and analysis capabilities." The Air Force sought a "solution to include hardware, software, training, and a commercial subscription service to include Space Situational Awareness Suite and Battle Management Command and Control software licenses." The parties have jointly stipulated that "the Air Force took a two-phase approach to determining and obtaining commercial capabilities that could contribute to the JICSpOC mission: (1) to test products found in the marketplace, and (2) to contract for operating capabilities." On August 24, 2015, the contracting officer issued a market research report (the JICSpOC market research report), recommending a sole source award to Analytical Graphics.[2] The JICSpOC market research report indicated that:

> Limited market research was conducted. Given the national security implications of the requirement, the use of various market research tools is necessarily constrained. For example, it is not practicable to engage industry with synopses for sources sought, draft request for proposals, capability statements/analysis, and other standard market research tools used for full and open competitions.

Regarding Analytical Graphics, the JICSpOC market research report stated:

---

[2] The parties have stipulated that "[t]he market research report leading to the AGI [Analytical Graphics] contract stated that the procurement was classified under NAICS Code 511210, Software Publishers."

AGI's ComSpOC [Commercial Space Operations Center] is cutting edge in the industry. Research confirms potential sources are time away from providing the tools AGI has developed commercially for application-level mission needs. The Government has determined that no other commercial sources currently produce or offer comparable capabilities in terms of the space situational awareness that AGI publicly offers for sale.

Commercial item: FAR 2.101 defines commercial item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and-- (i) Has been sold, leased, or licensed to the general public; or, (ii) Has been offered for sale, lease, or license to the general public. ComSpOC is available on the Analytical Graphics, Inc website (agi.com) for sale to the general public. This subscription service new and emerging technology with limited commercial sales; however, ComSpOC has been bought by the commercial company, Boeing Inc, to launch two commercial satellites. The backbone of ComSpOC is based on commercial software known as Space Situation Awareness (SSA). SSA is available and sold to the general public via the internet and GSA schedule. Therefore, FAR Part 12, Acquisition of Commercial Items, applies to the acquisition and has been determined by the contracting officer to be a commercial item.

The JICSpOC market research report also explained the difference between a license and subscription service, indicating:

License versus Subscription Service: Market research indicates this is a commercial software subscription and not a software license or agreement. In a license, the government gets rights to copy and use a software application, while in a subscription service; the government gets a subscription to use the software via the internet. The confusion stems from the central role of "software" in software as a service. Bottom line, what the government will do with the software. If the government puts a copy of a software application on a computer--downloads it, installs it from a disk, etc.--the contract calls for a license. Copyright law gives the software's owner a monopoly over the right to copy it (to "reproduce" it), so the government needs a copyright license to make a copy and put it on a computer. In a subscription service, the government does not put software on a computer, or copy it at all. The software sits on the contractor's computer and the government merely accesses it via the Internet. With no copies, copyright plays no role in the transaction, so the government does not need a copyright license. During the term of the contract, the contractor shall provide the application to government via the internet.

Finally, the JICSpOC market research report stated that "AGI provided a capability brief to the government customer. The customer has determined AGI is capable of providing

this capability. At this time, there are no known commercial items with the capabilities similar to ComSpOC."

In addition to the JICSpOC market research report, the contracting officer also issued a streamlined acquisition strategy summary (the JICSpOC streamlined acquisition strategy summary), again recommending a sole source award to Analytical Graphics. The JICSpOC streamlined acquisition strategy summary noted that "[t]he Government will acquire AGI's commercial products and capabilities collectively known as *Commercial Space Operations Center* (ComSpOC). The period of performance is 10 months from contract award." (emphasis in original). The JICSpOC streamlined acquisition strategy summary also indicated that:

> A search of General Service Administration, Space Symposium, and technical publications revealed no commercial product with similar capabilities other than AGI. In Space News, Lockheed Martin Space Systems, working with Australia's Electra Optic Systems, announced August 2014, it is planning a new space object-tracking site in western Australia and hopes to sell the data commercially and to the Government in the future. No commercial products are currently available for sale other than ComSpOC.

> AGI has provided a capability brief to the Government customer. At this time, there are no other known commercial items with the capabilities similar to ComSpOC.

Similar to the JICSpOC market research report, the JICSpOC streamlined acquisition strategy summary provided a rationale for proceeding under "FAR 12: Acquisition of a Commercial Item:"

> Commercial Item: FAR 2.101 defines commercial item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and-- (i) Has been sold, leased, or licensed to the general public; or, (ii) Has been offered for sale, lease, or license to the general public. ComSpOC is available on the Analytical Graphics, Inc. website (agi.com) for sale to the general public. In addition, this subscription service has been bought by commercial companies such as Boeing Inc to launch two commercial satellites. The backbone of ComSpOC is based on a commercial software known as Space Situation Awareness (SSA). SSA is available and sold to the general public via the internet and GSA schedule. Therefore, FAR Part 12, Acquisition of Commercial Items, applies to the acquisition and has been determined by the contracting officer to be a commercial item.

> This is a sole source requirement; therefore, FAR Part 15 applies. When contracting in a sole source environment, the request for proposal will be tailored to remove unnecessary information and requirements.

After the JICSpOC market research report and JICSpOC streamlined acquisition strategy summary, the contracting officer issued Solicitation Number FA2550-15-R-8002 to Analytical Graphics. The solicitation included CLIN 0001, which stated: "ComSpOC Subscription Service and Technical Support, including the AGI SSA and BMC2 SW Prototype/Risk Evaluation License IAW Statement of Objectives, 1 Sep 15," and CLIN 0002,[3] which stated:

> Onsite Data Processing Solution to include Hardware, Operating System/Software and Installation. Provide all necessary hardware for on-site data processing as well as all remote access log-in capabilities necessary to view and obtain ComSpOC subscription services and data from the contractor's processing center. Install and support initial system software configuration. Install and support the complete (target) system hardware configuration.

On September 29, 2015, the Air Force awarded Analytical Graphics, Contract No. FA2550-15-C-8008, a sole-source, fixed price contract (the JICSpOC contract). The period of performance was September 29, 2015 to July 30, 2016.[4] The value of the JICSpOC contract was $8,426,064.00.[5] The parties have stipulated that "[d]uring contract negotiations, the Contracting Officer negotiated a data rights addendum with AGI which was made part of the contract." The JICSpOC data rights addendum stated, in its entirety:

DFARS 252.227-7015-Technical Data Commercial Items
DATA RIGHTS ADDENDUM

> AGI grants AFSPC a limited, non-exclusive, non-transferable, non-sublicenseable right to access and use the features and functions of the ComSpOC Subscription Service for the Period of Performance, in accordance with the ComSpOC Corporation's Spacebook Subscription Service Agreement. ComSpOC Corporation is a wholly-owned subsidiary of AGI.

> AGI shall provide to AFSPC a Prototype/Risk Reduction License to AGI's SSA Software Suite for the Period of Performance in accordance with AGI's SSA Software License Agreement.

---

[3] The remaining CLINs refer to training and a "Commercial Communications Leased Line."

[4] The Air Force declined to exercise its option to extend the JICSpOC contract, allowing the JICSpOC contract to expire on July 31, 2016.

[5] The JICSpOC contract was broken out by CLINs. The fixed price for CLIN 0001 was $8,071,580.00, the fixed price for CLIN 0002 was $229,586.00, the fixed price for CLIN 0003 was $38,636.00, the fixed price for CLIN 0004 was $38,636.00, and the fixed price for CLIN 0005 was $47,626.00.

AGI shall provide to AFSPC a Prototype/Risk Reduction License to AGI's BMC2 Software Suite for the Period of Performance in accordance with AGI's BMC2 Software License Agreement.

The ComSpOC Subscription Service shall only be used for the purpose of the JICSpOC activities. Usage is limited to those "JICSpOC activity users." These users are defined as those JICSpOC, AFSPC HQ, and SMC personnel engaged in JICSpOC activities.

Furthermore, usage and distribution of any data resulting from the ComSpOC Subscription Service is limited as follows:

• ComSpOC raw data and products, including ComSpOC output products, may be used to directly support JICSpOC activities. These raw data and products will not be used for R&D purposes by other capability providers and developers, nor will they be used to reverse engineer and improve the tools of other participating capability providers and developers.

• Live data included in ComSpOC output products will not be transferred outside of the JICSpOC facility. However, historical data included in ComSpOC output products may be distributed outside the JICSpOC facility to be used solely as part of JICSpOC activities.

ComSpOC output products included as part of a JICSpOC operational report may be made available to all DoD personnel. ComSpOC output products not included as part of a JICSpOC operational report shall be limited in availability to JICSpOC, AFSPC HQ, and SMC personnel. Such availability to personnel beyond these Identified organizations shall require AGI's prior consent.

Commercial items are subject to the policies in other parts of the FAR. FAR Part 12 shall take precedence for the acquisition of commercial items. This addendum shall take precedence over the attached service and license agreements.

(capitalization in original).

Approximately one month after the JICSpOC contract was awarded to Analytical Graphics, the contracting officer began market research for the contract at issue in the above captioned protest, which was ultimately awarded to Applied Defense on October 21, 2016. The contracting officer first issued a Request for Information (RFI) on November 4, 2015, "to conduct market research, a continuous process for collecting and analyzing information about capabilities within the market to satisfy agency needs." The November 4, 2015 RFI continued, "the US Air Force needs processed, commercial Space Situational Awareness (SSA) data for operational use. SSA data must originate from non-DoD sensors and be validated on commercial systems outside of the Department of Defense (DoD) network." The parties have stipulated that the list of capabilities in the RFI was

similar to the "Application Technical Specifications"[6] in the JICSpOC contract and further stipulated that "[a]t the time this RFI was issued, the contracting officer anticipated that the application ultimately procured for operations would probably be a commercial item."

---

[6] The RFI sought information about the ability of offerors to provide the following applications:

- Include a mix of optical, radar and passive radio frequency (RF) systems capable of providing astrometric, radiometric, and/or photometric data.

- Provide high definition ephemeris data on space objects to include position, status, accuracy/confidence, covariance, and historical trending data.

- Provide specific meta-data on the source of the observations such as latitude, longitude, and altitude; time of collection, owner/operator, and/or country of origin.

- Provide sensor status, such as Non-Mission Capable, Fully Mission Capable, or Partially Mission Capable.

- Provide realistic SSA sensor collection opportunities considering feasibility and timing for metric and non-metric data needed to support SSA courses of actions.

- Be capable of processing metric observations from sensors from any commercial or US Government, civil, and/or international entity in any format.

- Be capable of identifying, when technically possible, possible, associate, characterize, monitor and track observable space objects whose orbits are not in the Geosynchronous Earth Orbit (GEO) belt, including, but not limited to, objects in Low Earth Orbit (LEO), Medium Earth Orbit (MEO), and Highly Elliptical Orbit (HEO).

- Provide a threat analysis for specified high interest US satellites, depicting time and distance, as well as required time for a specified threat to maneuver into a threatening position.

- Provide a threat analysis to current and planned operations of space-based mission capabilities supporting Intelligence, Surveillance and Reconnaissance (ISR), Communications, Position, Navigation and Timing (PNT), Missile Warning, and Weather.

- Provide predicted and real time characterization of all launch and early orbit operations, to include direct ascent Anti-satellite (ASAT) threats, by

Fifteen potential offerors responded to the November 4, 2015 RFI, including Analytical Graphics, Applied Defense and ExoAnalytic Solutions, Inc. (Exo). Subsequently, on March 29, 2016, the contracting officer issued the first amended RFI,[7] which included a revised statement of the needs, indicating: "The US Air Force needs commercial SSA data for operational use. SSA data must originate from non-DoD sensors and be real-time. See attached for minimum salient characteristics." The parties have stipulated:

> In the amended RFI, The Air Force sought information about collections of data, software and personal services that could meet certain minimum requirements. The Air Force included a list of ten "Salient Characteristics" that the Air Force considered to be "minimum requirements" for the SSA system:
>
> SALIENT CHARACTERISTICS: The collection of non-governmental SSA data, processing tools, personnel, and contracted support will be referred to as the Commercial SSA System.
>
> • Provide metric, non-metric, and Space Object Identification (SOI) observations from data collected from a minimum of 10 worldwide sensors outside the control of the USG, at least half of which must not be terrestrial sensors in North America (e.g. sensors in Europe, on orbit).
>
> • Document whether sensors can be utilized on an on-demand basis or if their use must be pre-planned and list the additional costs for on-demand service, if applicable.
>
> • Provide the format and source of the data.
>
> • Ingest authorized DoD data (raw or processed observations) into any contractor event processing or analysis capability.

---

> determining orbital trajectories, projected conjunctions with projected launch vehicle path, etc.
>
> • Support the ability to assess feasible courses of action, for deliberate and/or crisis action planning, to maximize safety of flight, continued operations, and response options of space assets and missions to support warfighter needs and commander's intents.

[7] The contracting officer subsequently issued a second amended RFI, on April 1, 2016, to publicly answer four questions submitted by potential offerors, as well as a third amended RFI, issued on April 5, 2016, to extend the deadline for submissions by five hours. Subsequently, the contracting officer issued a fourth amended RFI, dated May 11, 2016, which is discussed further below.

• Ensure they export their data, one-way, to DoD networks of equal or higher classification for additional processing.

• Provide for threat warning assessment by detecting and notifying JICSpOC personnel of a space object entering or projected to enter a user-definable area around specific resident space objects (RSO) within 15 minutes of entering. NOTE: 15 minutes is the unclassified value.

• Process and correlate feature-type data (Visual Magnitude (Vmag), Radar Cross Section (RCS) changes, RF spectrum, etc.).

• Ability to detect hostile and non-hostile maneuvers and analyze the change of behavior, to include the revised orbit, within 2 minutes of maneuver detection.

• Augment DoD persistent monitory capabilities by maintaining custody of designated objects (e.g. Super High Interest Objects) to the maximum degree possible.

• Provide telemetry data on the orbits of all detectable objects.

(capitalization in original). On April 6, 2016, fifteen potential offerors again responded to the first amended RFI, including Analytical Graphics, Applied Defense, and Exo. Analytical Graphics, Applied Defense, and Exo. Analytical Graphics stated that it could meet the Air Force's minimum salient characteristics and explained that "[t]he Government's requested product (the Commercial SSA System) requires a private implementation of AGI's Commercial Space Operations Center (ComSpOC) consisting of four AGI products, all of which are available commercially." In response to the RFI question: "Describe how your product meets the definition of commercial item in FAR 2.101," Analytical Graphics explained:

AGI's product meets the definition of commercial item in FAR 2.101 as follows:

1. The product is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and
a. Has been sold, leased, or licensed to the general public; or,
b. Has been offered for sale, lease, or license to the general public;
2. The product evolved from an item described in (1) of this definition through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation.
3. The product related services are of a type offered and sold competitively in substantial quantities in the commercial marketplace based on

established catalog or market prices for specific tasks performed or specific outcomes to be achieved and under standard commercial terms and conditions.

Analytical Graphics also suggested that:

Since the Government is procuring a commercial item, AGI recommends that source selection evaluation be done under FAR Part 12 (12.6, Streamlined evaluation of offers), which will enable the Government to select a commercial solution provider who not only meets but exceeds the majority of the salient characteristics, with recent and relevant past performance, and with a price that can be justified based on these contributing inputs.

The parties have stipulated that Applied Defense, in contrast to Analytical Graphics, indicated in its response that "it would lead a consortium of organizations long involved in SSA to provide a Commercial SSA System," and that "the consortium could meet the minimum salient characteristics set forth in the amended RFI." In response to the RFI question: "Describe how your product meets the definition of commercial item in FAR 2.101," Applied Defense responded:

The definition of the product in the Salient Characteristics is not available in the general public and as such would not meet these criteria. Due to the nature of the published requirements, it is our assessment that any existing product which meets all of those requirements would only do so with significant security concerns. This is a topic which could be addressed further at Industry Day and subsequent direct interactions. With that said we do believe commercially sourcing of data, processing, and services is very achievable and that non-US Government sourced products and services can mature quickly in an open marketplace if security and policy restrictions are eased.

Regarding the procurement generally, Applied Defense indicated that:

It is our strong belief that No Single Bundle of Commercial Products or Services will meet the USG needs. The requirements for SSA and the mission needs are such that a multiple award IDIQ type strategy is the only workable strategy. Sensor types satisfying the operational needs are so diverse, covering not only global geography but spanning all orbit regimes for small or large, bright or faint, and emitting or quiet, that new sensor phenomenology can only be brought online in a multiple award, non-monopoly marketplace. If the USG were to select only one provider of sensors and processing they would artificially restrain competition, innovation, and bring great long term risk to US commercial and sovereign

interests. A very real fear is that the marketplace would be dominated by a monopoly or duopoly, much like the launch industry had been dominated by two providers, to the detriment of the interests of the US Government and US industry competitiveness worldwide. The US Government should be concerned that they may evolve the SSA arena into a commercial market dominated by a monopoly.

In its response to the first amended RFI, Exo indicated that it could meet the government's minimum salient characteristics. In response to the RFI question: "Describe how your product meets the definition of commercial item in FAR 2.101," Exo stated, in part, "ExoAnalytic's commercial data and software packages meet the FAR 2.101 definition of commercial items as they have been sold and/or offered for sale to the general public, and are used for purposes other than governmental purposes." Both Applied Defense and Exo indicated in their April 6, 2016 responses that they were small businesses "according to the criteria of the relevant NAIC code." Analytical Graphics indicated that it was not a small business.

The parties have stipulated that, after the submissions to the first amended RFI, "[t]he Air Force determined that the responses of AGI and ADS [Applied Defense] indicated that AGI and ADS could satisfy all 10 of the minimum salient characteristics, and that the response of Exo indicated that Exo could satisfy 9 of the minimum salient characteristics."

After receiving the responses to the first amended RFI, the Air Force held a classified industry day on April 15, 2016, inviting eight potential offerors to the event, including Applied Defense, Exo, and Analytical Graphics.[8] Regarding protestor's participation at the industry day, the parties have stipulated that:

> During the Industry Day, AGI had a one-on-one meeting with the Air Force during which the Agency confirmed that AGI solutions satisfied the requirements. AGI was asked whether it was willing to negotiate greater data rights to satisfy unique Government needs. AGI responded affirmatively. An Industry Day One-on-One summary document later memorialized this exchange, explaining that "AGI stated they have no problem with giving the USG [United States Government] full data rights and 'it makes sense.'"

(internal references omitted).

---

[8] The court notes that the parties have stipulated that "[t]he portion of the market research conducted during industry day was not conducted directly by the contracting officer -- who lacked both technical expertise and the necessary security clearance." The parties agree that the agency relied upon the agency's technical expert, Lieutenant Colonel Anthony Calabrese.

Subsequent to the industry day, the Air Force generated a draft Performance Work Statement. The contracting officer, in a limited deposition taken after the protest was filed in this court, stated that, in her opinion, there were multiple factors that could not be met by a commercial item.[9]  She stated:

I determined it to be a noncommercial requirement although some of it could be met with commercial items, I did not feel that the entire solution could be network commercial items, due to several factors, which included services, the data -- services, data rights, the DOD publications and regulations and the type of contract that I was planning to utilize. The combination of those led me to believe it was noncommercial.

Regarding data rights, at the deposition, protestor's counsel asked the contracting officer, "you just testified that because you had a small business set aside, you didn't approach AGI to negotiate [the data rights]?"  The contracting officer answered:

I already had. There was no reason to have to negotiate. AGI had said in their market research that they were willing to negotiate. So at that time I have to take the fact that AGI stated several times you were willing to negotiate rights. However, at the same time, I was making a decision on the small business set aside, so based on the fact -- I was making a noncommercial decisions [sic] and yours was a commercial solution, and I had two small businesses capable, there was no reason to have to -- you wouldn't negotiate rights unless you had a proposal and you were going into discussions.

After generating the draft Performance Work Statement, the contracting officer issued a fourth amended RFI, dated May 11, 2016, which included the draft Performance Work Statement, asked potential offerors to comment on the draft Performance Work Statement and indicated in the section identified as "Scope:" "This is a non-personal services contract to provide nongovernmental space situational awareness (SSA) software and services. Nongovernmental SSA solutions are required to augment the Government's ability to detect and characterize space threats and improve integration between DoD, intelligence community, interagency, and nongovernmental space assets."[10] In addition, the fourth amended RFI stated that the Air Force was considering

---

[9] On November 22, 2016, the court issued an Order, which stated, in part, "for the reasons explained at the hearing, the protestor is permitted to take a deposition of the Contracting Officer." The protestor requested the deposition, over the defendant's and intervenor's objections, which the court granted, noting that although "depositions are unusual in protests," there were questions about what the contracting officer considered in making her decision, and how she handled the data rights issue.

[10] The parties have stipulated that "[t]he Contracting Officer testified that, prior to the issuance of the fourth amended RFI, the Contracting Officer began to doubt that the requirement could be satisfied in full with a commercial item."

issuing the procurement as a small business set-aside. The fourth amended RFI asked the potential offerors to address a series of questions, including, "[t]he Government is considering NAICS code 511210, Software Publisher. Do you believe this is an appropriate NAICS code? If not, please provide the NAICS code you consider to be most appropriate and why," and "[d]o you have a Top Secret facility clearance?"

Applied Defense responded to the fourth amended RFI on May 20, 2016. The parties stipulated that "ADS asserted that it would be eligible for a small business set-aside, but further asserted that the appropriate NAICS code category was 'Engineering Services.'"  Exo likewise responded to the fourth amended RFI, and like Applied Defense indicated it would be eligible for a small business set-aside, but unlike Applied Defense, Exo stated: "ExoAnalytic is a small business under NAICS code 511210, and considers this NAICS code appropriate for the subject acquisition."

Analytical Graphics responded to the fourth amended RFI on May 23, 2016, and suggested that its commercial solution, consisting of the ComSpOC SSA Subscription Service, SSA Software Suite, and BMC2 Software, all commercial items, met the requirements of the draft Performance Work Statement.  Regarding the issue of a small business set-aside, Analytical Graphics indicated that

> Although AGI understands the need of the Government to consider small business, AGI recommends that the Government purchase AGI's Commercial SSA System as a commercial item under FAR Part 12 (Commercial Item Acquisition). The reasons for this are: 1) the Government's requirements (from the FBO Announcements, Salient Characteristics, and PWS) indicate that the Government wants a _Commercial_ SSA System; 2) 41 USC 3307 and FAR Part 12 requires that commercial items be purchased when commercial items are available; and 3) a commercial item exists and has uniquely demonstrated that it exceeds the salient characteristics and provides the best value to the Government with the lowest risk during the JICSpOC exercises, as well as on other Government and Commercial contracts.

> Given that AGI does not qualify as a small business under any relevant NAICS code, AGI recommends that the Government not pursue a small business set-aside because it would preclude the Government from procuring the best available commercial solution, one that has uniquely demonstrated it satisfies the requirements and provides the best value at the lowest risk. Additionally, FAR Part 12 policy (12.102 (c)) states that FAR Part 12 shall take precedence over other FAR parts (including FAR Part 19 – Small Business Programs), when a policy in another part of the FAR is inconsistent with FAR Part 12. Furthermore, based upon market research and experience, AGI believes there are no small businesses with existing commercial items that can meet the Government's requirements. As a result, it is not reasonable to expect that the Government will obtain offers from at least two responsible small businesses, as required by FAR Part

13

19.502-2 (b)1 [sic], which mandates that the Government has to have a reasonable expectation that offers will be obtained from at least two responsible small business concerns and that award will be made at fair market prices.

Additionally, there is no reason to limit competition to small business due to security concerns. AGI has uniquely demonstrated under AFSPC Contract No. FA2550-15-C-8006 that it has satisfied all of the security requirements at the JICSpOC and can meet the security requirements in the PWS.

Finally, if commercial acquisition is used, there is still significant opportunity for small business participation. AGI has a commercial products subcontracting plan in place under its GSA contract (per FAR 19.704(d)), the preferred type of plan for contractors furnishing commercial items. This plan has goals for small business participation that are in accordance with the Small Business Program. For GFYE 2015, small business participation under AGI's commercial products subcontracting plan totaled 44%. For this procurement of AGI's Commercial SSA System, AGI expects 22% will be provided by small business.

(emphasis in original; footnote omitted).

On May 31, 2016, the contracting officer recommended a small business set-aside, and on June 1, 2016, the agency's small business specialist concurred with the recommendation of a small business set-aside. The same day, June 1, 2016, the contracting officer wrote a Memorandum for Record with the subject: "Noncommerciality for Services and Government Purpose Rights." The memorandum began:

The Government's requirement is for the contractor to provide government purpose rights for the raw data identified in the performance work statement to specified locations at Schriever AFB, Peterson AFB, Vandenberg AFB, and other locations directed by the Government. Product data shall be available with government purpose rights and shall be distributed to operations centers at: Offutt AFB, Vandenberg AFB, Chantilly, five specified intelligence locations; and other locations as deemed necessary by the Government. Such data may be shared for government use only, with other contractors.

The Government's rights typically would be limited to standard commercial uses as a "commercial item." AGI's license agreements included the following statement: You may NOT allow the processed data to be viewed outside the organization or program for which the software is licensed without the prior written consent of the vendor. The Government must have government purpose rights to allow the Government to make strategic, tactical, and course-of-action decisions real-time. The Government will not be able to obtain written permission prior to providing raw data, processed

14

data, or end products to another government agency or a contractor supporting a government requirement. The contracting officer assessed the data rights required were substantially different than standard commercial use.

(capitalization in original). Two days later, on June 3, 2016, the contracting officer wrote a Memorandum for Records with the subject: "Pricing for Analytical Graphics and ExoAnalytical [sic] Solutions." The memorandum stated:

The majority of respondents did not provide a price list for their products during market research. ExoAnalytical's [sic] price list was utilized to develop the Government's independent cost estimate and historical data from other contracts.

Analytical Graphics' prices were high compared to the Government's IGE. Based on the contracting officer's understanding of the requirement, an estimate was developed. The estimate utilizing AGI's price list was twice the estimate of the Government's IGE [Independent Government Estimate]. See attached spreadsheet for details.

The parties have stipulated that "[t]he Contracting Officer testified that, at the time she prepared this memorandum, she doubted whether a commercial item could satisfy the Government requirement, but no formal decision had been made."

As noted in the parties' joint stipulations of fact, "[b]etween June 7, 2016 and June 15, 2016, various Air Force officials signed the justification and authorization document to approve limiting competition to ADS and Exo, pursuant to the authority of 10 U.S.C. [§] 2304(c)(6) and 48 C.F.R. [§] 6.302-6." (internal references omitted). The parties have stipulated that:

The J&A [justification and authorization] document assumed the possible award of "one or more negotiated, non-commercial, hybrid-type contracts space situational awareness (SSA) capabilities to be deployed at the Joint Interagency Combined Space Operations Center (JICSpOC)." The J&A document also assumed "the CO determined the acquisition is suited for a total small business set aside," and noted that an "extensive market research report is in draft to support the conclusion that two small businesses are capable of fulfilling the government's requirement."

(internal references omitted).  The justification and authorization document explained:

(U)[11] For this acquisition, the government: 1) publicly sought sources for the opportunity to fulfill its requirements, 2) disclosed the salient features of the products/services sought, 3) transparently communicated the security

---

[11] The court in uncertain why each new paragraph begins with "(U)."

requirements associated with the acquisition, 4) evaluated thoroughly capability statements from all respondents, 5) provided an exchange of information opportunity at an Industry Day event, and 6) re-publicized the opportunity for industry consideration following the Industry Day event.

(U) As a result of government exchanges with industry as listed above, the government identified eight firms that demonstrated a rudimentary understanding of the government's requirements and possessed sufficient security clearances to participate in the government's Industry Day event.

(U) In reviewing the results of informational exchanges and vendor presentations from the Industry Day, the Contracting Officer (CO) and the Program Manager (PM) jointly determined that three of the firms participating in Industry Day were small business concerns that could potentially provide the products/services as prime contractors.

(U) In follow-on discussions with the three small business concerns, two of the firms expressed strong interest in submitting proposals as prime contractors. The PM assesses two of the interested small businesses as having capability to provide the required products and services for this requirement as prime contractors. Therefore the CO determined the acquisition is suited for a total small business set-aside as prescribed at FAR 19.502-2(a); that is, within the context of the national security constraints imposed on this acquisition.

(U) The CO finds a reasonable expectation exists for receiving proposals from two responsible small business concerns, and that award can be made at fair market prices. For this acquisition, the two small businesses that have emerged from the Requests for Information (RFI) and Industry Day processes appear to be uniquely qualified at this time in terms of security qualifications and possessing the capabilities required, or ability to obtain them, to facilitate the objectives contemplated in the Performance Work Statement (PWS). The two small businesses are ExoAnalytics [sic] and Applied Defense Solutions (ADS).

(U) Both ExoAnalytics [sic] and ADS were determined by the PM to have responded affirmatively to the questions posed by the government in the RFI and Industry Day exchanges. Both firms have demonstrated extensive experience with space observation technologies. Both have ongoing contractual relationships with the government and have developed, or helped to develop, capabilities currently in use in both the Defense and Intelligence communities. Both firms are postured to team as needed with an extensive network of commercial and non-government sources to facilitate delivery of the required products/services. Both firms have requisite facility and personnel security clearance posture to begin delivery/performance immediately upon contract award. Given these

factors, ExoAnalytics [sic] and ADS are reasonably assessed to have unique qualifications to provide/perform the SSA work contemplated in the PWS. Thus through [sic] these elements of market research, the CO and PM conclude that ExoAnalytics [sic] and ADS are presently the only two small businesses with demonstrated capabilities necessary to deliver the non-government, non-developmental SSA requirements for the JICSpOC, as put forth in the government's PWS.

As related to market research, the justification and authorization document stated:

(U) Market research was conducted, including two RFIs posted to the GPE [Government Point of Entry] and an industry day conducted between the first and second RFI. The initial RFI provided potential offerors with notification of security requirements and a list of salient characteristics offeror products and services would need to demonstrate to receive consideration for an industry day invitation. Responses from the initial RFI were assessed to gauge potential technical capabilities as well as security clearance requirements. Firms that did not demonstrate a rudimentary understanding of the requirements and those without appropriate clearance levels were not invited to attend industry day. For the industry day, the Program Manager (PM) determined disclosure of classified information to those invited was necessary to sufficiently explain the government's requirements and allow for a meaningful exchange of information. This led to the conclusion that eight responding firms possessed requisite security clearance requirements and demonstrated a rudimentary capability to potentially participate in the acquisition.

(U) Following industry day presentations, the PM and CO jointly determined three small business concerns were potential candidates for prime contract award. The three small businesses were contacted to discuss prime contract interest. Two of the small business firms (ExoAnalytics [sic] and ADS) expressed strong desire to participate as a prime contractor for the requirements. The third firm (Rincon) affirmed their desire to participate, but only in terms of subcontracting opportunities.

(U) An extensive market research report is in draft to support the conclusion that two small businesses are capable of fulfilling the government's requirement.

Regarding the cost, the justification and authorization document stated:

(U) **Determination by the Contracting Officer that the anticipated cost to the Government will be fair and reasonable.**

(U) The Contracting Officer (CO) anticipates that cost to the Government may be determined to be fair and reasonable on the basis of price and/or

cost analysis and by using certified cost or pricing data to analyze elements of cost.  Given the government with solicit for the award of one or more contracts for the work, the CO further anticipates that proposed costs to the government will be driven by competitive forces.

(emphasis in original).

On June 21, 2016, the Air Force produced a Market Research Report which contained the evaluation of the each of the offerors that had responded to the first amended RFI.[12] Of the seventeen offerors who had responded to the Air Force, only two, Applied Defense and Analytical Graphics, meet all ten of the ten "Salient Characteristics" identified by the Air Force. Notably, Exo met nine of the ten "Salient Characteristics," failing to meet the characteristic: "Process and correlate feature-type data (Visual Magnitude (Vmag), Radar Cross Section (RCS) changes, RF spectrum, etc."

The Market Research Report contained a section titled "Commercial Opportunities," which stated in full:

The RFI originally sought to obtain SSA data from a commercial solution. However, it became apparent after market research that the data and services required could only be met through noncommercial sources because of the following factors: limited commercial data solutions are available, the required services to be performed are not found in the commercial marketplace, the Government requires unique hardware requirements and the Government's desire to obtain complete technical rights. Also, the commercial data solutions that are available focus on safety of flight and do not meet all of the requirements for SSA as listed in the PWS. Additionally, some vendor's responses stated their solution was a commercial product; however, most vendors were unable to provide a commercial price list or commercial customers for the software. Lastly, upon review of the PWS, the DoD and AF regulations governing the execution of the requirement, the Government's desire to obtain data rights, and the integration of the product data into national security operations makes this requirement noncommercial. It is hereby determined that the requirement is not offered to the general public in the commercial marketplace and is not a commercial service as described in FAR Part 12.

For the section titled: "Government's Presence/Leverage in the Market," the Market Research Report indicated:

Although market research determined limited commercial data solutions are available; the required services to be performed, unique hardware requirements, the integration of product data into national security

_____

[12] The parties' joint stipulations of fact indicate that the Market Research Report was written "by the contracting officer and program manager."

operations and the Government's desire to obtain complete technical rights of the data are not commonly or readily available in the commercial marketplace. Additionally, the commercial data solutions that are available focus on safety of flight and do not meet all the requirements for Space Situational Awareness as listed in the PWS.

Regarding the small business possibility, the Market Research Report indicated that "[t]hree of the eight respondents deemed capable through market research as outlined in section E are small businesses. Two respondents (ADS and ExoAnalytics [sic]) stated they could perform 50% or more of the work [as the prime contractor]."

Concurrent to the justification and authorization document and the Market Research Report, the Air Force developed an acquisition plan, and as stipulated to by the parties: "The acquisition plan was signed on various dates between June 30, 2016 and July 12, 2016. The commercial item determination from the market research report is repeated in the acquisition plan."[13] (internal citations omitted). The acquisition plan, in a section titled "Product or Service Descriptions," stated:

The majority of this acquisition is commodity based. Approximately 71% of the estimated contract value is commodity and 29% of the estimated contract value is embedded non-personal services. The PWS is written IAW FAR part 37.6 to minimize non-performance aspects. There are, however, several DOD and AF directives that preclude a completely performance-based contract. Inclusion of these directives has been limited to the extent practicable.

The PWS in combination with the service summary (SS) will identify the minimum contractor performance requirements and associated performance thresholds. The SS Items are the key measures of success for contractor operations and are considered by the acquisition team from a risk management and contract quality assurance perspective.

The sources sought announcement requested comments regarding the PWS and service summaries. Industry has not recommended any specific performance thresholds and highly recommends the Government utilize only measurable and attainable thresholds.

During the deposition taken after the protest was filed in this court, the contracting officer indicated that "in her view, the 'commodity' portion of the contract could be satisfied by commercial items, but that the services portion could not be satisfied by commercial items."  On June 30, 2016, the Air Force finalized its decision to move forward with a non-

---

[13] The acquisition plan reflects that on June 30, 2016, the Competition Advocate, the Staff Judge Advocate, and the Approval Authority all signed the acquisition plan, and that on July 12, 2016, the Director of the AFSPC (Air Force Space Command) Small Business Programs signed the acquisition plan.

commercial item small business set-aside acquisition. The following day, on July 1, 2016, the Air Force issued Solicitation No. FA2550-16-R-8008,[14] and limited the competition to only two small businesses: Exo and Applied Defense. The solicitation was issued as a best value and indicated:

> The Government will select the best overall offer, based upon an integrated assessment of Technical/Technical Risk, and Cost/Price. The Government may only award a contract to an offeror who is deemed responsible in accordance with the FAR, as supplemented, whose proposal conforms to the solicitation's requirements (to include all stated terms, conditions, representations, certifications and all other information required by Section L of this solicitation) and is judged, based on the evaluation factors, to represent the best value to the Government.

The solicitation explained the evaluation process: "Subfactor 1 will be evaluated as a combined technical/risk. Subfactor 2 as acceptable/unacceptable. Cost/Price will be evaluated for reasonableness, completeness, affordability and realism." Subfactor 1 addressed technical products, and Subfactor 2 addressed technical products, and both subfactors required the offerors to demonstrate an acceptable approach and understanding of the solicitation's "Nongovernmental SSA Requirements," the Performance Work Statement's "Nongovernmental Space Situational Awareness Requirements," and the Performance Work Statement's "Nongovernmental Space Situational Awareness Product Requirements." Regarding price:[15]

> The price evaluation assesses each offeror's proposed price for base and two 12-month option period [sic] for reasonableness and affordability. An assessment that the proposal is not reasonable or affordable will result in the offer being considered unacceptable for award. The burden of proof for price reasonableness rests with the offeror. Price reasonableness and affordability will be evaluated using techniques described in FAR 15.404-1(b) as necessary.

The parties have stipulated that, "[a]fter July 1, 2016, AGI learned that the RFP had been issued and that responses were due on or before July 18, 2016. AGI learned that the Solicitation was set aside for small businesses and sought a non-commercial SSA solution. The Air Force further restricted the set-aside competition to only two firms, Exo and ADS." (internal reference omitted). The Air Force explained the agency's decision to Analytical Graphics in an email, which stated, in part:

---

[14] The solicitation was subsequently amended on July 6, 2016, July 20, 2016, August 25, 2016, and September 12, 2016.

[15] The solicitation also indicated that "[t]he Government will perform a cost realism analysis of all offers based on the offeror's cost/price proposal total estimated contract price for CLIN X002 only."

Through market research and evolving requirements, the JICSpOC software requirements have been determined to be non-commercial for the Space Situational Awareness integrated solution. The Government's has a reasonable expectation of obtaining offers from two or more responsible small business concerns that are competitive in terms of market prices, quality, and delivery. Therefore, this acquisition shall be set-aside exclusively for small business. The RFP will not be posted to FedBizOps due to the classified nature of the some of the documents.

On July 11, 2016, Analytical Graphics filed a bid protest at the GAO. Analytical Graphics alleged that the Air Force's decision to set aside the procurement for small businesses was unreasonable and an abuse of discretion. Analytical Graphics additionally alleged that the Air Force's decision to "disregard the statutorily-mandated preference for commercial items was unreasonable, arbitrary, capricious, and contrary to law."[16]

On October 17, 2016, the GAO denied Analytical Graphics' protest. See Analytical Graphics, Inc., B-413385, 2016 WL 6212299. The GAO indicated that, regarding Analytical Graphics' contention that Air Force unreasonably set the procurement aside for small businesses, "we find no basis to sustain the protest," and held that "[f]urther, nothing in the record supports the protester's argument that the Air Force unreasonably concluded that ADS could meet the agency's requirements." Id. at *4, *8. The GAO explained that for a small business set-aside determination, the Air Force was not required to make a responsibility decision, but only an "informed business judgment that there is a reasonable expectation of receiving acceptably priced offers from small business concerns that are capable of performing the contract." Id. at *6.  Regarding Exo, Analytical Graphics had argued that Exo "could meet only 9 of the 10 minimum requirements," which "meant that the agency could not reasonably expect this firm to be a responsible offeror."  The GAO noted that "ExoAnalytic stated that it could perform the requirements, and there is no allegation of misrepresentation in this regard," and that "[n]either FAR § 19.502-2(b) nor the decisions by our Office require an agency to request, or a prospective small business offeror to provide, a complete technically-acceptable approach in response to market research." Id. The GAO, therefore, determined that "[u]nder the applicable standards for making a set-aside determination, we find no basis to conclude that the agency's judgment here regarding ExoAnalytic was unreasonable." Id. Specifically regarding Applied Defense, the GAO indicated that although protestor "AGI argues that the Air Force unreasonably found that ADS would be capable of meeting the agency's requirement," "the agency found that ADS could meet all 10 of the minimum requirements." Id. at *7. The GAO concluded that, "given the discretion afforded to agencies in exercising their business judgment to determine whether to set aside a requirement for small businesses, we conclude that the record here does not show that the agency's determination regarding ADS was unreasonable." Id. at *8.

---

[16] At the GAO, Analytical Graphics raised a third issue, which it does not raise in this court, that the Air Force unreasonably had required that the proposed solutions only identify up to 200 resident space objects.

Regarding Analytical Graphics' protest ground that the Air Force improperly designated the solicitation requirements as non-commercial, the GAO first indicated that "[d]etermining whether a product or service is a commercial item is largely within the discretion of the contracting agency, and such a determination will not be disturbed by our Office unless it is shown to be unreasonable. Palantir USG, Inc., B-412746, May 18, 2016, 2016 CPD ¶ 138 at 4." Analytical Graphics, Inc., B-413385, 2016 WL 6212299, at *9.[17] Regarding the procurement currently at issue, rather than deciding the merits of the commerciality protest ground, the GAO referred to its earlier conclusion that that the Air Force reasonably set the procurement aside for small businesses and stated that Analytical Graphics "does not demonstrate why the agency's evaluation of the commerciality of the services affects the assessment of the capabilities of the two potential small business offerors." Id. The GAO concluded:

> Thus, even if the requirements were deemed commercial, the protester has not demonstrated that such a designation would affect the agency's conclusion here that the two small business firms are capable of meeting those requirements. Because AGI, a large business, is ineligible to compete for the award, we conclude that it is not an interested party to challenge the terms of the solicitation, and dismiss its remaining arguments.

Id.

The day after the GAO issued its decision, on October 18, 2016, the contracting officer made the "Determination and Finding Contractor Responsibility," and the Source Selection Evaluation Board recommended award to Applied Defense. The same day, October 18, 2016, the Source Selection Authority determined that Applied Defense and Exo were both "considered technically *good.*" (emphasis in original). The Source Selection Authority explained that for Subfactor 1, products, "SSA software products were rated based on a combination of technical acceptability and contract performance risk. Both offerors met all requirements and demonstrated a thorough approach and understanding to perform the product requirements in the PWS. Both proposals contained two strengths each," and for Subfactor 2, services, "[b]oth offerors were rated as

---

[17] There is not much precedent in the Federal Circuit regarding challenges to commercial/non-commercial standards. As discussed below, however, Palantir USG, Inc. and Palantir Technologies, Inc., after their GAO protest was unsuccessful, filed a bid protest in the court which was assigned to the undersigned. In Palantir USG, Inc. v. United States, 129 Fed. Cl. 218 (2016), in a different procurement from the one referenced above, which did not present a small business set-aside issue, and with different facts presented, the undersigned determined that pursuant, to 10 U.S.C. § 2377, the United States Army had failed to conduct a proper commercial availability evaluation. See Palantir USG, Inc. v. United States, 129 Fed. Cl. at 289. The Palantir decision is currently on appeal to the United States Court of Appeals for the Federal Circuit. See Palantir USG, Inc. v. United States, Case No. 17-1465 (Fed. Cir. Jan. 9, 2017).

*acceptable*." (emphasis in original). For the comparative analysis, the Source Selection Authority determined:

> Comparing the two offerors' proposals resulted in an assessment that both proposals were *good* and offered equivalent software and services per the solicitation. The technical differences are in details and not in overall performance, risk, or acceptability. A point-by-point comparison would show that the required data would be provided and handled similarly in a secure fashion; each offeror would be able to access and task a global network of SSA sensors; each offeror would provide effective and efficient analysis tools and support to JICSpOC experiments; and each offeror would adequately staff the effort. There are distinctive strengths, however: the ExoAnalytic sensor network is twice the size of ADS's network; ADS will be able to demonstrate its capability in the JICSpOC earlier than ExoAnalytic. These distinctions, however, are not enough to select one bidder over another on a purely technical or risk basis as both are considered technically *good.*

(emphasis in original).   Regarding cost/price, the Source Selection Authority determined:

> The final proposal revision cost/price proposals submitted by both offerors are reasonable, realistic (no probable cost adjustments were necessary), affordable, and complete. ADS offers the lowest total evaluated price at $24,252,038, which is $8,102,266 lower than ExoAnalytic's proposed price of $32,354,304. Both offerors were responsive to the RFP and met all requirements; acknowledged and responded to all amendments; conformed to all required terms and conditions; and included all required certifications. The Professional Compensation Plan was acceptable for both offerors. In addition, ADS and ExoAnalytic were deemed to be responsible in accordance with FAR 9.104, as supplemented.

The Source Selection Authority indicated the Source Selection Evaluation Board recommended award to Applied Defense, and noted that "[t]echnical performance and risk are equivalent. While both offerors demonstrated strengths in their approach, the non-similar ExoAnalytic strengths compared to ADS's strengths does not justify an $8 million price difference. The determining factor, therefore, is price. ADS's price is significantly lower than that quoted by ExoAnalytic for the similar products and services." The Source Selection Authority concluded:

> I made no tradeoffs in the evaluation of either the technical or cost/price factors. I assessed that the offerors' "*good* [sic] technical approaches and understanding and similar strengths are equal. While I acknowledge ExoAnalytic's 96-percent average availability rate to track tasked objects is a strength, ADS's ability to exceed PWS requirements, matched with a cost/price $8,102,266 less than ExoAnalytic, represents the best value to the Government.

(emphasis in original). After informing Exo that it would not receive the award, on October 21, 2016, the Air Force awarded a contract to Applied Defense.

As noted above, after the protest Analytical Graphics filed at GAO was unsuccessful, <u>Analytical Graphics, Inc.</u>, B-413385, 2016 WL 6212299, and after the Air Force made the award to Applied Defense the protestor filed the current post-award bid protest in this court. The complaint in this court has seven counts. Count one alleges that the Air Force violated 10 U.S.C. § 2377 (2012) and 48 C.F.R. § 10.002 (2017) and 48 C.F.R. § 11.002 (2017) by ignoring the statutorily mandated preference for commercial or non-developmental items. Similarly, count two alleges that the Air Force violated 10 U.S.C. § 2377 and 48 C.F.R. § 10.002 and 48 C.F.R. § 11.002 by refusing to tailor the requirements "in a manner that would allow the agency to take advantage of available commercial SSA solutions." Count three alleges that the Air Force's decision to procure a non-commercial solution in order to obtain broader data rights violated 10 U.S.C. § 2320 (2012), as well as several provisions of the FAR. Count four alleges that the Air Force's failure to negotiate the terms of Analytical Graphics software license violated 10 U.S.C. § 2320 (2012), as well as several provisions of the FAR. Count five alleges that "[t]he Air Force's 'Rule of Two' determination underlying the set-aside decision was arbitrary, capricious, and an abuse of discretion and unlawfully restricts competition in violation of the Competition in Contracting Act, 10 U.S.C. § 2304." Count six alleges that "[t]he Air Force's 'Rule of Two' determination underlying the set-aside decision was arbitrary, capricious, and an abuse of discretion because the Air Force did not analyze price as required under 48 C.F.R. § 19.502-2(b)." Finally, count seven alleges that "[t]he award of a contract to ADS was arbitrary, capricious, and an abuse of discretion because the underlying procurement was conducted in violation of law."

The complaint also asked this court to enter a temporary restraining order, a preliminary injunction and a permanent injunction. After a hearing, the court denied the temporary restraining order and preliminary injunction. After discussion with the parties at a hearing, and with the agreement of the parties, the court set a schedule for briefing regarding the protestor's request for:

A permanent injunction requiring the Air Force to rescind the Solicitation and to take any and all necessary corrective action needed to remedy its legal violations, including, at a minimum, by (1) terminating the contract with ADS; (2) issuing a revised Solicitation that complies with the statutory mandated preference for commercial items and; (3) conducting the procurement on an unrestricted basis, consistent with the Air Force's market research that demonstrated there are no small businesses with existing non-developmental solutions that satisfy the Air Force's SSA requirements.

Without a temporary restraining order in place, the procurement has continued pursuant to the contract award made to intervenor Applied Defense.

24

The parties have filed cross-motions for judgment on the Administrative Record. Protestor argues that "the Air Force has arbitrarily and capriciously violated the statutory preference for commercial items in the Federal Acquisition Streamlining Act ('FASA') and Federal Acquisition Regulation ('FAR') Part 12's implementation of the preference." Analytical Graphics also contends, "[a]dditionally, the Air Force wrongfully set-aside this procurement for small businesses. . . ." According to the defendant, the "contracting officer acted reasonably, and well within her discretion, when conducting market research." Defendant also argues that the Air Force's market research, and the determination based on the market research, were appropriate and that the documents in the Administrative Record do not support Analytical Graphics' argument that the Air Force erred in not issuing the solicitation as a commercial item or nondevelopmental item. Defendant and intervenor also stress that the procurement was a proper small-business set-aside, because the Air Force properly concluded that two small businesses could meet the requirements. According to defendant, Analytical Graphics, which is not a small business, therefore, does not have standing to challenge the Air Force's evaluation.

### D I S C U S S I O N

This protest presents difficult, extremely fact based commercial availability issues, regarding which little precedent exists, and equally novel small business set-aside issues. As noted above, the parties have filed cross-motions for judgment on the Administrative Record on the issues of the Air Force's compliance with 10 U.S.C. § 2377 and the small business set-aside. See 48 C.F.R. § 19.502-2 (2017). Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) (2017) governs motions for judgment on the Administrative Record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356–57 (Fed. Cir. 2005))); see also Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010).

The Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996), provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'"); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)); Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district

courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir. 2004) (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003).

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir. 2013) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350–51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057–58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000)), aff'd, 365 F.3d 1345 (Fed. Cir. 2004)))), reh'g and reh'g en banc denied (Fed. Cir. 2013) (alterations in original). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2012);[18] see also Tinton Falls Lodging Realty, LLC v.

---

[18] The language of 5 U.S.C. § 706 provides in full:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (internal citations omitted); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), reh'g and reh'g en

---

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure.") (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285–86); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531–32 (2010) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285–86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)). """If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a

different conclusion as to the proper administration and application of the procurement regulations.""" <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d at 1371 (quoting <u>Honeywell, Inc. v. United States</u>, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting <u>M. Steinthal & Co. v. Seamans</u>, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); <u>Jordan Pond Co., LLC v. United States</u>, 115 Fed. Cl. 623, 631 (2014); <u>Davis Boat Works, Inc. v. United States</u>, 111 Fed. Cl. 342, 349 (2013); <u>Norsat Int'l [America], Inc. v. United States</u>, 111 Fed. Cl. 483, 493 (2013); <u>HP Enter. Servs., LLC v. United States</u>, 104 Fed. Cl. 230, 238 (2012); <u>Vanguard Recovery Assistance v. United States</u>, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

<u>Citizens to Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971), <u>abrogated on other grounds by</u> <u>Califano v. Sanders</u>, 430 U.S. 99 (1977) (internal citations omitted); <u>see also</u> <u>U.S. Postal Serv. v. Gregory</u>, 534 U.S. 1, 6–7 (2001); <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. 281, 285 (1974), <u>reh'g denied</u>, 420 U.S. 956 (1975); <u>Co-Steel Raritan, Inc. v. Int'l Trade Comm'n</u>, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); <u>In re Sang Su Lee</u>, 277 F.3d at 1342; <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. at 285)); <u>Lockheed Missiles & Space Co. v. Bentsen</u>, 4 F.3d 955, 959 (Fed. Cir. 1993); <u>BCPeabody Constr. Servs., Inc. v. United States</u>, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (quoting <u>Keeton Corrs., Inc. v. United States</u>, 59 Fed. Cl. 753, 755, <u>recons. denied</u>, 60 Fed. Cl. 251 (2004), and <u>Axiom Res. Mgmt., Inc. v. United States</u>, 564 F.3d at 1381)), <u>appeal withdrawn</u>, 559 F. App'x 1033 (Fed. Cir. 2014) (internal citations omitted); <u>Supreme Foodservice GmbH v. United States</u>, 109 Fed. Cl. 369, 382 (2013); <u>Alamo Travel Grp., LP v. United States</u>, 108 Fed. Cl. 224, 231 (2012); <u>ManTech Telecomms. & Info. Sys. Corp. v. United States</u>, 49 Fed. Cl. 57, 63 (2001), <u>aff'd</u>, 30 F. App'x 995 (Fed. Cir. 2002); <u>Ellsworth Assocs., Inc. v. United States</u>, 45 Fed. Cl. 388, 392 (1999) ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. 729, 743–44 (1985))), <u>appeal dismissed</u>, 6 F. App'x 867 (Fed. Cir. 2001), <u>and superseded by regulation as recognized in</u> <u>MVS USA, Inc. v. United States</u>, 111 Fed. Cl. 639 (2013).

According to the United States Court of Appeals for the Federal Circuit:

> Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Furthermore, according to the Federal Circuit:

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also Weeks Marine, Inc. v. United States, 575 F.3d at 1368–69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

On a motion for judgment on the administrative record, a disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1364; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995–96; Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is

arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. 487, 496 (2013). To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial.") ; Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694-96 (2010). In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile

Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corp. v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.  This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed. [v. United States], 719 F.2d at 1574.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1996); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum . . . .  To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process.) (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d at 1581; Data Gen. Corp. v. Johnson, 78 F.3d at 1562); see also Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Archura LLC v. United States, 112 Fed. Cl. at 496 (using a "substantial chance" test); Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 96 (2006) (using a "substantial chance" test), recons. in part, 75 Fed. Cl. 406 (2007).

Small Business Set-Aside versus Commercial Availability

Prior to reaching the issue of commercial availability 10 U.S.C. § 2377, both defendant and intervenor argue that the Air Force's decision to make the procurement a small business set-aside must be addressed first.  Intervenor states: "The small business set aside should be analyzed first and it is clear that this decision comported with statute and regulation and that, therefore, AGI lacks standing to proceed to challenge the commerciality issues."  Intervenor emphasizes that "[t]he commerciality rule is subject to the Rule of Two." Defendant agrees, arguing that "once the small business set-aside is ruled proper, both of AGI's remaining claims should be dismissed for lack of standing because AGI is not eligible for award." By contrast, protestor emphasizes that "[t]he commerciality determination must come first," and argues that "[t]he statutorily mandated preference for commercial items and the Rule of Two are interpreted harmoniously by AGI, but the defendants' interpretation extinguishes the commercial item preference."

The only thing all parties properly agree on is that agency market research must precede both a commercial availability determination and a small business set-aside determination.

Regarding the small business set-aside determination, the FAR provides that: "The purpose of small business set-asides is to award certain acquisitions exclusively to small business concerns." 48 C.F.R. § 19.501(a) (2017); see also Proxtronics Dosimetry, LLC v. United States, 128 Fed. Cl. 656, 680 (2016). 48 C.F.R. § 19.502-2(b) indicates that:

> The contracting officer shall set aside any acquisition over $150,000 for small business participation when there is a reasonable expectation that—
>
> (1) Offers will be obtained from at least two responsible small business concerns offering the products of different small business concerns (see paragraph (c) of this section); and
> (2) Award will be made at fair market prices. Total small business set-asides shall not be made unless such a reasonable expectation exists (see 19.502–3 as to partial set-asides). Although past acquisition history of an item or similar items is always important, it is not the only factor to be considered in determining whether a reasonable expectation exists. In making R & D small business set-asides, there must also be a reasonable expectation of obtaining from small businesses the best scientific and technological sources consistent with the demands of the proposed acquisition for the best mix of cost, performances, and schedules.

48 C.F.R. § 19.502-2(b).

The "Preference for acquisition of commercial items" statute, 10 U.S.C. § 2377, states:

> **(a) Preference.**--The head of an agency shall ensure that, to the maximum extent practicable--
>
> **(1)** requirements of the agency with respect to a procurement of supplies or services are stated in terms of--
>
> **(A)** functions to be performed;
>
> **(B)** performance required; or
>
> **(C)** essential physical characteristics;
>
> **(2)** such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements; and

**(3)** offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements.

**(b) Implementation.**--The head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable--

**(1)** acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency;

**(2)** require prime contractors and subcontractors at all levels under the agency contracts to incorporate commercial items or nondevelopmental items other than commercial items as components of items supplied to the agency;

**(3)** modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items;

**(4)** state specifications in terms that enable and encourage bidders and offerors to supply commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items in response to the agency solicitations;

**(5)** revise the agency's procurement policies, practices, and procedures not required by law to reduce any impediments in those policies, practices, and procedures to the acquisition of commercial items; and

**(6)** require training of appropriate personnel in the acquisition of commercial items.

**(c) Preliminary market research.--(1)** The head of an agency shall conduct market research appropriate to the circumstances--

**(A)** before developing new specifications for a procurement by that agency;

**(B)** before soliciting bids or proposals for a contract in excess of the simplified acquisition threshold; and

**(C)** before awarding a task order or delivery order in excess of the simplified acquisition threshold.

**(2)** The head of an agency shall use the results of market research to determine whether there are commercial items or, to the extent that

commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that--

**(A)** meet the agency's requirements;

**(B)** could be modified to meet the agency's requirements; or

**(C)** could meet the agency's requirements if those requirements were modified to a reasonable extent.

**(3)** In conducting market research, the head of an agency should not require potential sources to submit more than the minimum information that is necessary to make the determinations required in paragraph (2).

**(4)** The head of an agency shall take appropriate steps to ensure that any prime contractor of a contract (or task order or delivery order) in an amount in excess of $5,000,000 for the procurement of items other than commercial items engages in such market research as may be necessary to carry out the requirements of subsection (b)(2) before making purchases for or on behalf of the Department of Defense.

10 U.S.C. § 2377 (emphasis in original). The regulation implementing 10 U.S.C. § 2377, 48 C.F.R. § 10.002, states:

(a) Acquisitions begin with a description of the Government's needs stated in terms sufficient to allow conduct of market research.

(b) Market research is then conducted to determine if commercial items or nondevelopmental items are available to meet the Government's needs or could be modified to meet the Government's needs.

(1) The extent of market research will vary, depending on such factors as urgency, estimated dollar value, complexity, and past experience. The contracting officer may use market research conducted within 18 months before the award of any task or delivery order if the information is still current, accurate, and relevant. Market research involves obtaining information specific to the item being acquired and should include—

(i) Whether the Government's needs can be met by—

(A) Items of a type customarily available in the commercial marketplace;

(B) Items of a type customarily available in the commercial marketplace with modifications; or

(C) Items used exclusively for governmental purposes;

(ii) Customary practices regarding customizing, modifying or tailoring of items to meet customer needs and associated costs;

(iii) Customary practices, including warranty, buyer financing, discounts, contract type considering the nature and risk associated with the requirement, etc., under which commercial sales of the products or services are made;

(iv) The requirements of any laws and regulations unique to the item being acquired;

(v) The availability of items that contain recovered materials and items that are energy efficient;

(vi) The distribution and support capabilities of potential suppliers, including alternative arrangements and cost estimates; and

(vii) Size and status of potential sources (see part 19).

(2) Techniques for conducting market research may include any or all of the following:

(i) Contacting knowledgeable individuals in Government and industry regarding market capabilities to meet requirements.

(ii) Reviewing the results of recent market research undertaken to meet similar or identical requirements.

(iii) Publishing formal requests for information in appropriate technical or scientific journals or business publications.

(iv) Querying the Governmentwide database of contracts and other procurement instruments intended for use by multiple agencies available at https://www.contractdirectory.gov/contractdirectory/ and other Government and commercial databases that provide information relevant to agency acquisitions.

(v) Participating in interactive, on-line communication among industry, acquisition personnel, and customers.

(vi) Obtaining source lists of similar items from other contracting activities or agencies, trade associations or other sources.

(vii) Reviewing catalogs and other generally available product literature published by manufacturers, distributors, and dealers or available on-line.

(viii) Conducting interchange meetings or holding presolicitation conferences to involve potential offerors early in the acquisition process.

(c) If market research indicates commercial or nondevelopmental items might not be available to satisfy agency needs, agencies shall reevaluate the need in accordance with 10.001(a)(3)(ii) and determine whether the need can be restated to permit commercial or nondevelopmental items to satisfy the agency's needs.

(d)(1) If market research establishes that the Government's need may be met by a type of item or service customarily available in the commercial marketplace that would meet the definition of a commercial item at subpart 2.1, the contracting officer shall solicit and award any resultant contract using the policies and procedures in part 12.

(2) If market research establishes that the Government's need cannot be met by a type of item or service customarily available in the marketplace, part 12 shall not be used. When publication of the notice at 5.201 is required, the contracting officer shall include a notice to prospective offerors that the Government does not intend to use part 12 for the acquisition.

(e) Agencies should document the results of market research in a manner appropriate to the size and complexity of the acquisition.

48 C.F.R. § 10.002.  The FAR also addresses multiple statutory provisions at 48 C.F.R. § 11.002:

(a) In fulfilling requirements of 10 U.S.C. 2305(a)(1), 10 U.S.C. 2377, 41 U.S.C. 3306(a), and 41 U.S.C. 3307, agencies shall—
(1) Specify needs using market research in a manner designed to—
(i) Promote full and open competition (see part 6), or maximum practicable competition when using simplified acquisition procedures, with due regard to the nature of the supplies or services to be acquired; and
(ii) Only include restrictive provisions or conditions to the extent necessary to satisfy the needs of the agency or as authorized by law.
(2) To the maximum extent practicable, ensure that acquisition officials—
(i) State requirements with respect to an acquisition of supplies or services in terms of—
(A) Functions to be performed;
(B) Performance required; or
(C) Essential physical characteristics;
(ii) Define requirements in terms that enable and encourage offerors to supply commercial items, or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items, in response to the agency solicitations;
(iii) Provide offerors of commercial items and nondevelopmental items an opportunity to compete in any acquisition to fill such requirements;

(iv) Require prime contractors and subcontractors at all tiers under the agency contracts to incorporate commercial items or nondevelopmental items as components of items supplied to the agency; and

(v) Modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items.

48 C.F.R. §11.002(a).

In consideration of the above described framework, defendant argues that "there is statutory and regulatory support for the contention that small business set-aside decisions should be made on a priority basis before further consideration of a procurement." By contrast, the protestor argues that "the Air Force has arbitrarily and capriciously violated the statutory preference for commercial items in the Federal Acquisition Streamlining Act ('FASA') and Federal Acquisition Regulation ('FAR') Part 12's implementation of the preference."

In a statutory construction analysis, the first step is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)); see also Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S, 132 S. Ct. 1670, 1680 (2012) ("We begin 'where all such inquiries must begin: with the language of the statute itself.'" (quoting United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989))); Bettcher Indus., Inc. v. Bunzl USA, Inc., 661 F.3d 629, 644 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2011); Jimenez v. Quarterman, 555 U.S. 113, 118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute."); Strategic Hous. Fin. Corp. of Travis Cnty. v. United States, 608 F.3d 1317, 1323 (Fed. Cir.) ("When interpreting any statute, we look first to the statutory language."), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 562 U.S. 1221 (2011); Mgmt. and Training Corp. v. United States, 115 Fed. Cl. at 42 ("Principles of statutory interpretation dictate that the court begin its analysis with the text of the regulation at issue because, if the terms of the regulation are unambiguous, the plain language of a regulation is controlling."). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. at 341 (citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 477 cert. denied 505 U.S. 1218 (1992); McCarthy v. Bronson, 500 U.S. 136, 139 (1991)). "'Beyond the statute's text, the traditional tools of statutory construction include the statute's structure, canons of statutory construction, and legislative history.'" Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States, 617 F.3d 1357, 1361 (Fed. Cir.) (quoting Bull v. United States, 479 F.3d 1365, 1376 (2007)), reh'g en banc denied (Fed. Cir. 2010); see also Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S, 132 S. Ct. at 1680 ("[W]e consider each question [of statutory interpretation] in the context of the entire statute." (citing Robinson v. Shell Oil Co., 519 U.S. at 341)); Roberts v. Sea-Land Servs., Inc., 132 S. Ct. 1350, 1356 (2012); Bush v.

United States, 655 F.3d 1323, 1329 (Fed. Cir. 2011), cert. denied, 132 S. Ct. 2681 (2012).

The initial inquiry into the statutory text ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" Barnhart v. Sigmon Coal Co., 534 U.S. at 450 (quoting Robinson v. Shell Oil Co., 519 U.S. at 340); see also Bettcher Indus., Inc. v. Bunzl USA, Inc., 661 F.3d at 644. In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute.  See Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 489 n.13 (2004) ("It is, moreover, '"a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or otherwise insignificant."'" (quoting TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001)))); Williams v. Taylor, 529 U.S. 362, 404 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible); see also Setser v. United States, 132 S. Ct. 1463, 1470 (2012) ("Our decision today follows the interpretive rule they invoke, that we must 'give effect . . . to every clause and word' of the Act."  (omission in original) (quoting United States v. Menasche, 348 U.S. 528, 538–39 (1955))); Sharp v. United States, 580 F.3d 1234, 1238 (Fed. Cir. 2009).  Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. See Duncan v. Walker, 533 U.S. at 174 (noting that courts should not treat statutory terms as "surplusage").  "[W]hen two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective."  Radzanower v. Touche Ross & Co., 426 U.S. 148, 155 (1976); see also Xianli Zhang v. United States, 640 F.3d 1358, 1368 (Fed. Cir.) (citing Cathedral Candle Co. v. U.S. Int'l Trade Comm'n, 400 F.3d 1352, 1365 (Fed. Cir. 2005)), reh'g and reh'g en banc denied (Fed. Cir. 2011), cert. denied, 132 S. Ct. 2375 (2012); Hanlin v. United States, 214 F.3d 1319, 1321 (Fed. Cir.), reh'g denied (Fed. Cir. 2000).

When the statute provides a clear answer, the court's analysis is at an end.  See Barnhart v. Sigmon Coal Co., 534 U.S. at 450; see also Arko Foods Int'l, Inc. v. United States, 654 F.3d 1361, 1364 (Fed. Cir. 2011) ("'[W]here Congress has clearly stated its intent in the language of a statute, a court should not inquire further into the meaning of the statute.'"  (quoting Millenium Lumber Distrib., Ltd. v. United States, 558 F.3d 1326, 1328 (Fed. Cir.), reh'g denied (Fed. Cir. 2009)); Am. Airlines, Inc. v. United States, 551 F.3d 1294, 1300 (Fed. Cir. 2008), reh'g granted, 319 F. App'x 914 (Fed. Cir. 2009). Thus, when the "'statute's language is plain, "the sole function of the courts is to enforce it according to its terms."'"  Johnson v. United States, 529 U.S. 694, 723 (2000) (quoting United States v. Ron Pair Enters., Inc., 489 U.S. at 241 (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917))); see also Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States, 617 F.3d at 1361 (citing Sharp v. United States, 580 F.3d at 1237); Jimenez v. Quarterman, 555 U.S. at 118; Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000)); Candle Corp. of Am. v. U.S. Int'l Trade Comm'n, 374 F.3d 1087, 1093 (Fed. Cir.), reh'g and reh'g denied (Fed. Cir. 2004).

Indeed, in construing a statute, courts "'must begin with the language employed by

Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'" Schindler Elevator Corp. v. United States, 131 S. Ct. 1885, 1891 (2011) (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 175 (2009) (internal quotation marks omitted)). Even "'[w]hen terms used in a statute are undefined, we give them their ordinary meaning.'" Schindler Elevator Corp. v. United States, 131 S. Ct. at 1891 (quoting Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995)). Consequently, if a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute. See Whitfield v. United States, 543 U.S. 209, 215 ("Because the meaning of [the statute's] text is plain and unambiguous, we need not accept petitioners' invitation to consider the legislative history . . . ."), reh'g denied sub nom. Hall v. United States, 544 U.S. 913 (2005). But see Chamberlain Grp., Inc. v. Skylink Techs., Inc., 381 F.3d 1178, 1196 (Fed. Cir. 2004) ("Though 'we do not resort to legislative history to cloud a statutory text that is clear,' Ratzlaf v. United States, 510 U.S. 135, 147–48 (1994), we nevertheless recognize that 'words are inexact tools at best, and hence it is essential that we place the words of a statute in their proper context by resort to the legislative history.'" (quoting Tidewater Oil Co. v. United States, 409 U.S. 151, 157 (1972))), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 544 U.S. 923 (2005).

Legislative history may be helpful in certain instances "to shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it into law." Bruesewitz v. Wyeth LLC, 131 S. Ct. 1068, 1081–82 (2011) (citing Exxon Mobile Corp. v. Allapatah Servs., Inc., 545 U.S. 546, 568 (2005); see also Xianli Zhang v. United States, 640 F.3d at 1373. Legislative history, however, does not "trump[] clear text." Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States, 617 F.3d at 1361 (citing Sharp v. United States, 580 F.3d at 1238; Glaxo Operations UK Ltd. v. Quigg, 894 F.2d 392, 396 (Fed. Cir. 1990)). The Supreme Court has noted, however, that when it appears that the plain language of a statute resolves the issue, a court is to "look to the legislative history to determine only whether there is [a] 'clearly expressed legislative intention' contrary to that language, which would require us to question the strong presumption that Congress expresses its intent through the language it chooses." INS v. Cardoza-Fonseca, 480 U.S. 421, 432 n.12 (1987) (citing United States v. James, 478 U.S. 597, 606 (1986); Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980)).

The United States Supreme Court also has held that the specific terms of a statute supersede general terms within that statute or within another statute that might otherwise control. See Fourco Glass Co. v. Transmirra Prods. Corp., 353 U.S. 222, 228–29 (1957) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling." (quoting D. Ginsberg & Sons v. Popkin, 285 U.S. 204, 208 (1932))); see also Bloate v. United States, 559 U.S. 196, 207 (2010); Bulova Watch Co. v. United States, 365 U.S. 753, 761 (1961). In addition, the Supreme Court has endorsed "the 'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended to have the same meaning.'" Gustafson v. Alloyd Co., 513 U.S. 561, 570 (1995) (quoting Dep't of Revenue of Or. v. ACF Indus., Inc., 510 U.S. 332, 342 (1994)); see also Kislev Partners, L.P. ex rel. Bahar v. United States, 84 Fed. Cl. 385,

389, recons. denied, 84 Fed. Cl. 378 (2008).

The defendant and intervenor both point to the language of "shall" in 48 C.F.R. § 19.502-2(b),[19] as evidence of the need to perform the small business set-aside determination before the commercial availability analysis. Defendant states:

> This section [§ 19.502-2(b)] - which includes the mandatory term "shall" - *requires* the Government to set-aside acquisitions when the Rule of Two is satisfied. Accordingly, the Air Force was bound by the mandatory "Rule of Two" directive to set aside this procurement for a small business, once the Air Force made the necessary findings.

(emphasis in original). Defendant also argues that "[t]here are many competition statutes and regulations, but they are structured in such a way to give priority to the application of the small business set-aside. Other competition regulations may be applied to the subsequent competition between small businesses." The government is correct that a number of the provisions of the FAR, specifically Part 19, addresses the importance of the small business set-aide, for example, 48 C.F.R. § 19.201(a) states that, "[i]t is the policy of the Government to provide maximum practicable opportunities in its acquisitions to small business." Likewise, 48 C.F.R. § 19.203(e) provides that, "[s]mall business set-asides have priority over acquisitions using full and open competition," and 48 C.F.R. § 19.501(a) states that, "[t]he purpose of small business set-asides is to award certain acquisitions exclusively to small business concerns. A 'set-aside for small business' is the reserving of an acquisition exclusively for participation by small business concerns. A small business set-aside may be open to all small businesses."

---

[19] As noted above, 48 C.F.R. § 19.502-2(b) states that:

> The contracting officer shall set aside any acquisition over $150,000 for small business participation when there is a reasonable expectation that—
>
> (1) Offers will be obtained from at least two responsible small business concerns offering the products of different small business concerns (see paragraph (c) of this section); and
> (2) Award will be made at fair market prices. Total small business set-asides shall not be made unless such a reasonable expectation exists (see 19.502–3 as to partial set-asides). Although past acquisition history of an item or similar items is always important, it is not the only factor to be considered in determining whether a reasonable expectation exists. In making R & D small business set-asides, there must also be a reasonable expectation of obtaining from small businesses the best scientific and technological sources consistent with the demands of the proposed acquisition for the best mix of cost, performances, and schedules.

48 C.F.R. § 19.502-2(b).

Although the defendant and intervenor are correct that 48 C.F.R. § 19.502-2 provides that "[t]he contracting officer shall set aside any acquisition over $150,000 for small business participation," as noted by protestor, 48 C.F.R. § 12.101 also contains the instruction "shall." 48 C.F.R. § 12.101, titled "Policy" provides that:

Agencies shall—

(a) Conduct market research to determine whether commercial items or nondevelopmental items are available that could meet the agency's requirements;

(b) Acquire commercial items or nondevelopmental items when they are available to meet the needs of the agency; and

(c) Require prime contractors and subcontractors at all tiers to incorporate, to the maximum extent practicable, commercial items or nondevelopmental items as components of items supplied to the agency.

48 C.F.R. § 12.101 (2017).[20] Defendant argues that "[o]ne flaw in AGI's position is that the plain meaning of section 12.101 does *not* mandate any particular action by a contracting officer (the general policy goals must be met by 'the agency')"[21] and that a "second flaw is that section 12.101(b) does *not* mandate the purchase of any commercial item. Instead, the policy goal is to 'acquire' *either* a 'commercial item' *or* a 'nondevelopmental item.'" (all emphasis in original).[22] The court does not understand as

---

[20] 48 C.F.R. § 12.102, titled, "Applicability," provides, in part:

(a) This part shall be used for the acquisition of supplies or services that meet the definition of commercial items at section 2.101.
(b) Contracting officers shall use the policies in this part in conjunction with the policies and procedures for solicitation, evaluation and award prescribed in part 13, Simplified Acquisition Procedures; part 14, Sealed Bidding; or part 15, Contracting by Negotiation, as appropriate for the particular acquisition.
(c) Contracts for the acquisition of commercial items are subject to the policies in other parts of the FAR. When a policy in another part of the FAR is inconsistent with a policy in this part, this part 12 shall take precedence for the acquisition of commercial items.

48 C.F.R. § 12.102 (2017).

[21] The court also notes that 10 U.S.C. § 2377 directs the "head of an agency" to "conduct market research," not necessarily that it has to be the contracting officer to conduct the market research or investigate commercial options.

[22] Although defendant empathizes "*either* a 'commercial item' *or* a 'nondevelopmental item,'" the intervenor argues that "a commercial item by definition *is* a nondevelopmental

dispositive that the commercial availability is aimed at the agency instead of the contracting officer. Moreover, as noted above, although the title of 48 C.F.R. § 12.101, is the word "Policy," the regulation nevertheless begins:

Agencies shall

(a) Conduct market research to determine whether commercial items or nondevelopmental items are available that could meet the agency's requirements;

(b) Acquire commercial items or nondevelopmental items when they are available to meet the needs of the agency; and

(c) Require prime contractors and subcontractors at all tiers to incorporate, to the maximum extent practicable, commercial items or nondevelopmental items as components of items supplied to the agency.

48 C.F.R. § 12.101 (emphasis added).

Despite defendant's attempt to minimize the importance of the commercial availability directive, it is not merely a "policy goal," but a requirement for the agency to determine if a commercial option is available or can be modified to meet the agency's needs. Based on the statutes and regulations at issue, the court believes that an agency is required to determine both if a procurement can be small business set-aside and if a commercial item is available for the procurement without specific direction as to the order.

Defendant also states that

section 10.002(d) is a narrow directive to use Part 12 procedures in certain circumstances. Even assuming that AGI could allege facts demonstrating that it falls within the section 10.002(d) criteria, the drafters of the regulation purposefully crafted section 10.002 so that it would not supercede [sic] small business authorities. Thus, where the Air Force properly set aside the acquisition for small business, AGI's allegations would not state a claim upon which relief might be granted.

Defendant's basis for claiming that 48 C.F.R. § 10.002 does not supersede the small business decision, is the language that "Market research involves obtaining information specific to the item being acquired and should include . . . Size and status of potential sources (see part 19)," and "[i]f market research establishes that the Government's need cannot be met by a type of item or service customarily available in the marketplace, part

---

item and a nondevelopmental item is a commercial item," and that "[a] commercial item and nondevelopmental items are synonymous." (all emphasis in original).

12 shall not be used." 48 C.F.R. § 10.002.[23] Although the defendant and intervenor repeatedly emphasize their belief that the small business set-aside determination could not be undermined by a commercial availability determination, they agree that market research must be accomplished before either the small business decision or the commercial availability decision is made. As intervenor explains, "[t]he purpose of market research – which is step one in the process, is, *inter alia*, to consider application of 15 U.S.C. § 644 and the capabilities of small businesses." (emphasis in original).

As demonstrated above, the agency in this protest performed the market research prior to making the small business decision. On May 31, 2016, the contracting officer recommended a small business set-aside, and, on June 1, 2016, the agency's small business specialist, concurred with the recommendation of a small business set-aside. This decision was in response to the potential offerors responses to the fourth amended RFI, which indicated the Air Force was considering a small business set-aside. This was the fifth time that the Air Force had sought a request for information about the potential procurement. It was the culmination of an extensive market research process to attempt to properly identify the requirements of the procurement. Almost seven months before the small business set-aside recommendation, the Air Force had initiated the procurement process with the first RFI issued on November 4, 2015.[24] As explained above, the contracting officer issued a first amended RFI, a second amended RFI, a third amended RFI, and a fourth amended RFI. Additionally, prior to the small business set-aside recommendation, the Air Force held an industry day, in response to information generated from the RFI and the amended RFIs, inviting eight potential offerors to the event. Notably, it was in response to the market research that the agency even considered a small business set-aside. The contracting officer testified in her deposition that it was after the industry day event that she first thought about the possibility of a small business set-aside. Therefore, the recommendation for a small business set-aside, in late May and early June 2016, was in response to, and not separate from, the market research.[25]

As noted by another Judge of the United States Court of Federal Claims, "[c]ontracting officers are required to 'review acquisitions to determine if they can be set

---

[23] The defendant also claims that "the drafters [of Section 10.002] purposefully did not identify Part 19 as a competing contracting approach. The drafters specifically identified the alternative contracting approaches of Part 13, Part 14 and Part 15 - both in the regulation and in the preamble. The drafters assumed that small business authorities would not be diminished by the final rule, and created no conflicting regulation." (citing 60 Fed. Reg. 48231, 48233 & 48242 (Sept. 18, 1995).

[24] As noted above, this process began just one month after the Air Force awarded the JICSpOC contract to Analytical Graphics, and almost nine months before the end of contract performance of the JICSpOC contract.

[25] The court notes that the Market Research Report for the procurement at issue in the above captioned protest was issued on June 21, 2016, after the small business set-aside recommendation. The market research itself, however, as described above, was conducted prior to the small business set-aside recommendation.

aside for small business,' and must 'perform market research' before concluding that an acquisition should not be set aside for a small business." Proxtronics Dosimetry, LLC v. United States, 128 Fed. Cl. at 680 (citing 48 C.F.R. § 19.501(c)); see also 48 C.F.R. § 19.501(c) (2017) ("The contracting officer shall perform market research and document why a small business set-aside is inappropriate when an acquisition is not set aside for small business, unless an award is anticipated to a small business under the 8(a), HUBZone, SDVOSB, or WOSB Programs."). Likewise, in McKing Consulting Group v. United States, 78 Fed. Cl. 715, 726 (2007), in finding that the contracting officer did not act arbitrarily or capriciously when issuing the solicitation at issue in that case, the McKing court explained that

> the record demonstrates that the contracting officer had multiple reasons for her decision to issue the Solicitation as a small business set-aside. First, the procurement history shows that the expectation of at least two responsive small business bidders was reasonable. Second, the contracting officer conducted sufficient market research and acquisition planning before issuing the Solicitation as a small business set-aside.

Id. Numerous other decisions by Judges of the United States Court of Federal Claims, although each factually based, point to the market research conducted by an agency as evidence that the small business set-aside determination was not made arbitrarily or capriciously. See, e.g., Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 447 ("The CO [Contracting Officer] did extensive market research and reasonably concluded that the agency was not likely to receive at least two offers from qualified small business manufacturers."); Raymond Express Int'l, LLC v. United States, 120 Fed. Cl. 413 (2015); Dynamic Educational Sys., Inc. v. United States, 109 Fed. Cl. 306, 326 (2013). The history of the market research in the current protest, and the nature of market research generally demonstrate that market research can guide an agency's decision making process. It is, therefore, logical that an agency use the market research for both the small business set-aside determination and of the commercial availability decision.

Although intervenor frames its arguments in contrast to protestor's claims that the commercial availability decision must come first,[26] the court notes that intervenor nevertheless states that the "FAR says that the consideration of small business capabilities and commercial item possibilities occurs at the same time." Intervenor also claims that "[u]nlike FAR's mandatory Rule of Two, FAR implements the commercial item rule in a precatory, not mandatory, way because there is no absolute mandate for one type of solution over the over. Rather, the commercial item preference creates a continuum of analysis and review." Intervenor, citing 48 C.F.R. § 10.001, argues that "FAR provides three steps in the procurement process: Step one is to conduct market research. Step two is to define the Government's specific needs. Step 3 is to create

---

[26] As noted above, protestor argues that "consideration of FASA's mandate precedes and takes priority over consideration of size status."

requirements descriptions." Intervenor, quoting from 48 C.F.R. § 10.001, argues, somewhat confusingly, that after conducting market research the

> FAR then states that "before developing new requirements," that is Step three, the "results of market research" are also used as part of the needs assessment (Step two) in determining if *inter alia* "commercial items or, to the extent commercial items suitable to meet the agency's needs are not available, nondevelopmental items are available." 48 C.F.R. § 10.001(a)(3)(ii)(C)). This determination of commercial items availability is part of the needs analysis in step two, as described in 48 C.F.R. Part 11 ("Describing Agency Needs [sic]) and specifically, 48 C.F.R.§ 11.002. So too are the "results of the market research" used to consider small business issues. 48 C.F.R. § 10.001(a)(3)(vi) and (vii).[27] Again, FAR says that the consideration of small business capabilities and commercial item possibilities occurs at the same time.

The defendant also argues that "[t]he Rule of Two determination is a simple, preliminary step, requiring none of the rigorous analysis of proposal review," citing to Adams and Associates, Inc. v. United States, 741 F.3d 102, 111 (Fed. Cir. 2014).[28] In attempting to explain how the FAR makes the set-aside determination "an uncomplicated procedure early in the procurement decision-making," defendant emphasizes that the decision not to set-aside a procurement must be documented, but a decision to procure as a set-aside does not. (citing 48 C.F.R. § 19.501(c)). As the court noted above,

---

[27] Although referenced by intervenor, "48 C.F.R. § 10.001(a)(3)(vi) and (vii)" provide an agency use the results of market research to "(vi) Determine whether consolidation is necessary and justified (see 7.107–2) (15 U.S.C. 657q); (vii) Determine whether bundling is necessary and justified (see 7.107–3) (15 U.S.C. 644(e)(2)(A)). . . ." The court notes that 48 C.F.R. § 10.001(a)(2)(vi) provides that:

> On an ongoing basis, take advantage (to the maximum extent practicable) of commercially available market research methods in order to effectively identify the capabilities of small businesses and new entrants into Federal contracting that are available in the marketplace for meeting the requirements of the agency in furtherance of—
> (A) A contingency operation or defense against or recovery from nuclear, biological, chemical, or radiological attack; and
> (B) Disaster relief to include debris removal, distribution of supplies, reconstruction, and other disaster or emergency relief activities (see 26.205). . . .

48 C.F.R. § 10.001(a)(2)(vi).

[28] Intervenor also repeatedly cites to Adams and Associates, Inc. v. United States in its submissions. The Federal Circuit's decision in Adams and Associates, Inc. v. United States is more fully address below in the small business set-aside analysis.

however, 10 U.S.C. § 2377, and the implementing regulation at 48 C.F.R. § 10.002(e), do not require a commercial availability determination be documented in a specific way, only that the commercial availability review be completed. Nor does 10 U.S.C. § 2377 require a specific type of analysis as the decision is made prior to determining what kind of procurement is required.

Protestor, however, argues that, based on the order of the subsections of 48 C.F.R. § 10.002, "[c]learly, during market research, consideration of FASA's mandate precedes and takes priority over consideration of size status." Protestor also argues that that "[t]he statutorily mandated preference for commercial items and the Rule of Two are interpreted harmoniously by AGI, but the defendants' interpretation extinguishes the commercial item preference." The court notes that defendant, likewise, claims that interpretation is "harmoniously" done, arguing that "reading the statutes and regulations together harmoniously, we conclude that Congress intended the small business set-aside to be considered first."

Despite the arguments from both sides, the court does not find either interpretation of the statutes works together "harmoniously." In the court's view, there is not a clear order of precedence in the statutes or implementing regulations for how to approach a procurement which potentially involves both a small business set-aside analysis and a commercial availability analysis. The intent of 10 U.S.C. § 2377 is to direct agencies to investigate whether commercial or non-developmental items exist that can satisfy the government's needs, in whole or in part, so as to avoid investing time and taxpayer money into developing a product that already exists. The agency must weigh the congressional policy goal of having a procurement be designated one of a percentage of small business set-asides and the policy goal of reducing the cost to the agency of a developmental contract, or not pursing a developmental contract, if an available product already exists in commercial form. Given the ambiguity in the two competing statutory goals and absent regulatory guidance regarding the choice as to which has precedence, the choice made by agency generally deserves deference.

The court should not be the entity to make that choice, and should intervene only when there is an obvious foul. Absent compelling statutory or regulatory guidance, which is missing here, the court generally defers to the agency's choice in a procurement in which the market research was carefully conducted. As the statutes and regulations do not point to a clear order for an agency to proceed between the small business set-aside determination and a commercial availability decision, the court does not read a requirement into the statutes and regulations that requires the agency or this court to first examine either.

The court notes, that the Air Force, in fact, considered both the small business set-aside determination and the commercial availability decision essentially contemporaneously after the market research process. As noted above, on May 31, 2016, the contracting officer recommended a small business set-aside, and on June 1, 2016, the agency's small business specialist, concurred with the recommendation of a small business set-aside. The same day, June 1, 2016, the contracting officer wrote a Memorandum for Record on the subject of: "Noncommerciality for Services and

Government Purpose Rights." Two days later, on June 3, 2016, the contracting officer was still evaluating both protestor and Exo, as evidenced by the June 3, 2016 Memorandum for Records tilted: "Pricing for Analytical Graphics and ExoAnalytical [sic] Solutions." Moreover, it was the market research process which led the contracting officer to consider, and ultimately opt for, the small business set-aside determination.

Small Business Set-Aside

The court therefore, must determine if the small business set-aside was proper. The defendant argues that the small business set-aside was indeed proper, and intervenor agrees, arguing that "the application of the Rule of Two here was proper." Protestor, by contrast, argues that "the Air Force's 'Rule of Two' determination underlying the set-aside decision was arbitrary and capricious and unlawfully restricts competition in violation of the Competition in Contracting Act, 10 U.S.C. § 2304."

As explained by the United States Supreme Court in Kingdomware Technologies, Inc. v. United States:

> In an effort to encourage small businesses, Congress has mandated that federal agencies restrict competition for some federal contracts. The Small Business Act thus requires many federal agencies, including the Department of Veterans Affairs, to set aside contracts to be awarded to small businesses. The Act requires each agency to set "an annual goal that presents, for that agency, the maximum practicable opportunity" for contracting with small businesses, including those "small business concerns owned and controlled by service-disabled veterans." 15 U.S.C. § 644(g)(1)(B). And federal regulations set forth procedures for most agencies to "set aside" contracts for small businesses. *See, e.g.,* 48 CFR § 19.502–2(b) (2015).

Kingdomware Techs., Inc. v. United States, 136 S. Ct. 1969, 1973 (2016). As noted above, the FAR provides that "[t]he purpose of small business set-asides is to award certain acquisitions exclusively to small business concerns." 48 C.F.R. § 19.501(a). The regulations at 48 C.F.R. § 19.502-2(b) indicates that:

> The contracting officer shall set aside any acquisition over $150,000 for small business participation when there is a reasonable expectation that—
>
> (1) Offers will be obtained from at least two responsible small business concerns offering the products of different small business concerns (see paragraph (c) of this section); and
> (2) Award will be made at fair market prices. Total small business set-asides shall not be made unless such a reasonable expectation exists (see 19.502–3 as to partial set-asides). Although past acquisition history of an item or similar items is always important, it is not the only factor to be considered in determining whether a reasonable expectation exists. In making R & D small business set-asides, there must also be a reasonable

expectation of obtaining from small businesses the best scientific and technological sources consistent with the demands of the proposed acquisition for the best mix of cost, performances, and schedules.

48 C.F.R. § 19.502-2(b); see also Adams & Assocs. v. United States, 741 F.3d at 111. As explained by a Judge of the United States Court of Federal Claims, "the decision to set aside a solicitation 'is a matter of business judgment within the contracting officer's discretion and, as such, must be upheld unless the Court finds the decision to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. at 44 (quoting Benchmade Knife Co. v. United States, 79 Fed. Cl. 731, 738 (2007)); see also Adams & Assocs. v. United States, 741 F.3d at 111; Res-Care Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir. 2013) (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1368–69 ("A contracting officer's decision to set aside a contract for small businesses invokes 'highly deferential rational basis review.'")). Likewise, as noted by another Judge of this court, "[w]e begin with the reminder that, whether to set aside a solicitation for small businesses '"is a matter of business judgment within the contracting officer's discretion."' Gear Wizzard, Inc. v. United States, 99 Fed. Cl. 266, 282 (2011) (quoting Benchmade Knife Co. v. United States, 79 Fed. Cl. 731, 738 (2007)). The 'law does not require any particular method.'" Dynamic Educational Sys., Inc. v. United States, 109 Fed. Cl. 306, 326 (2013) (quoting Gear Wizzard, Inc. v. United States, 99 Fed. Cl. at 282). The determination for the Rule of Two is based on the information available to the contracting officer at the time the decision is made, in this case, after the market research review, as "the FAR provides for set asides based on the contracting officer's 'reasonable expectation,' implicitly accepting the possibility that that expectation may ultimately prove incorrect." Mgmt. & Training Corp. v. United States, 118 Fed. Cl. 155, 169 (2013).

The relevant authority for the court to look to regarding the requirements for a small business set-aside determination is the United States Court of Appeals for the Federal Circuit's 2014 decision in Adams & Associates v. United States. In Adams, the protestor had challenged the United States Department of Labor's decision to set aside two contracts, the Gadsden contract and the Shriver contract, as small business set-asides. See Adams & Assocs. v. United States, 741 F.3d at 105.[29] The Federal Circuit explained regarding the requirements for a small business set-aside determination:

> Adams's reading of the Rule of Two ignores that "a reasonable expectation" that at least two responsible small businesses will submit bids at fair market prices is all that is required. Here, through the RFI process, the DOL performed market research about the level of interest from small businesses in bidding on the Shriver and Gadsden contracts. It then determined from the responses that there was a reasonable expectation that at least two

---

[29] The protestor in Adams also challenged the decision to use a small business set-aside as violating the Workforce Investment Act, which is not at issue in the current procurement under review. See Adams & Assocs. v. United States, 741 F.3d at 107-108.

responsible small businesses would make offers for the operation of each of the Centers. To Adams, "the issue here is that the market research . . . must generate the information necessary to address the expressly required responsibility and price reasonableness legal elements of the Rule of Two." According to Adams, the required information is identified in another part of the Federal Acquisition Regulation pertaining to determining whether a prospective contractor is "responsible" before awarding a contract to that contractor. These factors include capability, capacity, and past performance. 48 C.F.R. § 9.104-1. Adams contends that only by collecting information related to these factors can the DOL meet the requirements of the Rule of Two.

Adams conflates a set-aside determination with a responsibility determination made pursuant to § 9.104-1; the former determines whether there is a reasonable expectation that at least two responsible small businesses will make an offer at fair market prices, while the latter determines whether an individual contractor is responsible in the context of awarding a contract. As the lower court noted, a seta-side determination requires only that the contracting officer have a reasonable expectation that likely small business offerors will survive a future responsibility determination. The DOL was not required to impose the requirements of the contractor-selection process onto the small business set-aside determination, and it properly applied the Rule of Two. Because its decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, it will not be disturbed. 5 U.S.C. § 706(2)(A).

Adams & Assocs. v. United States, 741 F.3d at 111 (internal citations omitted).

Despite the Federal Circuit's clear guidance in Adams not to require a responsibility determination before making the set-aside determination, the protestor nonetheless argues that "the Air Force irrationally concluded that ExoAnalytic could meet the Agency's minimum requirements," and also argues that "the Air Force's 'Rule of Two' determination was flawed because, at the time the set-aside decision was made, the Air Force could not have rationally concluded that ADS could satisfy the requirements of the PWS without violating the limitation on subcontracting clause." The court addresses each of these arguments separately. Regarding the protestor's argument that "Air Force irrationally concluded that ExoAnalytic could meet the Agency's minimum requirements," the protestor points to the "Salient Characteristics" identified during the RFI process as Exo's inability to meet the Air Force's requirements. The parties have stipulated:

In the amended RFI, The Air Force sought information about collections of data, software and personal services that could meet certain minimum requirements. The Air Force included a list of ten "Salient Characteristics" that the Air Force considered to be "minimum requirements" for the SSA system:

SALIENT CHARACTERISTICS: The collection of non-governmental SSA data, processing tools, personnel, and contracted support will be referred to as the Commercial SSA System.

• Provide metric, non-metric, and Space Object Identification (SOI) observations from data collected from a minimum of 10 worldwide sensors outside the control of the USG, at least half of which must not be terrestrial sensors in North America (e.g. sensors in Europe, on orbit).

• Document whether sensors can be utilized on an on-demand basis or if their use must be pre-planned and list the additional costs for on-demand service, if applicable.

• Provide the format and source of the data.

• Ingest authorized DoD data (raw or processed observations) into any contractor event processing or analysis capability.

• Ensure they export their data, one-way, to DoD networks of equal or higher classification for additional processing.

• Provide for threat warning assessment by detecting and notifying JICSpOC personnel of a space object entering or projected to enter a user-definable area around specific resident space objects (RSO) within 15 minutes of entering. NOTE: 15 minutes is the unclassified value.

• Process and correlate feature-type data (Visual Magnitude (Vmag), Radar Cross Section (RCS) changes, RF spectrum, etc.).

• Ability to detect hostile and non-hostile maneuvers and analyze the change of behavior, to include the revised orbit, within 2 minutes of maneuver detection.

• Augment DoD persistent monitory capabilities by maintaining custody of designated objects (e.g. Super High Interest Objects) to the maximum degree possible.

• Provide telemetry data on the orbits of all detectable objects.

(capitalization in original). As indicated above, although in its response to the first amended RFI, Exo indicated that it could meet the government's minimum salient characteristics, the parties have stipulated that, after the responses to the first amended RFI, "[t]he Air Force determined that the responses of AGI and ADS [Applied Defense] indicated that AGI and ADS could satisfy all 10 of the minimum salient characteristics, and that the response of Exo indicated that Exo could satisfy 9 of the minimum salient characteristics." The Air Force concluded that, at the time of the first amended RFI

response, Exo did not meet the characteristic: "Process and correlate feature-type data (Visual Magnitude (Vmag), Radar Cross Section (RCS) changes, RF spectrum, etc)." Based on this, protestor argues that this failure is clear proof that the Air Force's conclusion that there was a reasonable expectation Exo survive a future responsibility determination was arbitrary and capricious.

Defendant argues that "AGI gives undue weight to a preliminary technical scoring exercise conducted *prior* to the classified information exchanges at Industry Day." (emphasis in original). Intervenor echoes defendant's argument noting that:

> AGI says that the Air Force irrationally concluded that ExoAnalytic could meet the Agency's requirements, because the *preliminary* stage RFI found that Exo could not meet one of the ten 'salient characteristics. [sic] After the later industry day, further evaluation, and receipt of more information, however, the Air Force found both Exo and ADS capable of meeting the Air Force's requirement certainly with teaming partners.

(emphasis in original). The court agrees that protestor places too much weight on Exo's responses to the first amended RFI and does not allow for the possibility that the Air Force would acquire additional information that would lead them to reasonably believe Exo could be a responsible small business offeror. As noted above, the parties have jointly stipulated that "[b]etween June 7, 2016 and June 15, 2016, various Air Force officials signed the justification and authorization document to approve limiting competition to ADS and Exo, pursuant to the authority of 10 U.S.C. [§] 2304(c)(6) and 48 C.F.R. [§] 6.302-6." (internal references omitted). Regarding the market research conducted by the Air Force, the justification and authorization document stated:

> (U) Market research was conducted, including two RFIs posted to the GPE and an industry day conducted between the first and second RFI. The initial RFI provided potential offerors with notification of security requirements and a list of salient characteristics offeror products and services would need to demonstrate to receive consideration for an industry day invitation. Responses from the initial RFI were assessed to gauge potential technical capabilities as well as security clearance requirements. Firms that did not demonstrate a rudimentary understanding of the requirements and those without appropriate clearance levels were not invited to attend industry day. For the industry day, the Program Manager (PM) determined disclosure of classified information to those invited was necessary to sufficiently explain the government's requirements and allow for a meaningful exchange of information. This led to the conclusion that eight responding firms possessed requisite security clearance requirements and demonstrated a rudimentary capability to potentially participate in the acquisition.

> (U) Following industry day presentations, the PM and CO jointly determined three small business concerns were potential candidates for prime contract award. The three small businesses were contacted to discuss prime contract interest. Two of the small business firms (ExoAnalytics [sic] and

ADS) expressed strong desire to participate as a prime contractor for the requirements. The third firm (Rincon) affirmed their desire to participate, but only in terms of subcontracting opportunities.

(U) An extensive market research report is in draft to support the conclusion that two small businesses are capable of fulfilling the government's requirement.

(internal references omitted). The justification and authorization document also explained:

(U) For this acquisition, the government: 1) publicly sought sources for the opportunity to fulfill its requirements, 2) disclosed the salient features of the products/services sought, 3) transparently communicated the security requirements associated with the acquisition, 4) evaluated thoroughly capability statements from all respondents, 5) provided an exchange of information opportunity at an Industry Day event, and 6) re-publicized the opportunity for industry consideration following the Industry Day event.

(U) As a result of government exchanges with industry as listed above, the government identified eight firms that demonstrated a rudimentary understanding of the government's requirements and possessed sufficient security clearances to participate in the government's Industry Day event.

(U) In reviewing the results of informational exchanges and vendor presentations from the Industry Day, the Contracting Officer (CO) and the Program Manager (PM) jointly determined that three of the firms participating in Industry Day were small business concerns that could potentially provide the products/services as prime contractors.

(U) In follow-on discussions with the three small business concerns, two of the firms expressed strong interest in submitting proposals as prime contractors. The PM assesses two of the interested small businesses as having capability to provide the required products and services for this requirement as prime contractors. Therefore the CO determined the acquisition is suited for a total small business set-aside as prescribed at FAR 19.502-2(a); that is, within the context of the national security constraints imposed on this acquisition.

(U) The CO finds a reasonable expectation exists for receiving proposals from two responsible small business concerns, and that award can be made at fair market prices. For this acquisition, the two small businesses that have emerged from the Requests for Information (RFI) and Industry Day processes appear to be uniquely qualified at this time in terms of security qualifications and possessing the capabilities required, or ability to obtain them, to facilitate the objectives contemplated in the Performance Work

Statement (PWS). The two small businesses are ExoAnalytics [sic] and Applied Defense Solutions (ADS).

(U) Both ExoAnalytics [sic] and ADS were determined by the PM to have responded affirmatively to the questions posed by the government in the RFI and Industry Day exchanges. Both firms have demonstrated extensive experience with space observation technologies. Both have ongoing contractual relationships with the government and have developed, or helped to develop, capabilities currently in use in both the Defense and Intelligence communities. Both firms are postured to team as needed with an extensive network of commercial and non-government sources to facilitate delivery of the required products/services. Both firms have requisite facility and personnel security clearance posture to begin delivery/performance immediately upon contract award. Given these factors, ExoAnalytics [sic] and ADS are reasonably assessed to have unique qualifications to provide/perform the SSA work contemplated in the PWS. Thus through [sic] these elements of market research, the CO and PM conclude that ExoAnalytics [sic] and ADS are presently the only two small businesses with demonstrated capabilities necessary to deliver the non-government, non-developmental SSA requirements for the JICSpOC, as put forth in the government's PWS.

The justification and authorization document explains that in addition to the RFI, the Air Force considered the responses by Exo at the industry day.[30]  Indeed, in the justification and authorization document, the Air Force stated:

For the industry day, the Program Manager (PM) determined disclosure of classified information to those invited was necessary to sufficiently explain the government's requirements and allow for a meaningful exchange of information. This led to the conclusion that eight responding firms possessed requisite security clearance requirements and demonstrated a rudimentary capability to potentially participate in the acquisition.

Moreover, the Market Research Report, in identifying Exo as capable, noted that not only did Exo participate in the industry day, but that "the Government held a teleconference with ExoAnalytic Solutions to ascertain their capability and willingness to serve as a prime contractor on this effort. During the teleconference, ExoAnalytic Solutions indicated they would be interested in acting as a prime contractor for this effort[.]" Notably, after the submissions to the third amended RFI were received and the industry day was held, the contracting officer issued a fourth RFI, on May 11, 2016.  As noted above, the fourth amended RFI included the draft Performance Work Statement, and a section titled "Scope," which stated that, "[t]his is a non-personal services contract to provide nongovernmental space situational awareness (SSA) software and services.

_____

[30] Notably, the contracting officer testified in her deposition that it was after the industry day event that she first thought about the possibility of a small business set-aside.

Nongovernmental SSA solutions are required to augment the Government's ability to detect and characterize space threats and improve integration between DoD, intelligence community, interagency, and nongovernmental space assets." This fourth amended RFI provided potential offerors, like Exo, a further opportunity to demonstrate to the Air Force the ability to potentially demonstrate future responsibility to meet the agency's requirements.

In addition to Exo being identified as capable, other potential offerors, with lower scores than Exo on the Salient Characteristics were determined to be capable, indicating that the Air Force had taken into account more than just the number of Salient Characteristics to conclude if a potential offeror could be capable. For example, the Harris Corporation was given a Salient Characteristics score of 5, but deemed capable, and Rincon Research Corp. was given a Salient Characteristics score of 4, but deemed capable. Another potential offeror was initially given a Salient Characteristics score of 7, but was upgraded to a score of 9 after the industry day, and was judged capable. The court does not believe that the failure to achieve a perfect score of Salient Characteristics, on the information the potential offerors submitted in response to the first amended RFI, precludes a finding that a potential offeror could be capable and it appears the Air Force did not limit the capability determination to simply the number of the Salient Characteristics a potential offeror received. The court agrees with the defendant and the intervenor that the Air Force could have had, and acted on, a reasonable expectation that Exo could survive a future responsibility determination.[31]

The court notes that although the defendant also argues that "[t]he reasonable expectation of the contracting officer that Exo could meet the technical requirements was subsequently confirmed when Exo did, in fact, submit a proposal meeting the technical requirements," the court can only look to the information that the contracting officer and the agency had at the time the Rule of Two determination was made, and not at the time the Source Selection Authority evaluated Exo's proposal, even if it was subsequently validated. See Mgmt. & Training Corp. v. United States, 118 Fed. Cl. at 169.

Regarding protestor's second argument, in which protestor cites to 48 C.F.R. § 9.104-3(d)(2), to argue that "the Air Force could not have rationally concluded that ADS could satisfy the requirements of the PWS without violating the limitation on

---

[31] The court notes that this conclusion is in line with the GAO decision, referenced above. See Analytical Graphics, Inc., B-413385, 2016 WL 6212299. Before the GAO, Analytical Graphics argued that Exo "could meet only 9 of the 10 minimum requirements," which "meant that the agency could not reasonably expect this firm to be a responsible offeror." Id. at *6. The GAO noted that "ExoAnalytic stated that it could perform the requirements, and there is no allegation of misrepresentation in this regard," and that "[n]either FAR § 19.502-2(b) nor the decisions by our Office require an agency to request, or a prospective small business offeror to provide, a complete technically-acceptable approach in response to market research." Id. The GAO determined that "[u]nder the applicable standards for making a set-aside determination, we find no basis to conclude that the agency's judgment here regarding ExoAnalytic was unreasonable." Id.

subcontracting clause." Protestor contends the limitation on subcontracting clause "makes clear that '[a] small business that is unable to comply with the limitations on subcontracting at 52.219-14 may be considered nonresponsible.'" (citing 48 C.F.R. § 9.104-3(d)(2)). The court notes that protestor's brief states that "it appears the CO simply relied on ADS's RFI response to a question about compliance with FAR 52.219-14 without ever following up on the issue independently. . . ." Applied Defense points to the Administrative Record, and explains that "ADS explicitly stated that it could meet the requirement, and there is nothing in the record indicating the contrary. In fact, the Air Force awarded a contract to ADS and there still is no evidence that it has not met the requirement."[32] (internal citation omitted). Intervenor also points to the Small Business Administration's (SBA) regulations which indicate that for "[d]etermining compliance with applicable limitation on subcontracting," "[c]ompliance will be considered an element of responsibility and not a component of size eligibility." 13 C.F.R. § 125.6(e)(2) (2017).[33] Moreover, the very FAR provision protestor cites also makes it clear that it relates to responsibility: "A small business that is unable to comply with the limitations on subcontracting at 52.219-14 may be considered nonresponsible." 48 C.F.R. § 9.104-3(d)(2). To the extent the subcontracting clause was an issue, it would not be one that the Air Force was required to address when making the Rule of Two determination. See Adams & Assocs. v. United States, 741 F.3d at 111 ("Adams conflates a set-aside determination with a responsibility determination. . . .").

Protestor also points to the second prong of the Rule of Two analysis, that the award will be made at fair market prices, to argue that the "Air Force's 'Rule of Two' determination was arbitrary and capricious." In response, intervenor argues that "AGI's

---

[32] Protestor cites a single case, Klinge Corp. v. United States, 82 Fed. Cl. 127, 135 (2008), for its proposition that "contracting officers cannot simply rely on an offeror's affirmative representations when their exists indicia to the contrary," but as defendant correctly notes, "AGI cites a case involving the validity of a formal trade certification submitted by the winning vendor in response to a solicitation (and relied upon by the contracting officer to determine that the offeror could perform) rather than a case concerning what evidence is sufficient to support a 'reasonable expectation' prior to a set-aside determination."

[33] In a footnote in its reply brief, protestor states:

AGI acknowledges that on May 31, 2016, SBA issued its final rule implementing the National Defense Authorization Act (NDAA) of 2013 which changed, among other things, the basis for limitations on subcontracting for supplies from the cost of the items to the amount paid to the prime contractor and to subcontractors that are similarly situated. See 81 Fed. Reg. 34243; 13 C.F.R. § 125.6(a)(2). However, at the time the set-aside decision was purportedly made, the SBA final rule had not been issued. Moreover, the current version of FAR 52.219-14 as well as the version of FAR 52.219-14 incorporated into the RFP and the final ADS contract have not been updated to reflect the changes in the SBA final rule.

challenge to the fair market price determination is baseless," and defendant argues that "[b]oth ADS and Exo had been successful in the SSA marketplace for years, indicating an ability to compete on price. Accordingly, it was reasonable for the Air Force to expect that the competition between ADS and Exo, two well-established business, would result in a fair market price."

Regarding cost, the justification and authorization document stated:

> (U) **Determination by the Contracting Officer that the anticipated cost to the Government will be fair and reasonable.**
>
> (U) The Contracting Officer (CO) anticipates that cost to the Government may be determined to be fair and reasonable on the basis of price and/or cost analysis and by using certified cost or pricing data to analyze elements of cost.  Given the government will solicit for the award of one or more contracts for the work, the CO further anticipates that proposed costs to the government will be driven by competitive forces.

(emphasis in original). In addition, the record reflects a Memorandum for Records, dated June 3, 2016, with the subject, "Pricing for Analytical Graphics and ExoAnalytical [sic] Solutions." The memorandum reflected that:

> The majority of respondents did not provide a price list for their products during market research. ExoAnalytical's [sic] price list was utilized to develop the Government's independent cost estimate and historical data from other contracts. Analytical Graphics' prices were high compared to the Government's IGE. Based on the contracting officer's understanding of the requirement, an estimate was developed. The estimate utilizing AGI's price list was twice the estimate of the Government's IGE.

Regarding price, protestor argues:

> Here, the contemporaneous record lacks any analysis of the small business offerors' potential pricing and, indeed, the RFI exercise revealed that one small business offeror – ExoAnalytic - was unable to provide any meaningful pricing information. Thus, regardless of whether the Air Force ultimately received proposals from two offerors capable of providing "fair market pricing" in response to the final Solicitation, at the time the set-aside determination was made, the Air Force could not have rationally held such an expectation.

(emphasis in original; internal citation omitted). Protestor also stated that "ExoAnalytic, provided pricing information, but only for observation and telescope data, not the complete SSA solution required by the Air Force."[34]

---

[34] Protestor concedes, however, in its reply brief,

Moreover, as the June 3, 2016 Memorandum for Records titled: "Pricing for Analytical Graphics and ExoAnalytical [sic] Solutions" demonstrates Exo prices were lower than protestor's prices, and Exo's prices were used by the Air Force to develop the government's own independent cost estimate for the procurement. In the justification and authorization document, the Air Force likewise indicated that the "CO further anticipates that proposed costs to the government will be driven by competitive forces." It was, therefore, reasonable for the contracting officer to believe that the small business set-aside would result in a fair market price.[35]

In its reply brief, protestor also claims that "there is nothing in the contemporaneous procurement record indicating the Air Force considered ADS's and ExoAnalytic's previous 'successes' in the SSA marketplace as evidence of the firms' ability to compete on price." The Market Research Report, however, has a section for both Exo's and Applied Defense's past performance, noting "ExoAnalytic Solutions has sold more than 50 million observations as well as commercial software to both industry and government customers," and "ADS has provided SSA systems, algorithms, and services to: 1) US Naval Space Operations Center at Point Mugu, California, 2) Defense Advanced Research Projects Agency (DARPA) Orbit Outlook Program, 3) National Reconnaissance Office (NRO) 4) US Air Force Research Laboratories (AFRL) 5) classified customers at various locations."

---

[i]n its MJAR [motion for judgment on the Administrative Record] and in earlier pleadings, AGI mistakenly stated that ExoAnalytic only provided pricing information for observation and telescope data. Upon further review, it appears ExoAnalytic also provided pricing information for software products and enterprise solutions. There is no indication, however, that the price information submitted by ExoAnalytic addressed the full range of the Air Force's SSA requirements and, indeed, because ExoAnalytic did not satisfy all of the salient characteristics, the pricing information at a minimum did not cover the costs associated with processing and correlating feature-type data and radar cross section changes.

(internal citations omitted).

[35] Defendant makes a different, but related point, nothing that:

Assuming that AGI's *commercial prices* were at or near fair market prices, and recognizing that the contracting officer determined that Exo's prices were *lower than AGI's prices*, then there is ample support in the administrative record for the contracting officer's reasonable expectation that a competition between Exo (with *Exo prices at or below the fair market value)* and ADS would result in an award at fair market value.

(emphasis in original; internal citations omitted).

As noted above, the Federal Circuit in <u>Adams</u> stated, "'a reasonable expectation' that at least two responsible small businesses will submit bids at fair market prices is all that is required." <u>Adams & Assocs. v. United States</u>, 741 F.3d at 111. The June 3, 2016 Memorandum for Records and the justification and authorization document provide sufficient evidence that the Air Force had a reasonable expectation that fair market prices could be met with Exo and Applied Defense. <u>See</u> <u>Res-Care Inc. v. United States</u>, 735 F.3d at 1390 (quoting <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d at 1368–69) ("A contracting officer's decision to set aside a contract for small businesses invokes 'highly deferential rational basis review.'"). Protestor has not met its high burden to show that there was not a reasonable expectation that fair market prices could be obtained. The contemporaneous record at the time the solicitation was restricted to Exo and Applied Defense, as evidenced, in part, by the justification and authorization document, demonstrates that the agency had the reasonable expectation that both small business offerors could survive a future responsibility determination and that the award would be made at fair market prices. Therefore, the Air Force's Rule of Two analysis was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. <u>See id.</u>

<u>10 U.S.C. § 2377</u>

Although the court has determined that the agency's small business set-aside determination was proper, and Analytical Graphics, as a non-small business, therefore, would not be qualified for award, because the court has determined that there is no clear order of precedence as to which of the two issues presented by this case should be addressed first, the small business set-aside determination or the commercial availability decision, the court also examines the implications of 10 U.S.C. § 2377 in the instant protest.

Protestor Analytical Graphics argues that the Air Force violated 10 U.S.C. § 2377 by "ignoring the statutorily mandated preference for commercial items," and further refused to "modify, or consider modifying its requirements in a manner that would allow the Air Force to take advantage of available commercial SSA solutions." Defendant responds that "AGI is mistaken. The contracting officer acted reasonably, and well within her discretion, when conducting market research," and argues that "[t]he contracting officer was plainly correct that the Government requirement, as a whole, could not be met by a product from the commercial marketplace."

As noted above, the "Preference for acquisition of commercial items" statute, 10 U.S.C. § 2377, states:

**(a) Preference.**--The head of an agency shall ensure that, to the maximum extent practicable--

**(1)** requirements of the agency with respect to a procurement of supplies or services are stated in terms of--

**(A)** functions to be performed;

**(B)** performance required; or

**(C)** essential physical characteristics;

**(2)** such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements; and

**(3)** offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements.

**(b) Implementation.**--The head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable--

**(1)** acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency;

**(2)** require prime contractors and subcontractors at all levels under the agency contracts to incorporate commercial items or nondevelopmental items other than commercial items as components of items supplied to the agency;

**(3)** modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items;

**(4)** state specifications in terms that enable and encourage bidders and offerors to supply commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items in response to the agency solicitations;

**(5)** revise the agency's procurement policies, practices, and procedures not required by law to reduce any impediments in those policies, practices, and procedures to the acquisition of commercial items; and

**(6)** require training of appropriate personnel in the acquisition of commercial items.

**(c) Preliminary market research.--(1)** The head of an agency shall conduct market research appropriate to the circumstances--

**(A)** before developing new specifications for a procurement by that agency;

**(B)** before soliciting bids or proposals for a contract in excess of the simplified acquisition threshold; and

**(C)** before awarding a task order or delivery order in excess of the simplified acquisition threshold.

**(2)** The head of an agency shall use the results of market research to determine whether there are commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that--

**(A)** meet the agency's requirements;

**(B)** could be modified to meet the agency's requirements; or

**(C)** could meet the agency's requirements if those requirements were modified to a reasonable extent.

**(3)** In conducting market research, the head of an agency should not require potential sources to submit more than the minimum information that is necessary to make the determinations required in paragraph (2).

**(4)** The head of an agency shall take appropriate steps to ensure that any prime contractor of a contract (or task order or delivery order) in an amount in excess of $5,000,000 for the procurement of items other than commercial items engages in such market research as may be necessary to carry out the requirements of subsection (b)(2) before making purchases for or on behalf of the Department of Defense.

10 U.S.C. § 2377 (emphasis in original). The regulation implementing 10 U.S.C. § 2377, 48 C.F.R. § 10.002, states:

(a) Acquisitions begin with a description of the Government's needs stated in terms sufficient to allow conduct of market research.

(b) Market research is then conducted to determine if commercial items or nondevelopmental items are available to meet the Government's needs or could be modified to meet the Government's needs.

(1) The extent of market research will vary, depending on such factors as urgency, estimated dollar value, complexity, and past experience. The contracting officer may use market research conducted within 18 months before the award of any task or delivery order if the information is still current, accurate, and relevant. Market research involves obtaining information specific to the item being acquired and should include—

(i) Whether the Government's needs can be met by—

(A) Items of a type customarily available in the commercial marketplace;

(B) Items of a type customarily available in the commercial marketplace with modifications; or

(C) Items used exclusively for governmental purposes;

(ii) Customary practices regarding customizing, modifying or tailoring of items to meet customer needs and associated costs;

(iii) Customary practices, including warranty, buyer financing, discounts, contract type considering the nature and risk associated with the requirement, etc., under which commercial sales of the products or services are made;

(iv) The requirements of any laws and regulations unique to the item being acquired;

(v) The availability of items that contain recovered materials and items that are energy efficient;

(vi) The distribution and support capabilities of potential suppliers, including alternative arrangements and cost estimates; and

(vii) Size and status of potential sources (see part 19).

(2) Techniques for conducting market research may include any or all of the following:

(i) Contacting knowledgeable individuals in Government and industry regarding market capabilities to meet requirements.

(ii) Reviewing the results of recent market research undertaken to meet similar or identical requirements.

(iii) Publishing formal requests for information in appropriate technical or scientific journals or business publications.

(iv) Querying the Governmentwide database of contracts and other procurement instruments intended for use by multiple agencies available at https://www.contractdirectory.gov/contractdirectory/ and other Government and commercial databases that provide information relevant to agency acquisitions.

(v) Participating in interactive, on-line communication among industry, acquisition personnel, and customers.

(vi) Obtaining source lists of similar items from other contracting activities or agencies, trade associations or other sources.

(vii) Reviewing catalogs and other generally available product literature published by manufacturers, distributors, and dealers or available on-line.

(viii) Conducting interchange meetings or holding presolicitation conferences to involve potential offerors early in the acquisition process.

(c) If market research indicates commercial or nondevelopmental items might not be available to satisfy agency needs, agencies shall reevaluate the need in accordance with 10.001(a)(3)(ii) and determine whether the need can be restated to permit commercial or nondevelopmental items to satisfy the agency's needs.

(d)(1) If market research establishes that the Government's need may be met by a type of item or service customarily available in the commercial marketplace that would meet the definition of a commercial item at subpart 2.1, the contracting officer shall solicit and award any resultant contract using the policies and procedures in part 12.

(2) If market research establishes that the Government's need cannot be met by a type of item or service customarily available in the marketplace, part 12 shall not be used. When publication of the notice at 5.201 is required, the contracting officer shall include a notice to prospective offerors that the Government does not intend to use part 12 for the acquisition.

(e) Agencies should document the results of market research in a manner appropriate to the size and complexity of the acquisition.

48 C.F.R. § 10.002.

The FAR also addresses multiple statutory provisions at 48 C.F.R. § 11.002:

(a) In fulfilling requirements of 10 U.S.C. 2305(a)(1), 10 U.S.C. 2377, 41 U.S.C. 3306(a), and 41 U.S.C. 3307, agencies shall—
(1) Specify needs using market research in a manner designed to—
(i) Promote full and open competition (see part 6), or maximum practicable competition when using simplified acquisition procedures, with due regard to the nature of the supplies or services to be acquired; and
(ii) Only include restrictive provisions or conditions to the extent necessary to satisfy the needs of the agency or as authorized by law.
(2) To the maximum extent practicable, ensure that acquisition officials—
(i) State requirements with respect to an acquisition of supplies or services

in terms of—
(A) Functions to be performed;
(B) Performance required; or
(C) Essential physical characteristics;
(ii) Define requirements in terms that enable and encourage offerors to supply commercial items, or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items, in response to the agency solicitations;
(iii) Provide offerors of commercial items and nondevelopmental items an opportunity to compete in any acquisition to fill such requirements;
(iv) Require prime contractors and subcontractors at all tiers under the agency contracts to incorporate commercial items or nondevelopmental items as components of items supplied to the agency; and
(v) Modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items.

48 C.F.R. §11.002(a). The FAR further provides a definition of a "commercial item:"

Commercial item means-

(1) Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and-

(i) Has been sold, leased, or licensed to the general public; or

(ii) Has been offered for sale, lease, or license to the general public;

(2) Any item that evolved from an item described in paragraph (1) of this definition through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in item to satisfy the delivery requirements under a Government solicitation;

(3) Any item that would satisfy a criterion expressed in paragraphs (1) or (2) of this definition, but for-

(i) Modifications of a type customarily available in the commercial marketplace; or

(ii) Minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements. Minor modifications means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item, or component, or change the purpose of a process.

48 C.F.R. § 2.101.[36]

As an initial matter, the court notes as mentioned above, the application of 10 U.S.C. § 2377 has not often been addressed in this court or in this circuit, in the context of a bid protest.[37]

In 10 U.S.C. § 2377(a), the statute instructs: "The head of an agency shall ensure that, to the maximum extent practicable . . . such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements," and "offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements." Id. In 10 U.S.C. § 2377(b), the statute requires that "[t]he head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable," "acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency," and "modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the

---

[36] The court notes that the United States Code, at 41 U.S.C. § 103, provides a substantially similar definition of commercial item. See 41 U.S.C. § 103 (2012).

[37] The statute, 10 U.S.C. § 2377, has been cited in three prior bid protest decisions before this court, and never before in a decision by the United States Court of Appeals for the Federal Circuit. See Alfa Laval Separation, Inc. v. United States, 40 Fed. Cl. 215 (1998), rev'd, 175 F.3d 1365 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); Hydro Eng'g, Inc. v. United States, 37 Fed. Cl. 448 (1997); Palantir USG, Inc. v. United States, 129 Fed. Cl. 218. In Alfa Laval, the United States Court of Federal Claims only cited 10 U.S.C. § 2377 in a footnote for defendant's statement that "one factor militating in favor of competitive bidding" was 10 U.S.C. § 2377. See Alfa Laval Separation, Inc. v. United States, 40 Fed. Cl. at 217 n.2. In Hydro Engineering, a decision by the undersigned, the protestor argued that the United States Army's Chemical and Biological Defense Command "violated the Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103–355, 108 Stat. 3243 (1994) (FASA), as codified at 10 U.S.C. § 2377, by giving Centech [the awardee] a technical advantage for its heating coil, which allegedly is a sole source part." Hydro Eng'g, Inc. v. United States, 37 Fed. Cl. at 473.  In Hydro Engineering, this court noted that "not only is 10 U.S.C. § 2377 introduced by the words 'to the maximum extent practicable,' but the solicitation also contemplated that the offerors could use sole source or proprietary parts" in the designs. Id. at 474. In Hydro Engineering, the undersigned did not discuss the degree of discretion afforded by the phrase "to the maximum extent practicable," or specifically analyze the phrase. Most recently, the undersigned addressed 10 U.S.C. § 2377 in Palantir USG, Inc. v. United States, and concluded that the United States Army had failed to conduct a proper commercial availability evaluation. See Palantir USG, Inc. v. United States, 129 Fed. Cl. at 289. As noted above, that decision is currently on appeal to the Federal Circuit. See Palantir USG, Inc. v. United States, Case No. 17-1465.

agency's needs are not available, nondevelopmental items other than commercial items." 10 U.S.C. § 2377(b).

As this court previously observed in <u>Palantir</u>, the phrases "to the maximum extent practicable" and "appropriate to the circumstances" in 10 U.S.C. § 2377 are not further defined in the statute or in the implementing regulations. <u>See</u> <u>Palantir USG, Inc. v. United States</u>, 129 Fed. Cl. at 267. Moreover, the same phrases "to the maximum extent practicable" and "appropriate to the circumstances" in the context of 10 U.S.C. § 2377, have not been judicially defined with any finality to date and are not easily subject to bright line tests. <u>See</u> <u>id.</u> Turning to dictionary definitions, "maximum" is defined as "as great, high or intense as possible as permitted" New Oxford American Dictionary 1082 (3d ed. 2010); "practicable" is defined as "able to be done or put into practice successfully," <u>id.</u> at 1372; and "appropriate" is defined as "suitable in the circumstance." <u>Id.</u> at 77.  These dictionary definitions provide little further clarification, the words chosen by Congress clearly indicate, however, that the agency must conduct a fact based analysis of commercial availability.

The court also notes that the word "maximum" was a specific choice made by Congress. In the House Report for the Federal Acquisition Streamlining Act of 1994, the House of Representatives proposed the following language regarding the acquisition of commercial items:

SEC. 111. PREFERENCE FOR ACQUISITION OF COMMERCIAL ITEMS

Section 16 of the Office of Federal Procurement Policy Act (41 U.S.C. 414) is amended by redesignating paragraphs (2), (3), and (4) in order as paragraphs (3), (4), and (5), respectively, and by inserting after paragraph (1) the following new paragraph:

(2) implement a preference for the acquisition of commercial items by–

(A) whenever practicable, stating specifications in solicitation for bids and proposals in terms such that bidders and offerors are enabled and encouraged to offer to supply commercial items in response to agency solicitations[.]

H. Rep. 103-545(I), at 41 (1994), 1994 WL 261997 (capitalization in original). By contrast, the Senate Report first proposed the following language:

PREFERENCE FOR ACQUISITION OF COMMERCIAL ITEMS AND NONDEVELOPMENTAL ITEMS

SEC. 33. (a) PREFERENCE.—The head of each executive agency shall ensure that, to the maximum extent practicable—

(1) requirements of the executive agency with respect to a procurement of supplies are stated in terms of—

(A) functions to be performed;

(B) performance required; or

(C) essential physical characteristics;

(2) such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, other nondevelopmental items may be procured to fulfill such requirements; and

(3) offerors of commercial items and other nondevelopmental items are provided an opportunity to compete in any procurement to fill such requirements.

(b) IMPLEMENTATION.—The head of each executive agency shall ensure that procurement officials in that executive agency, to the maximum extent practicable—

(1) acquire commercial items or other nondevelopmental items to meet the needs of the executive agency;

(2) require prime contractors and subcontractors at all levels under the executive agency contracts to incorporate commercial items or other nondevelopmental items as components of items supplied to the executive agency;

(3) modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, other nondevelopmental items[.]

S. Rep. 1587, at 282-83 (1994) (capitalization in original). The House Conference Report, from August 21, 1994, adopted the approach of the Senate Report, and consciously adopted the phrase "to the maximum extent practicable." The House Conference Report stated:

SEC. 8104. PREFERENCE FOR ACQUISITION OF COMMERCIAL ITEMS.

(a) In General.-Chapter 140 of title 10, United States Code, as amended by section 8103, is further amended by adding after section 2376 the following new section:

S 2377. Preference for acquisition of commercial items

(a) Preference.-The head of an agency shall ensure that, to the maximum extent practicable-

(1) requirements of the agency with respect to a procurement of supplies or services are stated in terms of-

(A) functions to be performed;

(B) performance required; or

(C) essential physical characteristics;

(2) such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements; and

(3) offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity to compete in any procurement to fill such requirements.

(b) Implementation.-The head of an agency shall ensure that procurement officials in that agency, to the maximum extent practicable-

(1) acquire commercial items or nondevelopmental items other than commercial items to meet the needs of the agency;

(2) require prime contractors and subcontractors at all levels under the agency contracts to incorporate commercial items or nondevelopmental items other than commercial items as components of items supplied to the agency;

(3) modify requirements in appropriate cases to ensure that the requirements can be met by commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items[.]

H.R. Conf. Rep. 103-712, at 154 (1994), reprinted in 1994 U.S.C.C.A.N. 2607 (capitalization in original).

The court notes that the language of the House Conference Report closely tracked the final language of the Federal Acquisition Streamlining Act of 1994, and tracks the language at 10 U.S.C. § 2377. The word "maximum" in the phrase "to the maximum extent practicable," therefore, should not be ignored and read out of the statute. Given the congressional choice of the word "maximum," even when coupled with words like

"practicable" and "appropriate," agencies cannot ignore or superficially comply with the requirement to review the availability of commercial products to meet agency needs as the statute instructs agencies to make serious and genuine efforts to review the availability of commercial products to meet all or some of their needs.  In Palantir, the undersigned specifically explained:

> Although the statute grants discretionary authority to the agency, and agency discretionary authority can be the most difficult kind of action to test in the courts, government contract law is replete with challenges to the exercises of agency discretion as alleged to be arbitrary and capricious; the current challenge to the implementation of 10 U.S.C. § 2377 is in the same category.

Palantir USG, Inc. v. United States, 129 Fed. Cl. at 269.

In this protest, Analytical Graphics states that "an agency's determination regarding the commerciality of an item or services is a matter of discretion," but points out, "such discretion is not unfettered," and argues that the "Air Force's decision to conduct the procurement on a non-commercial item basis violates FASA and its implementing regulations."  The protestor first points to the "Product or Service Descriptions" section of the Air Force's acquisition plan.  As noted above, the acquisition plan, stated:

> The majority of this acquisition is commodity based. Approximately 71% of the estimated contract value is commodity and 29% of the estimated contract value is embedded non-personal services. The PWS is written IAW FAR part 37.6 to minimize non-performance aspects. There are, however, several DOD and AF directives that preclude a completely performance-based contract. Inclusion of these directives has been limited to the extent practicable.

> The PWS in combination with the service summary (SS) will identify the minimum contractor performance requirements and associated performance thresholds. The SS Items are the key measures of success for contractor operations and are considered by the acquisition team from a risk management and contract quality assurance perspective.

> The sources sought announcement requested comments regarding the PWS and service summaries. Industry has not recommended any specific performance thresholds and highly recommends the Government utilize only measurable and attainable thresholds.

Protestor argues that "as a practical matter, all of the service requirements in the PWS involve manipulating, processing, analyzing, and interpreting commercial SSA date which originates from commercial data sources and, which the Air Force admits, can be processed using commercial SSA software." Protestor also contends that "[t]here is no

independent basis for the service requirements outside of the underlying data subscription service and software, which both require the involvement of analysts and/or engineers to interpret, analyze, and evaluate the data as it is being processed through the SSA software. The services are ancillary requirements." Analytical Graphics, therefore, alleges that it was arbitrary and capricious for the agency to have concluded that non-commercial items were ever needed.

The court notes that for the current protest the Air Force embarked on an extensive process to determine what the requirements of the contract at issue would be, first issuing the RFI on November 4, 2015, "to conduct market research, a continuous process for collecting and analyzing information about capabilities within the market to satisfy agency needs." The contracting officer subsequently issued a first amended RFI, followed by a second amended RFI, a third amended RFI, and a fourth amended RFI, which identified, among other items, the minimum salient characteristics required by the Air Force, and a fourth amended RFI. The fourth amended RFI, dated May 11, 2016, included the draft Performance Work Statement, and a section titled "Scope," which stated that, "[t]his is a non-personal services contract to provide nongovernmental space situational awareness (SSA) software and services. Nongovernmental SSA solutions are required to augment the Government's ability to detect and characterize space threats and improve integration between DoD, intelligence community, interagency, and nongovernmental space assets." The agency also held an industry day after receiving the responses to the first amended RFI, and invited eight potential offerors to the event, including Analytical Graphics, Applied Defense, and Exo.

In addition to the industry day, the RFI and the various revised RFIs, on June 21, 2016, the Air Force produced a Market Research Report which contained the evaluation of the each of the offerors that had responded to the first amended RFI. For the section titled: "Government's Presence/Leverage in the Market," the Market Research Report indicated:

> Although market research determined limited commercial data solutions are available; the required services to be performed, unique hardware requirements, the integration of product data into national security operations and the Government's desire to obtain complete technical rights of the data are not commonly or readily available in the commercial marketplace. Additionally, the commercial data solutions that are available focus on safety of flight and do not meet all the requirements for Space Situational Awareness as listed in the PWS.

The protestor states that "during the RFI stage, the Air Force determined that AGI's commercial SSA solution could satisfy its requirements, thereby demonstrating that the requirements themselves were commercial or, at a minimum 'of a type' commercial item requirements." The court notes that the parties have stipulated that at the time the initial RFI was issued, "the contracting officer anticipated that the application ultimately

procured for operations would probably be a commercial item."[38] Indeed, the Market Research Report had a section titled "Commercial Opportunities" which stated in full:

[38] The court notes that this fact demonstrates a very different approach by the Air Force in the instant protest compared with the Army's approach to market research in Palantir. In Palantir, the undersigned repeatedly observed that the Army's focus from the beginning of the procurement process was on a developmental contract, not commercial options. For example, in Palantir the undersigned explained how the market research was focused on developmental options:

> The initial Request for Information, issued August 13, 2014, was "conducted to assess the level of relevant competition and capabilities in the market place and elicit industry feedback to assist the Program Office in developing the Acquisition Plan." The August 13, 2014 Request for Information, however, "request[ed] respondents' corporate overview information and basic qualifications in managing software <u>development</u> projects that are <u>similar in scope and process to the DCGS-A program</u>." (emphasis added). Instead of asking about commercial items, or asking more open-ended questions about the approach to the procurement, potential respondents only were asked about developmental projects similar to the existing DCGS-A Increment 1 program.
>
> After the August 13, 2014 Request for Information, the Army issued a second Request for Information on December 5, 2014, which "[w]as issued to determine ability of individual companies to act as the prime contractor for the <u>DCGS-A development effort</u>." (emphasis added). "In addition, this RFI requests respondents' specific answers regarding the basic qualifications in managing software <u>development projects</u> that are similar in scope and process to the DCGS-A program." (emphasis added). As with the first Request for Information, the Army's focus in the December 5, 2014 Request for Information was on "the DCGS-A development effort" and not on the possibility of procuring commercial items. The goal of this second Request for Information was for the Army to understand the respondent's "<u>development</u> projects that are <u>similar in scope and process to the DCGS-A program</u>." (emphasis added). The May 6, 2015 Request for Information, the third issued by the Army,  stated, "this RFI requests respondents' specific answers regarding the basic qualifications in managing software development projects that are <u>similar in scope and process to the DCGS-A program</u>." (emphasis added). The May 6, 2015 Request for Information also asked respondents: "For this RFI, the Government seeks information regarding your corporate capabilities and experience related to the delivery of capabilities as described" earlier in the May 6, 2015 Request for Information. Like the previous two Requests for Information, the May 6, 2015 Request for Information did not seek information for commercial items from the respondents, suggesting to the court that the agency likely already had decided that the DCGS-A Increment 2 was going to be another developmental project.

The RFI originally sought to obtain SSA data from a commercial solution. However, it became apparent after market research that the data and services required could only be met through noncommercial sources because of the following factors: limited commercial data solutions are available, the required services to be performed are not found in the commercial marketplace, the Government requires unique hardware requirements and the Government's desire to obtain complete technical rights. Also, the commercial data solutions that are available focus on safety of flight and do not meet all of the requirements for SSA as listed in the PWS. Additionally, some vendor's responses stated their solution was a commercial product; however, most vendors were unable to provide a commercial price list or commercial customers for the software. Lastly, upon review of the PWS, the DoD and AF regulations governing the execution of the requirement, the Government's desire to obtain data rights, and the integration of the product data into national security operations makes this requirement noncommercial. It is hereby determined that the requirement is not offered to the general public in the commercial marketplace and is not a commercial service as described in FAR Part 12.

The protestor takes issue with the conclusions, described in the Market Research Report, arguing "whether there are 'limited' commercial solutions available or many does not change whether the requirement itself is commercial. Essentially, the Air Force is suggesting that, if there were more commercial solutions like AGI's available, it would concede that its requirement is commercial. This position is illogical and unsupportable." Moreover, protestor claims that all of the services that the agency cited as being non-commercial, protestor could offer on a commercial basis. Protestor tries to explain that:

The service portion of the PWS includes engineering services, operational and analytical services, and services related to software customization and integration, which clearly are commercial in nature, are services regularly performed as part of commercial item acquisitions, including under AGI's recently-completed commercial contract with AFSPC/50CONS for the JICSpOC as well as with AFSPC/SMC for JMS, a related SSA program, and are services that are available on AGI's GSA FSS contract.

Protestor also claims that "there are no unique hardware requirements in the RFP. Rather, all of hardware listed in the PWS is clearly commercial hardware." Protestor also

---

Palantir USG, Inc. v. United States, 129 Fed. Cl. at 270-71. The narrow focus on the developmental approach to the procurement in Palantir was one of the reasons this court found that the Army had not met the requirements of 10 U.S.C. § 2377. The market research in the above captioned protest, by contrast, was more thorough than in Palantir, and, as indicated above, the contracting officer was initially open to considering if the procurement needs could be met though commercial items.

dismisses the desire to obtain complete technical rights as "an improper factor to support a non-commerciality determination."

Initially, the court notes that some of protestor's arguments would appear to require this court to second guess the agency's process when determining how the agency could best meet its requirements, which the Federal Circuit has cautioned, "'is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess.'" Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1284 (quoting Wit Assocs., Inc. v. United States, 62 Fed. Cl. 657, 662 (2004)); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 908 (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996)); COMINT Sys. Corp. v. United States, 700 F.3d at 1384.; E.W. Bliss Co. v. United States, 77 F.3d at 449; CHE Consulting, Inc. v. United States, 74 Fed. Cl. 742, 747 (2006). As the Federal Circuit in Res-Care noted, a federal agency "has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" Res-Care, Inc. v. United States, 735 F.3d at 1390 (quoting Tyler Constr. Grp. v. United States, 570 F.3d at 1334). Indeed, the court does not wish to be in the position to tell how any agency how they must procure any item, commercial or otherwise. The court, therefore, does not determine if the entire procurement could be met by commercial or non-developmental items, although the acquisition plan initially indicated that it was contemplated that "[t]he majority of this acquisition is commodity based. Approximately 71% of the estimated contract value is commodity and 29% of the estimated contract value is embedded non-personal services."

As noted above, 10 U.S.C. § 2377(c) requires:

**(c) Preliminary market research.--(1)** The head of an agency shall conduct market research appropriate to the circumstances--

**(2)** The head of an agency shall use the results of market research to determine whether there are commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items available that--

**(A)** meet the agency's requirements;

**(B)** could be modified to meet the agency's requirements; or

**(C)** could meet the agency's requirements if those requirements were modified to a reasonable extent.

10 U.S.C. § 2377(c). Therefore, an agency must consider, one, if a commercial item is available to meet all of the agency's needs, two, if the commercial item could be modified to meet the agency's needs, or three, if the agency's needs could be modified to use a commercial item. Even holding aside the 29% of the requirements which the agency considered non-commercial services, protestor argues that "the Air Force had a legal obligation to consider modifying its requirements in a manner that would allow the Agency

to incorporate available commercial products, which the Air Force admits satisfy the lion's share of its requirement." Analytical Graphics zeroes in on the acquisition plan's statement that 71% of the estimated contract value was contemplated to be a commodity and argues that this demonstrates that the Air Force acknowledged that the procurement could be satisfied with commercial items. Defendant argues that this argument "should be summarily dismissed," and notes that the contracting officer indicated that the contractor had to understand the software given the urgency of the procurement.  The defendant argues that "[t]he contracting officer's answer was common sense, and obviously correct!  How could another company take COMSpOC [protestor's software] off the shelf and quickly and adroitly modify it for crucial military operations?" (footnote omitted). The court agrees, and, as noted above, does not wish to be in the business of telling an agency how to best meet its requirements. See Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1284. The court believes that the language of 10 U.S.C. § 2377 instructing the agency to consider modification of the agency's requirements or modifications of the commercial items themselves does not, in every case, force an agency to have to separate out all potentially commercial items from a procurement. This could lead to the impractical, inefficient, and unintegrated result of having only a fraction of a procurement utilizing a commercial item and the balance of a procurement taking the form of a developmental contract, which could delay procurements and also make the contract cumbersome to perform and administer, and further, could hinder the mission of the agency seeking to award the contract, especially for an urgent contract.

In the above captioned protest, during the deposition taken after the protest was filed in this court,[39] the contracting officer was asked to discuss the 71% figure, and had the following exchange with protestor's counsel:

Q: So do you agree with this 71 percent figure that's in here? Was that accurate at the time it was written?

A: To the best of my knowledge, it was accurate at the time it was written.

Q: And what is the 71 percent commodity, "commodity" being the word? What does commodity refer to?

A: I would have to refer to the IGE [Independent Government Estimate] to determine how we came up with those numbers originally. But my -- I would -- based on the fact it would be like the hardware, the software. There's data lines, I believe. I would have to refer to the independent government estimate to determine how we came up with that.

The contracting officer also indicated in her deposition that she believed the commodity portion of the contract could be satisfied by commercial items, however, the services

---

[39] The court notes that the deposition of the contracting officer has been made part of the Administrative Record in the above captioned protest.

portion could not be satisfied by commercial items. In addition, the contracting officer also had the following exchange with protestor's counsel at the deposition:

[Q.] Up until the time the RFP was issued, did you consider modifying the requirement to allow a commercial item to satisfy part of the overall requirement?

A. Through the market research, through the sources sought, through the draft PWS, through the industry day, all of that went into consideration on how commercial items could be utilized, but in the end it came down to the final PWS and the government's requirements and the four items that I've outlined that came down to my decision, that the government's requirements were not commercial products or were not customarily in the commercial market.

Q. But could part of the government's requirement have been satisfied by a commercial item?

A. As I stated previously, there were two companies that offered software, and that software was a commercial item.

Q. So yes; is that correct? You're saying yes?

A. Yeah, part, but no, the entire requirement could not be met with commercial items. Only part of it could be.

Q. Did you consider separating the two, the part that can be satisfied by a commercial item and the part that cannot?

A. We needed -- because of the urgency of the requirement, we needed the contractor to be able to hit the ground running at the time and I needed the contractor to know the software and to be able to operate the software. That was important. So there was no -- that wasn't an option that was available to the government based on the fact that we wanted the contractor to be in place and hit the ground running from day one and they needed to know how to operate the software.

Protestor challenges the urgency argument, by stating, "the CO's argument against splitting the requirements vastly overstates the urgency of the Air Force requirement." The defendant responds that "AGI cites no evidence in the administrative record" in this protest. Protestor only cites to an online source for its claim that "at least one Air Force stakeholder has made public statements that the JICSpOC SSA program will not achieve full operational capability until 2018," which, the court notes, at this point is not that far in the future. Defendant argues that "[a]bsent a violation of statute or regulation, the agency possesses discretion to make procurement decisions unless evidence in the administrative record demonstrates that a decision is arbitrary." Protestor also states that "nothing in the contemporaneous procurement record indicates that the

CO ever considered modifying the Air Force's requirements to accommodate commercial items." Protestor refers the court to the Memorandum for Record for "Noncommerciality for Services and Government Purpose Rights," the justification and authorization document, the Market Research Report and the acquisition plan. Those documents, described in detail above, do not specify the urgency of the procurement,[40] however, in the contracting officer's deposition, referred to above, the contracting officer testified, regarding splitting the procurement in multiple parts, that "no -- that wasn't an option that was available to the government based on the fact that we wanted the contractor to be in place and hit the ground running from day one." To be sure, this is a broad statement, provided after the award, but reflective of the contemporaneous thinking of the contracting officer, made under oath, as is her statement that an offeror "needed to know how to operate the software." In her deposition, the contracting officer indicated that some elements could be met with commercial items, but in concluding the entire requirement was noncommercial, she did not specifically elaborate why the procurement as a whole was so intertwined that it would not be possible to break out some items for commercial award. The contracting officer also indicated in her deposition:

> I determined it to be a noncommercial requirement although some of it could be met with commercial items, I did not feel that the entire solution could be network commercial items, due to several factors, which included services, the data -- services, data rights, the DOD publications and regulations and the type of contract that I was planning to utilize. The combination of those led me to believe it was noncommercial.

As noted above, the court believes there are decisions to be made within the agency's discretion and that forcing the agency to spilt a potential contract into noncommercial requirements and commercial item requirements, especially when the agency has identified an urgent need, would be too broad of a second guess of the needs of the

---

[40] As the court noted in <u>Palantir</u>, there is not an identifiable requirement in the commercial determination statute or regulations that requires the agency to document its decision regarding commercial availability. <u>See</u> <u>Palantir USG, Inc. v. United States</u>, 129 Fed. Cl. at 272. Nor is there any published requirement as to what would constituted sufficient documentation. The undersigned in <u>Palantir</u> specifically declined to make a court based rule defining the amount of documentation that would be sufficient. The agency, however, must still be able to justify its decision. As noted above, in determining what the requirements would be the contracting officer properly conducted market research and identified the portions of the requirements that could not be met by commercial items. The extensive process by the agency of considering commercial and non-commercial possibilities demonstrated the seriousness with which the agency undertook how to ultimately undertake the procurement. The court believes, however, it behooves any agency making a commercial availability determination to document its decision making process contemporaneously, if only to demonstrate to the GAO or this court the steps the agency took. In the above captioned protest, documentation regarding the urgency of procurement would have been helpful, and would not have required the Air Force to rely on the deposition of the contracting officer taken after the protest was filed in this court, although the deposition was requested by protestor.

agency. Moreover, forcing the Air Force to procure some of the items as a commercial items would potentially put the awardee of the developmental contract and the agency in an unfavorable and detrimental position. As noted above, defendant questioned how another offeror could take protestor's software and "quickly and adroitly modify it for crucial military operations?"

Anticipating defendant's and intervenor's position, protestor argues that, "the CO's position that the requirements could not be split is illogical. As argued, all required services are commercial. The commercial item requirements for data, software, and hardware could easily be provided by a single commercial item contractor with a non-commercial item contractor providing any ancillary non-commercial services." Analytical Graphics tries to explain that:

> As AGI's work on the AGI Contract demonstrates, such services, delivered in conjunction with commercial SSA processing software and a commercial SSA data subscription, are clearly sufficient to provide the Air Force with a working SSA system, capable of satisfying all of the requirements of the PWS. To the extent the Air Force believes additional non-commercial item services are necessary to satisfy its requirements—a position AGI rejects— nothing would prohibit the Air Force for [sic] procuring such services under a separate contract.

The existence of the JICSpOC contract, however, does not alone prove that the contracting officer must have procured the requirements on a commercial basis, although there was overlap with the JICSpOC contract and the requirements of the Performance Work Statement in the instant procurement. Both the current contract and the JICSpOC contract sought commercial data subscription, SSA processing software, and technical support. Moreover, the parties also have stipulated that the list of capabilities in the RFI was similar to the "Application Technical Specifications" in the JICSpOC contract. But the two were not identical, and the Air Force began the process for procurement at issue only one month after the JICSpOC contract was awarded. Defendant argues in response to protestor that "AGI tries to expand the contracting officer's finding that AGI's subscription service was a commercial item *to an additional finding* that whatever services AGI may have subsequently provided were part of that commercial item." (emphasis in original). Defendant argues that this is unreasonable, and claims that "the purpose of the experiments conducted during the AGI contract was to determine what services *beyond the capabilities* of the AGI commercial product would be needed to meet the Government requirement; such additional services were among those services identified in the PWS for this procurement." (emphasis in original). In its statement of needs, the first amended RFI indicated: "The US Air Force needs commercial SSA data for operational use. SSA data must originate from non-DoD sensors and be real-time. See attached for minimum salient characteristics." In addition, the "Salient Characteristics," discussed at length above, began by noting: "The collection of non-governmental SSA data, processing tools, personnel, and contracted support will be referred to as the Commercial SSA System."

The "maximum extent practicable" language, as well as the requirement to conduct market research to "determine if commercial items or nondevelopmental items are available to meet the Government's needs or could be modified to meet the Government's needs," 48 C.F.R. § 10.002, means the government had an obligation, once it determined what the requirements were to see if commercial items existed or if it could be modified to meet all or part of the procurement requirements. See 10 U.S.C. § 2377(c). The Air Force was aware of Analytical Graphics' capabilities, both from the performance of the JICSpOC contract, and in protestor's submissions in response to the RFIs, and, as noted repeatedly above, had a statutory requirement determine if the capabilities could be modified in a way to meet some or all of the agency's needs. The record reflects, however, that the contracting officer gave serious consideration to the Analytical Graphics approach, but determined that the requirement could best be meet by a noncommercial requirement, although some commercial items could theoretically be included. The contracting officer indicated, however, "I did not feel that the entire solution could be network commercial items, due to several factors." In the absence of a protestor demonstrating from the record before the court that the agency acted arbitrarily or violated a statute or regulation, which, in the court's view, Analytical Graphics has not done, the court gives deference to the contracting officer's decision about the best approach for the agency, to acquire the urgently needed contract.

Each commercial availability decision must be based on the specific facts of the particular case. The Palantir protest presented a much clearer picture of an agency trying to avoid a particular contractor and a commercial items approach to the procurement, as well as a failure on the part of the agency to do a proper investigation and review of available commercial alternatives. In the protest currently before the court, the Air Force was more deliberate and more candid about its commercial options than the Army in Palantir. The Air Force's consideration of how to proceed with the procurement, therefore, cannot be said to have been casual, unthinking, or not deliberate, despite the absence of articulated, contemporaneous documentation of the urgency of the procurement. In this case, the contracting officer selected the intervenor in order to allow one contractor to move expeditiously due to the urgent nature of the requirement by providing the capability, rather than separating the procurement. As explained above, the agency decision is entitled to some deference to determine its own needs and to best judge the urgency of those needs. The court relies on the sworn testimony of the contracting officer that the need was urgent and could not be spilt. Moreover, other than to question the agency actions in this protest, the protestor has not demonstrated that the Air Force lacked urgency, or that the contracting officer's basis for her decision was incorrect.

Protestor also argues that the Air Force improperly considered the issue of data rights before making the commerciality decision and, in any event, the Air Force did not consider Analytical Graphics willingness to negotiate data rights. Specifically, Analytical Graphics argues that the decision to pursue the procurement on a non-commercial basis was motived in part "by the desire to obtain broader intellectual property rights in the resulting data." Analytical Graphics contends, "this approach to determining commerciality allows the tail to wag the dog. The requirement is either commercial in nature or it is not." Protestor, therefore, argues that "[t]he data rights associated with the Air Force's substantive SSA requirement are incidental to that substantive requirement

and the determination regarding whether such is commercial in nature." Defendant responds that "AGI's arguments that the contracting officer could have negotiated unlimited data rights are irrelevant. No one has ever disputed that AGI has the capability to meet the Government requirement; the market research report identified AGI as one of eight capable vendors." Instead, defendant argues, "[t]he point is simply that what was required (unlimited data rights) was not a feature available in the commercial marketplace. And on this issue, the contracting officer was clearly correct."

As noted above, on June 1, 2016, the contracting officer wrote a Memorandum for Record with the subject: "Noncommerciality for Services and Government Purpose Rights." The memorandum stated, in part:

> The Government's requirement is for the contractor to provide government purpose rights for the raw data identified in the performance work statement to specified locations at Schriever AFB, Peterson AFB, Vandenberg AFB, and other locations directed by the Government. Product data shall be available with government purpose rights and shall be distributed to operations centers at: Offutt AFB, Vandenberg AFB, Chantilly, five specified intelligence locations; and other locations as deemed necessary by the Government. Such data may be shared for government use only, with other contractors.

> The Government's rights typically would be limited to standard commercial uses as a "commercial item." AGI's license agreements included the following statement: You may NOT allow the processed data to be viewed outside the organization or program for which the software is licensed without the prior written consent of the vendor. The Government must have government purpose rights to allow the Government to make strategic, tactical, and course-of-action decisions real-time. The Government will not be able to obtain written permission prior to providing raw data, processed data, or end products to another government agency or a contractor supporting a government requirement. The contracting officer assessed the data rights required were substantially different than standard commercial use.

(capitalization in original). Likewise, the Market Research Report indicated:

> Although market research determined limited commercial data solutions are available; the required services to be performed, unique hardware requirements, the integration of product data into national security operations and the Government's desire to obtain complete technical rights of the data are not commonly or readily available in the commercial marketplace. Additionally, the commercial data solutions that are available focus on safety of flight and do not meet all the requirements for Space Situational Awareness as listed in the PWS.

The acquisition plan similarly indicated that:

> After market research the CO determined that the requirement could only be met through noncommercial sources because of the following factors: limited commercial data solutions are available; the required services to be performed are not found in the commercial marketplace, the government requires unique hardware requirements and the Government's desire to obtain complete technical rights.

Consistent with the statements in the Market Research Report and the acquisition plan, and as described above, the contracting officer, in a deposition taken after the protest was filed in this court, testified:

> I did not feel that the entire solution could be network commercial items, due to several factors, which included services, the data -- services, data rights, the DOD publications and regulations and the type of contract that I was planning to utilize. The combination of those led me to believe it was noncommercial.

The Administrative Record reflects Analytical Graphics willingness to negotiate the terms of the data rights and protestor points to the government's industry day summaries, which indicated that, regarding Analytical Graphics' presentation: "AGI stated they have no problem with giving the USG full data rights and 'it makes sense.' AGI stated they envisioned the USG paying an annual subscription, that could be fixed price, and that labor could be available per FAR Part 12. Furthermore, in its response to the question: "If the Government has a need for rights not conveyed under the license customarily provided to the public, would you be willing to negotiate acceptable terms for transferring such rights?" in the RFI, protestor responded that, "[y]es AGI is willing to negotiate mutually acceptable terms for transferring rights not conveyed under the license customarily provided to the public." The court notes, however, despite Analytical Graphics' willingness to negotiate the terms of the data rights, protestor's commercial item, the subscription service, at the time of the market research did not include the data rights the government sought, and, therefore, was not a commercial items that typically available in the marketplace. Given the urgency of the procurement, the contracting officer's hesitancy to consider a commercial item for something not then commercially available, and which would be subject to possible failed negotiations to meet the procurement's stated needs is understandable. Furthermore, the government, in its reply brief stresses that

> in this case, the services required are in support of a highly classified and technical military operation. There is no commercial marketplace for such services, and no commercial item services (falling within subsections (5) or (6) of the commercial item definition) available to meet those service requirements because national defense operations are reserved to the Department of Defense and intelligence agencies.

Given the through and complete market research that the Air Force undertook prior to issuing the solicitation, the court defers to the government's view that there was no commercially available product with the requisite data rights the Air Force needed for their urgent requirement.

In addition, protestor notes that Defense Federal Acquisition Regulation Supplement (DFARS) to the FAR requires if greater rights are needed that "the Government must negotiate with the contractor to determine if there are acceptable terms for transferring such rights." DFARS 227.7202-(3)(b) (2017).[41] Analytical Graphics argues that the above demonstrates that protestor was willing to enter into negotiations, and moreover, points to its experience with Agency during the award of the JICSpOC contract. Protestor argues "[n]otably, the Air Force required greater rights in data than what was available through AGI's standard commercial license agreements at the time that the AGI contract was formed. Accordingly, during contract negotiations, the CO negotiated a data rights addendum with AGI, which was made part of the resulting contract." (internal reference omitted). Indeed, the parties in this protest have stipulated that "[d]uring

---

[41] Protestor additionally argues that the Air Force first should have considered acquiring the license as commercially offered by Analytical Graphics, pointing to DFARS 227.7202-1, which states:

> (a) Commercial computer software or commercial computer software documentation shall be acquired under the licenses customarily provided to the public unless such licenses are inconsistent with Federal procurement law or do not otherwise satisfy user needs.
> (b) Commercial computer software and commercial computer software documentation shall be obtained competitively, to the maximum extent practicable, using firm-fixed-price contracts or firm-fixed-price orders under available pricing schedules.
> (c) Offerors and contractors shall not be required to—
> (1) Furnish technical information related to commercial computer software or commercial computer software documentation that is not customarily provided to the public except for information documenting the specific modifications made at Government expense to such software or documentation to meet the requirements of a Government solicitation; or
> (2) Relinquish to, or otherwise provide, the Government rights to use, modify, reproduce, release, perform, display, or disclose commercial computer software or commercial computer software documentation except for a transfer of rights mutually agreed upon.

48 C.F.R. 227.7202–1 (2017). The court notes that DFARS 227.7202-1(b) has similar language to the commercial availability statute of 10 U.S.C. § 2377, by instructing commercial software "shall be obtained competitively, to the maximum extent practicable . . . ." DFARS 227.7202-1(b).

contract negotiations, the Contracting Officer negotiated a data rights addendum with AGI which was made part of the [JICSpOC] contract."

The data rights issue was a factor in the contracting officer's decision not to award to protestor.  Whether or not sufficient data rights in the current procurement and the government's needs could have been negotiated prior to award remains unknown, the urgency of the procurement, however, appears to have made this one of the multiple considered reasons not to award the contract as a commercial item.[42] The DFARS language instructing the government to negotiate, moreover, does not demonstrate that protestor was offering a commercial item.  As determined above, the Air Force concluded that protestor's subscription service, at the time of the market research, did not include the data rights the government sought, and, therefore, was not a commercial items that typically available in the marketplace.

## CONCLUSION

Accordingly, the agency's decision to consider Applied Defense and Exo as reasonably likely to meet the requirements of the procurement was rational, and, therefore, the small business set-aside determination was proper. Regarding the issue of 10 U.S.C. § 2377, the court finds that the government's market research was sufficient and the court will not second guess the agency's determination that the requirements of the procurement could not be met by commercial items. Therefore, protestor's motion for judgment on the administrative record is **DENIED**. Defendant and intervenor's cross-motions for judgment on the administrative record are **GRANTED**. Protestor's request for injunctive relief is **DENIED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

---

[42] The court notes that protestor raised an additional objection to the Air Force's Rule of Two determination, that because the "Air Force's SSA requirement is commercial," the Air Force needed a rational basis to conclude that at least two small businesses capable of providing a <u>commercial</u> SSA solution would submit proposals with fair market prices." (emphasis in original). Protestor, reiterating its arguments above, then claims that "under applicable law, the Air Force was required to determine the commerciality of its requirements before assessing whether the procurement should be set-aside for small businesses. Because the Air Force's SSA requirements are commercial, and because the Air Force did not identify any small businesses capable of providing a commercial SSA solution as a prime contractor, the set-aside determination is arbitrary and capricious." As the court has found that the Air Force was not required to make the commerciality determination first, and has, moreover, found that the non-commercial decision was rational, the protestor's argument is without merit.